**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          )

for the use and benefit of        )

D.L.I., INCORPORATED              )

       Plaintiff,              )

        v.                   )    Case No.

ALLEGHENY JEFFERSON              )    1:06CV00875

MILLWORK, LLC., et al.,          )

       Defendants.             )

Rockville, Maryland

Tuesday, July 10, 2007

The deposition of

    MICHAEL CORRIGAN,

called for oral examination by Counsel for the

plaintiff, pursuant to notice, held in the law

offices of Shawn C. Whittaker, Esquire, 1010

Rockville Pike, Suite 607, Rockville, MD 20878,

beginning at 10:30 a.m., before Carol J.

Robinson, Registered Professional Reporter and a

Notary Public, when were present:

**EXHIBIT 1**

Page 2

1       A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFFS:

4       LAW OFFICES OF SHAWN C. WHITTAKER

5       BY:  SHAWN C. WHITTAKER, ESQ.

6       1010 Rockville Pike, Suite 607

7       Rockville, MD 20878

8       (240) 477-1677

9

10   ON BEHALF OF THE DEFENDANT:

11      GAVETT AND DATT, P.C.

12      BY:  GEOFFREY S. GAVETT

13      15850 Crabbs Branch Way, Suite 180

14      Rockville, MD 20855

15      (301)948-1177

16

17   Also Present:  Dale Lacy

18

19

20

21

22

Page 3

1       C O N T E N T S

2    EXAMINATION OF MICHAEL CORRIGAN      PAGE

3    By Mr. Whittaker:              4

4       E X H I B I T S

5       (retained by counsel)

6    No.   Description

7    1    Three-ring binder containing     25

8         25 tabbed documents

9    2    Three-ring binder containing     45

10        tabbed documents

11       (attached)

12   3    Defendant Allegheny Jefferson    79

13       Millwork, LLC's Supplemental Answers

14

15

16

17

18

19

20

21

22

Page 4

1       P R O C E E D I N G S

2    Whereupon,

3       MICHAEL JOSEPH PATRICK CORRIGAN,

4    called as a witness, having been first duly sworn

5    to tell the truth, the whole truth, and nothing

6    but the truth, was examined and testified as

7    follows:

8       EXAMINATION BY COUNSEL FOR PLAINTIFF

9          BY MR. WHITTAKER:

10      Q    Good morning, Mr. Corrigan.  My name

11   is Shawn Whittaker.  As you know, I'm the

12   attorney who represents D.L.I. in this matter,

13   the United States versus Allegheny Jefferson,

14   which is regarding the Federal Courthouse in the

15   District of Columbia.

16          Could you please state your name,

17   your full legal name for the record?

18      A    Michael Joseph Patrick Corrigan.

19      Q    What is your home address, please?

20      A    38842 Ridge Court, Hamilton, Virginia

21   20158.

22      Q    What is your office address?

Page 5

1       A    44098 Mercure Circle, Suite 115,

2    Sterling, Virginia 20166.

3       Q    With whom are you employed?

4       A    Jefferson Millwork.

5       Q    What is your position with them?

6       A    General manager.

7       Q    Who are the principals of Jefferson

8    Millwork?

9       A    Myself, Mark Howe, Jorge Kfoury and

10   Jeff Fontello.

11          MR. GAVETT:  For the record, it is my

12   understanding this deposition is of the corporate

13   representative of Allegheny Jefferson Millwork.

14   That is what was noted for 10:00 a.m. this

15   morning.

16          MR. WHITTAKER:  You said we could

17   combine those and you have no objection.

18          MR. GAVETT:  That's fine.  The only

19   thing I'll note, I don't believe Mr. Corrigan was

20   served with his $45 witness fee for his

21   individual deposition but we'll waive that being

22   served in advance of the deposition but at some

## Capital Reporting Company

Page 6

1　point, he is owed his $45, Rule 45 under the
2　Federal Rules of Civil Procedure.
3　　　　BY MR. WHITTAKER:
4　　　Q　　Okay.  Have you reviewed the Notice
5　of Deposition in this case?
6　　　A　　Yes.
7　　　Q　　And you are prepared to testify as to
8　all those matters?
9　　　A　　Yes.
10　　　Q　　Is there any reason you can't give
11　truthful testimony today?
12　　　A　　No reason.
13　　　Q　　Are you under any -- the influence of
14　any drugs or alcohol today?
15　　　A　　No.
16　　　Q　　Can you please -- where is Allegheny
17　Jefferson Millwork incorporated?
18　　　A　　Pennsylvania.
19　　　Q　　Is it registered as a foreign
20　corporation in any other jurisdiction?
21　　　A　　I don't know.
22　　　Q　　What is the makeup of Allegheny

Page 7

1　Jefferson?  Who are the members?
2　　　A　　50 percent Jefferson Millwork,
3　50 percent, Allegheny Millwork.
4　　　Q　　What is Allegheny Millwork?
5　　　A　　They're a millwork shop in
6　Pennsylvania.
7　　　Q　　Is it an LLC, a corporation?
8　　　A　　Allegheny Millwork is a PBT.  I
9　think's it a PBT is what they call it.
10　　　　MR. GAVETT:  Pennsylvania beneficial
11　trust?  Business trust?
12　　　　THE WITNESS:  Something like that,
13　right, PBT.
14　　　　BY MR. WHITTAKER:
15　　　Q　　Who are the principals of Allegheny
16　Jefferson Millwork?
17　　　A　　I am some not certain but Rich Certi
18　is one of them.
19　　　Q　　What is your relationship to
20　Allegheny Jefferson Millwork?
21　　　A　　I am the manager of the LLC, a
22　manager of the LLC.

Page 8

1　　　Q　　Are you a member of the LLC?
2　　　A　　Not personally, no.  Jefferson
3　Millwork is.
4　　　Q　　And you are a member of Jefferson
5　Millwork?
6　　　A　　Correct, or a partner, a shareholder.
7　S Corp.
8　　　Q　　Jefferson Millwork is an S Corp?
9　　　A　　Correct.
10　　　Q　　Your contract with Centex, what was
11　the total amount of that contract?
12　　　A　　I believe the original contract was
13　5.9 million.
14　　　Q　　And what was the scope of work of
15　that contract?
16　　　A　　Generally, staircase, bridges, the
17　work in the judge's chambers area on the fifth
18　and sixth floors, door frames, wood base,
19　servery, items that were not covered by the time
20　and materials directive.
21　　　Q　　Describe the time and materials
22　directive.

Page 9

1　　　A　　The time and materials was a separate
2　contract with Centex and it was for the
3　installation and continued fabrication of items
4　needed in the courtrooms, for items needed in the
5　judge's chambers on two, three, and four, I
6　believe, and the installation of what was already
7　onsite fabricated by Doug Miller Millwork who had
8　gone out of business.
9　　　Q　　What was the total amount billed on
10　that time and materials contract?  If you have
11　documents you need to look at --
12　　　A　　I don't have our billing records for
13　the Joint Venture's billings to Centex for the T
14　and M.  I have D.L.I.'s, a portion of it.
15　　　Q　　That was one of the items you were
16　requested to testify about today.
17　　　A　　We have those in the papers we turned
18　over to you.  All the T and M billings were
19　turned over.  So, anything and everything that is
20　a paper item on the shelves is in your hands.
21　So, if we pull those records --
22　　　　MR. WHITTAKER:  Mr. Gavett, do you

| Page 10 |
|---|
| 1    have those documents or something you can refer |
| 2    to to give us the answer to that? |
| 3         MR. GAVETT: Well, what we did, we |
| 4    turned over the complete files of the defendant |
| 5    to the plaintiff for inspection. Over 6,000 |
| 6    pages were copied. |
| 7         Mr. Corrigan is here and able to |
| 8    testify to any document you care to show him, but |
| 9    I think that the scope of the designation was |
| 10   sufficiently broad that we did not expect to have |
| 11   to come here and pull documents out for you. |
| 12   Those documents were delivered over two months |
| 13   ago. |
| 14        MR. WHITTAKER: Document production |
| 15   isn't in lieu of a deposition and is one of the |
| 16   items specifically listed there. |
| 17        MR. GAVETT: If you want to show him |
| 18   a document and ask him about the document, fine. |
| 19   If you want to him to testify about it to the |
| 20   best of his recollection, that's fine. But if it |
| 21   is your contention that it was his obligation to |
| 22   bring the documents with him here today, having |

| Page 11 |
|---|
| 1    already produced over 6,000 pages designated by |
| 2    you for copying, and have him fish for those |
| 3    documents in this deposition, that -- |
| 4         MR. WHITTAKER: Is it your position |
| 5    that the document production is in lieu of |
| 6    deposition testimony? |
| 7         MR. GAVETT: No. |
| 8         MR. WHITTAKER: If so, we'll just |
| 9    cancel this, I'll review the documents, and we'll |
| 10   file a motion with the Court. |
| 11        MR. GAVETT: No. I'm saying the |
| 12   documents have been produced. |
| 13        MR. WHITTAKER: Right and you are |
| 14   saying he doesn't need to know the information |
| 15   contained in those documents when he's asked to? |
| 16        MR. GAVETT: He's here to testify to |
| 17   any information that you care to -- if you want |
| 18   to ask him about a document, ask him about a |
| 19   document. If you want to ask him to testify to |
| 20   the best of his recollection what Centex paid AJM |
| 21   for the work, he can testify to the best of his |
| 22   recollection. |

| Page 12 |
|---|
| 1         However, if you wanted him to come |
| 2    here today prepared to say these are the exact |
| 3    dollars that were paid under the time and |
| 4    materials portion of the contract, then I think |
| 5    your Notice has to say that explicitly, that he |
| 6    needs to be prepared to testify to that |
| 7    particular number. I think at the end of the |
| 8    day, if you want to have that information |
| 9    conveyed to you informally -- |
| 10        MR. WHITTAKER: I'll ask the Court to |
| 11   address this issue then. |
| 12        BY MR. WHITTAKER: |
| 13   Q    To the best of your recollection, |
| 14   what was the total amount billed for time and |
| 15   materials? |
| 16   A    I think 2.1. |
| 17        MR. GAVETT: Million. |
| 18        THE WITNESS: Million. Sorry. |
| 19        MR. GAVETT: Just so the record is |
| 20   clear, we think that information has already been |
| 21   given to you. The documents are here in your |
| 22   office. |

| Page 13 |
|---|
| 1         THE WITNESS: We know it has. |
| 2         MR. GAVETT: And they have been in |
| 3    your office for two months now. |
| 4         MR. WHITTAKER: After three motions |
| 5    to compel. |
| 6         MR. GAVETT: Well, you've got them. |
| 7         MR. WHITTAKER: Right. For the |
| 8    record, you're saying your client doesn't need to |
| 9    testify because you produced documents? |
| 10        MR. GAVETT: No. He's here to |
| 11   testify. He testified to the best of his |
| 12   recollection. |
| 13        MR. WHITTAKER: Let's move on. |
| 14        BY MR. WHITTAKER: |
| 15   Q    What was the total amount paid by |
| 16   Centex to Allegheny Jefferson for the project? |
| 17   A    To date, it is 6,380,000. That |
| 18   includes the Department of Labor check that was |
| 19   issued in escrow. |
| 20   Q    Were there any changes to that |
| 21   $5.9 million contract? |
| 22   A    Yes. |

# Capital Reporting Company

| Page 14 | Page 16 |
|---|---|
| 1  Q   What were those, approximately, to | 1  $8.4 million? |
| 2  the best of your recollection? | 2  A   Approximately 8.4 million. |
| 3  A   The total was about 600-some | 3  Q   Did Allegheny Jefferson perform any |
| 4  thousand. | 4  labor on the project? |
| 5  Q   So, that would bring it to | 5  A   No, we did not. |
| 6  approximately 6.5 million? | 6  Q   All you did was to fabricate the |
| 7  A   6.5, yes, approximately. | 7  millwork? |
| 8  Q   So, the total amount billed between | 8  A   LLC wrote subcontracts to individual |
| 9  the time and materials and between the contract | 9  subcontractors with LLC. |
| 10  with changes is approximately 8 and a half | 10  Q   Can you explain? |
| 11  million? | 11  A   For example, they wrote a contract to |
| 12  A   Correct, approximately. | 12  D.L.I. for installation, the LLC wrote a contract |
| 13  Q   And you were paid approximately | 13  to Gaithersburg Millwork for the second floor |
| 14  6.4 million? | 14  courtroom installations, they wrote a contract to |
| 15  A   Yes. | 15  AIW Metal Works to do the metal railings, et |
| 16  Q   What was the reason for the | 16  cetera. |
| 17  difference between the total amount billed and | 17  Q   Who were the subcontractors you had |
| 18  the total amount paid? | 18  on the project? |
| 19  A   They're not paying a balance due to | 19  A   They were D.L.I., AIW for metals -- |
| 20  us due to this lawsuit. | 20  Q   AIW? |
| 21  Q   Can you please describe that further? | 21  A   Yes, AIW. |
| 22  A   It is part of the -- it is in writing | 22  Q   Where are they from? |

| Page 15 | Page 17 |
|---|---|
| 1  from Centex to us in e-mail form that they would | 1  A   They are in Hyattsville, Maryland. |
| 2  be holding money, and I believe it is in this | 2  They do metal railings. |
| 3  binder, until such a time that the Department of | 3  Q   Is that their legal name, AIW or is |
| 4  Labor matter is settled.  And subsequently, it | 4  that an acronym for something? |
| 5  was reinforced with the Miller Act notice that he | 5  A   American Iron Works. |
| 6  placed on Centex's bonding company. | 6  Q   Who else were the subcontractors? |
| 7  Q   Are you saying that Centex would pay | 7  A   Gaithersburg Millwork, Mahogany does |
| 8  the $2 million delta if this is resolved? | 8  installation. |
| 9  A   Let me correct the record here.  The | 9  Q   Who is Mahogany? |
| 10  $2.1 million was billed and paid.  That is the T | 10  A   Mahogany, Inc. is an installer based |
| 11  and M contract.  That is separate.  The balance | 11  in Baltimore. |
| 12  that is being held is approximately 6.5 million | 12  Q   Installation, who is that? |
| 13  lump sum contract minus 6.38 million lump sum | 13  A   Mahogany does installation work.  I'm |
| 14  contract paid to date with approximately | 14  sorry. |
| 15  $127,000. | 15  Q   Oh. |
| 16  Q   So, the total amount on the two | 16  A   Then you have Onsite Woodwork based |
| 17  contracts paid is the 2.1 million plus the 6.4? | 17  in Chicago, Onsite, S-I-T-E.  Then you have |
| 18  A   Correct. | 18  Jefferson Millwork as a sub and you have |
| 19  Q   6.38? | 19  Allegheny Millwork. |
| 20  A   Correct. | 20  Q   What did Jefferson do on the project? |
| 21  Q   So, you have been paid a total by | 21  A   We fabricated the staircase, the |
| 22  Centex on this project of approximately | 22  parts and the bridge parts. |

**Capital Reporting Company**

Page 18

1    Q    And what did Allegheny Jefferson do
2    on the project?
3    A    Allegheny Millwork, PBT fabricated
4    the bookcases, the judge's chambers bookcases,
5    the panels, servery. That is essentially it, the
6    courtroom parts.
7    Q    Have all these subs been paid in
8    full?
9    A    No.
10    Q    Who are owed money?
11    A    Jefferson is owed money, Allegheny
12    Millwork is owed money and Gaithersburg Millwork
13    is owed money.
14    Q    How much is Jefferson owed?
15    A    Approximately three hundred -- I'll
16    say two-fifty. This is all actual -- when you
17    say owed, these are pending two matters. The
18    payments are pending, number one, GSA approval of
19    change orders, which still has not happened.
20    Secondly, it is pending release of funding from
21    Centex to the Joint Venture, pending release of
22    the Department of Labor matter and also the

Page 19

1    lawsuit. So, in terms of what is actually owed,
2    it is less.
3    Q    How much is Allegheny Jefferson still
4    owed or has not been paid?
5    A    The Joint Venture has not been paid a
6    balance of 6.5 minus 6.38 million, subject to
7    approval of change orders from the federal
8    government.
9    Q    And Gaithersburg Millwork?
10    A    Their approximate balance due is
11    related to owner change orders, and it's
12    approximately $28,000.
13    Q    Have they filed any claims relating
14    to their balance due?
15    A    No.
16    Q    Can you describe -- how did D.L.I.
17    become involved in the project?
18    A    Well, it started with the time and
19    materials portion of the work. There was an
20    immediate need from Centex to begin installation
21    of work that was already onsite from a mill
22    worker who was flooded out of business. D.L.I.

Page 20

1    began performing work early December to
2    December 5 or December 4 of '04 on time and
3    materials basis. So, that just rolled into
4    delineation of a scope and pricing for a lump sum
5    contract, which is a separate contract.
6    Q    And what were the details of the time
7    and materials contract or the time and materials
8    work that was being performed?
9    A    Signed work tickets, paid $55 for
10    regular hours and $65 for overtime hours.
11    Q    How was that amount agreed to?
12    A    Rates given to me over the phone or
13    rates discussed over the phone, essentially,
14    presented to Centex and agreed to.
15    Q    Who was that agreed to by?
16    A    D.L.I. and myself and Centex. Centex
17    knew the charges.
18    Q    And who at D.L.I. agreed to those
19    rates?
20    A    Dale Lacy.
21    Q    Do you have any documents where that
22    was agreed to?

Page 21

1    A    I may have an e-mail corroborating a
2    discussion. We do have invoices from D.L.I.
3    showing the billing rates at 55 and 65.
4    Q    Did you inform D.L.I. at that point
5    this was a Davis-Bacon job?
6    A    Yes. I informed him before
7    discussions began.
8    Q    How did you inform him?
9    A    By fax. There is an October 5 fax,
10    2004. It is in the binder, tab 13.
11    MR. GAVETT: For the record, when
12    Mr. Corrigan is referring to the binder, it is a
13    binder called Allegheny Jefferson Millwork LLC,
14    E. Barrett, B-A-R-R-E-T-T, Prettyman,
15    P-R-E-T-T-Y-M-A-N, Courthouse, response to claim
16    number 6850153200. That binder was produced to
17    plaintiff in April of 2006.
18    BY MR. WHITTAKER:
19    Q    There is a cover letter attached to
20    that fax. Is that correct.
21    A    There is this one, "Call me."
22    October 5, '04.

# Capital Reporting Company

Page 22

```
1       Q    Or maybe the last page.
2       A    Christine Kelly.  This is the GSA
3  representative, the contracting officer.
4       Q    What are the contents of that letter?
5       A    This was attached to the wage scale
6  that was sent to us by Centex.  Centex sent me
7  this, the same day I sent it over to D.L.I.
8       Q    The question was, what are the
9  contents of that letter?
10      A    I'll read it.  It is from John Franks
11 of Wage Determination to Christine Kelly.
12           "Dear Miss Kelly:  This is in
13 response to your request proposing the addition
14 of a classification and wage rate to the wage
15 decision in accordance with 29 CFR 5.5A1ii.  The
16 proposed classification and wage rate is a roofer
17 at $18.77 per hour and 3.80 fringe benefits.  The
18 above conformed classification and wage rate are
19 approved and shall be paid to all workers
20 performing work in the classification under this
21 contract from the first day on which work is
22 performed in this classification.  Sincerely,
```

Page 23

```
1  John Frank."
2       Q    Why did you fax D.L.I. information on
3  the scale of a roofer?
4       A    This was attached to what Centex sent
5  me.  I sent the entire wage scale -- to answer
6  your question why, is I sent exactly what was
7  sent to me to D.L.I.  Classification for
8  carpenter was highlighted, arrow pointed to it,
9  24.48 an hour.
10      Q    Whose handwriting is that?
11      A    Mine.  Carpenters including drywall
12 hanging is the classification under which we
13 fell.
14      Q    Tell me about this Indian Museum
15 project.  How did that relate to this project?
16      A    Well, it was brought into the
17 discussions and negotiations at the time of
18 D.L.I. and I agreeing on a lump sum contract, not
19 the T and M, lump sum contract amount.  Tab 15
20 gives you the scope of that.
21           You can see at the bottom the
22 differences in man hours that were estimated in
```

Page 24

```
1  D.L.I. versus our man hours, rate per hour.
2       Q    Please answer the question.  I'm not
3  asking you to look at the binder.
4       A    I am just bringing it into context.
5  The context was negotiations over a lump sum
6  amount, the agreement to come down to $1.175
7  million as a contract amount, and the carrot to
8  county that was the -- was a payment of $200,000
9  in a timely fashion for the American Indian
10 Museum or $75,000 would be added to the amount
11 there.
12      Q    And you agreed to add $75,000 to this
13 contract, to the Courthouse project if you did
14 not make the payment -- if Jefferson did not make
15 the payment on the Indian Museum project?
16      A    Correct.
17      Q    So, $75,000 should have been added to
18 the contract amount?
19      A    Other factors notwithstanding and it
20 would have been included, yes.
21      Q    What other factors notwithstanding?
22      A    The Department of Labor investigation
```

Page 25

```
1  and Centex holding our money and inability to --
2       Q    That has nothing to do with the
3  contract amount.
4       A    Okay.
5       Q    $75,000 should be added to the
6  contract amount.  Is that correct?
7       A    $75,000 can be added to the contract
8  with my approval.
9       Q    That is not the question.  You just
10 testified that you agreed to add $75,000 to
11 D.L.I.'s contract if Jefferson did not make
12 payment on the North American Indian Museum in a
13 timely fashion.
14      A    Correct.  I just testified to that,
15 yes.
16      Q    Right.
17           MR. GAVETT:  Do you want to mark the
18 whole binder and save yourself time?
19           MR. WHITTAKER:  That's fine.  Let's
20 use this binder as an exhibit here.
21           MR. GAVETT:  For the record, counsel
22 for the plaintiff is going to have marked as
```

Page 26

1  Deposition Exhibit 1 a three-ring binder
2  containing 25 tabbed documents, and that will be
3  Exhibit 1 to this deposition, and we'll just
4  inquire from the tabs rather than marking each
5  document.
6           (Allegheny Jefferson
7            Deposition Exhibit No. 1,
8            a three-ring binder
9            containing 25 tabbed
10           documents, was marked for
11           identification.)
12      BY MR. WHITTAKER:
13      Q    Can you turn, Mr. Corrigan, to tab 1?
14      A    Yes.
15      Q    That $75,000 -- could you describe
16  what that document is?
17      A    Invoice number 4606 to Jefferson
18  Millwork -- and not to the Joint Venture -- for
19  $75,000.
20      Q    And that is an addition that you
21  agreed to on behalf of Allegheny and on behalf of
22  Jefferson?

Page 27

1      A    As it turned out with the
2  circumstances, yes.  It would be an agreement --
3  it would be an addition to a total contract
4  amount due to D.L.I. after all settlement of
5  outstanding change orders, back charges, what
6  have you, are contemplated and agreed to.
7      Q    Of course.  I'd ask you to turn to
8  tab 22, please.  Can you indicate what that
9  e-mail is?
10      A    That is an e-mail from me to Dale,
11  December 22 of 2004; 1.75 million Prettyman,
12  turnkey, stocked, OT is necessary and reasonable,
13  scribed the floor; any savings for rebuild panel,
14  install changes is D.L.I.'s to keep, floors two,
15  three, and four on change order, meaning T and M,
16  new change is coming for more bookcases, may be a
17  reduction in wood base and cabinet takeoff and
18  must pay NMAI, which is American Indian, $315,000
19  off by January 19 or price goes up 1.250.
20  Correct.
21      Q    So, that is another document that
22  indicates that you agreed to the $75,000 increase

Page 28

1  in the contract?
2      A    Yes.
3      Q    Did you make that payment on North
4  American Indian Museum by January 19?
5      A    No.
6      Q    When did D.L.I. begin work on this
7  project?
8      A    December 5 of '04.
9      Q    And when did they complete work or
10  when was D.L.I.'s last day?
11      A    Oh.  I don't remember.
12      Q    Approximately?
13      A    September of '05.
14      Q    Okay.
15      A    I'm guessing.
16      Q    When did you inform D.L.I. that they
17  were indeed working for a Joint Venture or not
18  working for Jefferson?
19      A    The very first discussions were about
20  the Joint Venture being set up and they were
21  going to work with Allegheny Millwork and LLC,
22  subcontract things, what have you.

Page 29

1      Q    But the subcontract didn't come until
2  February?
3      A    Yes, a lump sum.  Work prior to that
4  February work was mostly T and M.  A large part
5  of his actual work effort and labor hours were
6  all T and M work.
7      Q    If you turn back to that tab 22,
8  there is the e-mail that you had just read.
9      A    Right.
10      Q    That e-mail is written by you on
11  behalf of Jefferson Millwork, is that correct?
12      A    It was written in our negotiations as
13  part of Allegheny Jefferson Millwork LLC.  It was
14  in the context of the contract negotiations.
15      Q    Does that e-mail anywhere indicate
16  that was a deal made on behalf of Allegheny
17  Jefferson?
18      A    It does not indicate that.
19      Q    And you signed that, or I guess your
20  typed signature is on behalf of Jefferson
21  Millwork, is that correct?
22      A    My name is in there twice, just as a

# Capital Reporting Company

| Page 30 | Page 32 |
|---|---|
| 1  regular inclusion in any e-mail l send out. | 1  site. |
| 2     Q  Right. And that e-mail right there | 2     Q  It shows about $750,000 D.L.I. is |
| 3  describes the contract and that is on behalf of | 3  owed by Jefferson at that time. Does that sound |
| 4  Jefferson Millwork? | 4  accurate? |
| 5     A  It describes the results of our | 5     A  No, it does not. But I have no idea. |
| 6  negotiations further defined by the scope that is | 6     Q  Let me ask you to turn to tab 25. |
| 7  here, tab 15. | 7     A  Okay. |
| 8     MR. GAVETT: Referring to tab 15 not | 8     Q  Do you recognize that document? That |
| 9  in Exhibit 1 but rather in the binder that was | 9  is a different 25 than I have. |
| 10  previously discussed but not marked for exhibit | 10     MR. GAVETT: Yes. Mine is different. |
| 11  purposes. | 11  My tabs are already off also. Tab 24 on his. |
| 12     BY MR. WHITTAKER: | 12     BY MR. WHITTAKER: |
| 13     Q  At the onset of this project, | 13     Q  All right. Our tabs are off. Looks |
| 14  however, approximately how much did Jefferson owe | 14  like those documents were reversed actually. Tab |
| 15  D.L.I. on other projects? | 15  24 of your binder. |
| 16     A  There was ongoing work in December of | 16     A  Okay. |
| 17  '04. I believe the American Indian Museum was an | 17     Q  Do you recognize that document? |
| 18  outstanding payment that was subject to being | 18     A  Yes. This looks familiar because it |
| 19  settled by Core Construction on different | 19  has comments on it. |
| 20  contracts. So, we had to make those payments and | 20     Q  Do you recall if that document was |
| 21  we had, I believe, Johns Hopkins University which | 21  created by you? |
| 22  was paid in a timely enough fashion. | 22     A  It looks familiar, yes. |

| Page 31 | Page 33 |
|---|---|
| 1     Q  Let me ask you to turn to tab 23. | 1     Q  Or was sent by you? |
| 2  That is a chart that has been created by D.L.I. | 2     A  Right. It would have -- it has my |
| 3  Do you think that chart is a fair indication of | 3  type of wording on it. Right. |
| 4  the receivables of Jefferson to D.L.I.? | 4     Q  And that is a -- do you recall if |
| 5     MR. GAVETT: Objection. | 5  that was a document that was sent to you from |
| 6     THE WITNESS: I have no idea. | 6  D.L.I.? |
| 7     MR. WHITTAKER: Basis, counsel? | 7     A  It does ring a bell, yes. |
| 8     MR. GAVETT: The basis is the | 8     Q  It looks like that document goes up |
| 9  document was not created by this witness. It is | 9  until February of '05. |
| 10  not from the records of AJM or Jefferson Millwork | 10     A  Okay. |
| 11  although Jefferson Millwork is not a party in | 11     Q  Is that correct? |
| 12  this case, and exceeds the scope of designation | 12     A  Yes. It starts December of '03 to |
| 13  for the corporate representative of AJM. | 13  February 10 of '05. It seems like there are four |
| 14     BY MR. WHITTAKER: | 14  copies. |
| 15     Q  My question was, do you think that is | 15     Q  I see that too. |
| 16  a fair indication of the receivables of D.L.I. | 16     A  It is only one page. They are |
| 17  from Jefferson? | 17  identical. |
| 18     A  I have no idea. | 18     Q  What does that indicate, that the |
| 19     Q  Well, we look at December of '04, you | 19  amount owed from Jefferson to D.L.I. is in |
| 20  say that is when this project started with D.L.I. | 20  February of '05? |
| 21  That's accurate. Is that correct? | 21     A  It indicates billed was 2.354 million |
| 22     A  December 5 of '04, we started on the | 22  and paid was 1.549 million. That's what it says. |

Page 34

1    Q   So, the document created by you shows
2    that Jefferson owed D.L.I. over $800,000 as of
3    February of '05?
4        MR. GAVETT: Objection.
5        THE WITNESS: No.
6        BY MR. WHITTAKER:
7    Q   No?
8    A   No, it doesn't. One item says, it
9    says right here January 28 of '05, $120,000
10   Prettyman contract, my comment says paid. His
11   field says nothing paid.
12   Q   Where are you referring?
13   A   Going down to January 28, 2005,
14   $120,000; the Prettyman contract billed 120,000;
15   paid zero. I marked it down as paid. That is my
16   column. It sounds like it is my column. So,
17   that would be one example where 120,000 is paid.
18       MR. GAVETT: Just so we are clear,
19   did you create the entire spreadsheet --
20       THE WITNESS: No.
21       MR. GAVETT: -- or did you comment on
22   somebody else's spreadsheet?

Page 35

1        THE WITNESS: I commented on D.L.I.'s
2    spreadsheet.
3        MR. WHITTAKER: You'll have your
4    chance to ask questions and talk to the witness.
5    Okay?
6        MR. GAVETT: All right.
7        MR. WHITTAKER: That's enough. You
8    have interrupted numerous times.
9        MR. GAVETT: Other than make
10   objections.
11       MR. WHITTAKER: No. You've made two
12   objection, and you have interrupted numerous
13   times. You have instructed the witness and
14   guided the witness. That is not proper. You'll
15   have your chance to talk to him.
16       MR. GAVETT: All right. Just ask
17   your next question.
18       MR. WHITTAKER: Thank you.
19       BY MR. WHITTAKER:
20   Q   So, what does this document indicate
21   if it doesn't indicate the receivables?
22   A   It indicates the billables, amounts

Page 36

1    paid and my comments on the status of those
2    payments or question marks about the amount of
3    billing; IMF contract, 45 percent complete in
4    January, it was a large question mark. The job
5    finished in July of '05 so it was overbilled.
6    So, there are overbilling comments in there,
7    question marks from me that the amounts exceed
8    the progress on the job site.
9    Q   Was it fair to say that Jefferson did
10   owe D.L.I. money as of February of '05?
11   A   Yes. D.L.I. was working for
12   Jefferson and, therefore, would be owed money.
13       MR. GAVETT: I will note a continuing
14   objection to any inquiries about projects other
15   than the Prettyman Courthouse. The witness was
16   not asked to testify about anything other than
17   the Prettyman Courthouse, and not only that, but
18   Jefferson Millwork is not a party defendant in
19   this case.
20       MR. WHITTAKER: We'll take a break
21   for a second. I want to get the Notice of
22   Deposition.

Page 37

1        (Recess taken.)
2        BY MR. WHITTAKER:
3    Q   Can you turn to tab 21? Can you tell
4    us what that document is?
5    A   This is the Joint Venture subcontract
6    with D.L.I. for the lump sum contract amount,
7    marked up.
8    Q   When did you sign that document or
9    when did Allegheny Jefferson sign that document?
10   A   When we received it or thereafter.
11   It was put in a file for accounting because the
12   payments were made based upon the 1.75 million.
13   So, I don't recall the exact date of signature.
14   It was received after the job was already going
15   on.
16   Q   How did you return it to D.L.I.?
17   A   I did not return it to D.L.I.
18   Q   So, you never provided D.L.I. a
19   notice that you accepted the terms of the
20   contract as marked up?
21   A   I never commented back on the marked
22   up contract.

**Capital Reporting Company**

Page 38

1      Q    And you never provided D.L.I. a
2  signed copy of the contract?
3      A    Correct.
4      Q    D.L.I. had also asked you or do you
5  recall if D.L.I. had asked you for documents
6  regarding the Joint Venture when it returned the
7  contract to you?
8      A    Yes, and that's why I didn't reply to
9  it because the letter was kind of farcical, that
10  they had just found out we were a Joint Venture
11  is what the cover letter said.
12         The actual checks that had been paid
13  to D.L.I. for the last three, four months prior
14  to that had the Joint Venture's name on them.
15  The correspondence and discussions along the way
16  for several months were Joint Venture related
17  discussions.
18      Q    But all e-mails that were sent by you
19  and all correspondence sent by you were from
20  Jefferson?
21      A    I don't know that for a fact.  I
22  think I retyped in manager, LLC; some I just let

Page 39

1  go as Jefferson Millwork.
2      Q    And did you provide D.L.I. with any
3  of the documents that were requested regarding
4  the Joint Venture?
5      A    During the document procurement, I
6  gave everything up to the table for your partner
7  to come look at.
8      Q    My partner?  I don't have a partner.
9      A    Your designated somebody who came
10  out.  Who came out?
11      Q    That wasn't the question.  A former
12  associate.
13      A    Okay.
14      Q    The question was, when D.L.I. had
15  sent you that letter asking for documents
16  regarding the Joint Venture, did you send any
17  documents to D.L.I. regarding the Joint Venture?
18      A    No.
19      Q    Let's turn to the main issue of this
20  case.  When did you find out about the -- that
21  this was a Davis-Bacon job?
22      A    October 5 of '04, the first meeting

Page 40

1  with Centex.
2      Q    How did you find out?
3      A    I had a meeting with Centex.
4      Q    What was the extent of that meeting
5  or the purpose of that meeting?
6      A    Discussing their plight.
7      Q    Their flight?
8      A    Their plight.  They had a flooded
9  mill worker, had a mill worker on site, they
10  needed somebody to jump on it, did we have the
11  time.
12      Q    How did you come into that meeting?
13      A    By a phone call.  We had an ongoing
14  relationship with Centex prior to this.
15      Q    And how did you find out at that
16  meeting that this was a Davis-Bacon job?
17      A    It was discussed at the meeting by
18  Centex, a copy of the notice given to us at the
19  meeting or actually faxed to us right after the
20  meeting.
21      Q    What was the purpose of that?  Was it
22  to adjust your bid?

Page 41

1      A    To be clear that any work done on T
2  and M had to include certified payrolls.
3  Certified payrolls are a requirement of
4  Davis-Bacon regulations.  We certify the amount
5  paid and the fringes paid and report those to the
6  GC, et cetera.  So, there are reporting
7  requirements.  There is a level of wage
8  requirement.
9      Q    And how far after that meeting did
10  you get D.L.I. involved in the project?
11      A    My discussions with D.L.I. were the
12  same night, if not the very next morning, because
13  it was an immediate question of labor to install,
14  shop labor to build.  There were two questions
15  but the more immediate need was --
16      Q    Did D.L.I. normally provide the labor
17  for your installation.
18      A    They did a good chunk of it for jobs
19  out of town as well as larger jobs in town, not
20  all jobs.
21      Q    What other jobs had D.L.I. been
22  involved in with Jefferson?

Page 42

1    A    American Indian Museum, IMF
2    Headquarters, Strathmore Concert Hall, Venable,
3    White and Case -- I'm sure there are others;
4    Hogan and Hartson work out of town.
5        Q    What is your opinion of D.L.I.?
6        A    The men who install under D.L.I.'s
7    umbrella, which includes D.L.I.'s own employees
8    as well as sub subcontractors, are good hard
9    workers with, in general, good work ethic.
10       Q    How do you know Dale Lacy?
11       A    Through our first project in Miami,
12   Hogan and Hartson law firm, through them.
13       Q    And when was that?
14       A    I believe it was the spring of '01,
15   2001.
16       Q    What is your opinion of Dale Lacy?
17           MR. GAVETT: Objection. Go ahead.
18           THE WITNESS: The man or the company?
19           BY MR. WHITTAKER:
20       Q    Both. Yes. Give me your opinion of
21   the company.
22       A    Dale Lacy is -- I think, first and

Page 43

1    foremost, if you know Dale Lacy deep down, as
2    deep as I know him, I don't know if that's the
3    full truth, but you know he's a family man, that
4    he is a religious man -- he doesn't wear that on
5    his shirt sleeves -- his core beliefs are very
6    conservative, family oriented, and he has a
7    strong religious tradition. But you don't see
8    that. That is what I know.
9        Q    Is he trustworthy?
10       A    He's a businessman. I categorize
11   trustworthy in terms of his occupation.
12       Q    Can you elaborate on that?
13       A    I think that -- well, it is
14   conjecture. No, I can't. I really can't.
15           MR. GAVETT: I'll have a continuing
16   objection to reputation testimony. It doesn't
17   have anything to do with the issues in this case
18   but if you want to inquire, go ahead.
19           MR. WHITTAKER: Thank you.
20           THE WITNESS: I can't really
21   conjecture.
22           BY MR. WHITTAKER:

Page 44

1        Q    Turn back to the -- we have already
2    looked at it but the tab with the contract, 21
3    tab. Does that document indicate anywhere that
4    it is a Davis-Bacon job? Do you need a moment to
5    read it or look at it?
6        A    There is a page missing here, pages 3
7    and 4. It goes from 1, 2, and then 5. I have a
8    full copy here.
9        Q    Why don't you look at that one. And
10   actually, at tab 13, there is a full copy.
11           MR. GAVETT: It is 14 in the binder
12   that Mr. Corrigan and I have.
13           BY MR. WHITTAKER:
14       Q    Actually, at that tab, if you go back
15   a moment, that document, there is a letter there,
16   April 5, 2005?
17       A    Yes.
18       Q    Is that the document that we were
19   referring to earlier?
20       A    Yes, this farcical letter about the
21   fact that he did not -- that he discovered that
22   there was a partnership. Again, the checks

Page 45

1    written to D.L.I. in December forward had the
2    full name and the LLC on the check.
3        Q    And you didn't provide any documents
4    in response to his inquiry?
5        A    No, I did not.
6        Q    Now, if you turn the page, there is a
7    complete copy of the contract.
8        A    Okay.
9        Q    And the question was, does this
10   document in any place indicate that it is a
11   Davis-Bacon job?
12       A    No. It does not say Davis-Bacon in
13   this contract that I know of, but I haven't
14   looked at those. Those words are not mentioned,
15   that I know of.
16       Q    When did you find out about the DOL's
17   claim regarding the Davis-Bacon wages?
18       A    That was an unfolding saga that I
19   typed up a time line in my binder to put a series
20   of events together that culminated with the
21   actual assignment of an investigator to the job.
22   Yes, tab 12 is the time line.

**Capital Reporting Company**

13 (Pages 46 to 49)

Page 46

1    MR. GAVETT: For the record, can we
2    mark the other binder that he has referred to so
3    we don't have confusion between the binder you
4    have produced and the binder he has put together?
5        MR. WHITTAKER: That's fine.
6        MR. GAVETT: Can we mark this as
7    Allegheny Jefferson Exhibit 2?
8            (Allegheny Jefferson
9            Exhibit No. 2, a
10           three-ring binder
11           containing tabbed pages,
12           was marked for
13           identification.)
14       MR. GAVETT: For the record, we are
15   going to retain custody of this particular binder
16   but a copy of this binder has been produced
17   previously to plaintiffs.
18   BY MR. WHITTAKER:
19       Q    All right. So, to ask you again,
20   when did you first find out about the DOL's claim
21   or investigation regarding the Davis-Bacon issue?
22       A    The Department of Labor became

Page 47

1    involved in September of '05 according to my time
2    line. Prior to that date, there was the GSA
3    itself asking questions -- and GSA's
4    representatives -- of the construction manager.
5        Q    When did that begin?
6        A    June and July of '05. It was a date
7    I reference in my time line.
8        Q    If you look down to the fourth
9    paragraph there, D.L.I. signed subcontract dated
10   2-12-05, includes under section 15 labor. And
11   then it says, subcontractor shall comply with all
12   wage scales, reporting obligations and other
13   labor requirements established under the contract
14   or contract documents and by any governmental
15   authority having jurisdiction.
16           If you turn to tab 15, could you
17   indicate where that language is?
18       A    My tab 15, it's in paragraph 15,
19   labor, page four, second sentence.
20       MR. GAVETT: Tab 15 from Exhibit 2.
21       THE WITNESS: Page 4, bottom; 15
22   paragraph.

Page 48

1    BY MR. WHITTAKER:
2        Q    If you turn to tab 10, in my binder,
3    Exhibit 1, can you indicate what that e-mail is?
4        A    Yes. March 7 of '05, my e-mail to
5    Danny, who was the office manager for D.L.I.,
6    thanking him for correcting his subcontractor,
7    his sub sub, our sub sub, Labor Ready, who
8    provided temporary labor, who is the temporary
9    labor company, had not been paying their men the
10   helper or laborer wage scale properly.
11       Q    So, the issue had arisen before June
12   or July?
13       A    Yes. It did arise before then. The
14   time line is not fully comprehensive.
15       Q    Or accurate?
16       A    No. It is completely accurate. It
17   is not fully comprehensive.
18       Q    This e-mail indicates a labor issue
19   in March.
20       A    All the more reason to know that
21   there were ongoing issues with the Department of
22   Labor and to be extra sensitive.

Page 49

1        MR. GAVETT: Again, just because we
2    are jumping around between binders, we have been
3    referring to tab 10 of Exhibit 1 of today's
4    deposition.
5        MR. WHITTAKER: Which I had already
6    said.
7        MR. GAVETT: Okay.
8    BY MR. WHITTAKER:
9        Q    Can you read that last sentence of
10   that e-mail?
11       A    "I hope these two guys aren't onsite
12   anymore."
13       Q    What do you mean by that?
14       A    Because they are not working, they
15   are causing problems, and they have, I guess, a
16   concern about their rate of pay, does not mean
17   they don't work.
18       Q    You said two guys from Labor Ready
19   actually went into her office, being Tracy from
20   Centex, I assume, right, and complained about the
21   wage scale thing?
22       A    Yes.

Page 50

1    Q    "I hope those two guys aren't onsite
2  anymore."
3    A    Yes.
4    Q    What do you mean by that?  They
5  complained about the wage scale?
6    A    Meaning they went to the client's
7  office rather than taking their issue to their
8  own client, which is D.L.I., their foreman
9  representative onsite, to correct their wage
10  matter.  That's what I meant.
11    Q    You were upset that they brought the
12  wage issue, the Davis-Bacon issue to somebody's
13  attention.  Is that correct?
14    A    No, not at all.
15    Q    And this e-mail again is signed by
16  Jefferson Millwork?
17    A    Yes.  That is the title block there.
18    Q    Yes.  Did Dale at this point or
19  around this time on behalf of D.L.I. address the
20  Davis-Bacon issue with you?
21    A    Yes.  This is when I believe D.L.I.
22  did some research on the Internet with the

Page 51

1  Department of Labor's web site.
2    Q    And --
3    A    Regarding the matter of compliance
4  and fringes.  It was his research topic.
5    Q    Did you tell D.L.I. to stay on the
6  job and not to worry about the Davis-Bacon issue?
7    A    I don't recall using those words, I
8  don't think.
9    Q    Anything to that extent, any kind of
10  conversations?
11    A    I didn't believe there was any
12  problem with wages or fringes on this job at this
13  point except for what I knew about the temporary
14  help which had already come up and had been
15  resolved.  So, I was not aware of any glaring
16  matter or problem.  There would be no reason to
17  discuss not proceeding.
18    Q    You didn't have any conversation with
19  Dale, not to worry about it, to stay on the
20  project?
21    A    I wasn't asked whether he should
22  leave the project or not.  So it wasn't a topic

Page 52

1  that I remember discussing.
2    Q    Did D.L.I. or Dale ask you or mention
3  they would need more money if they had to pay
4  additional amounts?
5    A    D.L.I. has always mentioned it needs
6  more money.  It would be hard to parse that.
7    Q    Did D.L.I. specifically with regard
8  to the Davis-Bacon and the Prettyman project
9  state they would need more money if they had to
10  pay their workers more?
11    A    D.L.I. stated that when the
12  discussions were going on with Thelen Reid and
13  the other attorneys doing an investigation as to
14  what the proper classification of per diem wages
15  would be, I believe that is reflected in here
16  some time in -- I'm going to say August -- it's
17  in the binder but in August of '05, there were
18  discussions that if per diem doesn't apply
19  towards wages, then I needed to have charged more
20  back then.  So, that's what --
21    Q    And what was your response?
22    A    My response is to settle all matters

Page 53

1  with the subcontractors as best possible.  I made
2  offers of settlement for the purpose of
3  settlement for this job too regarding --
4    Q    That's not my question.  When D.L.I.
5  said it would need more money for the project,
6  whether it was in August or March, our dates
7  vary, what was your response?
8    A    I don't recall my exact response.
9    Q    You didn't tell D.L.I. you wouldn't
10  pay them more, did you?
11    A    No, I did not say that.
12    Q    And you allowed D.L.I. to continue to
13  work?
14    A    I offered in settlement and
15  discussion later on contributions towards their
16  problem from the Joint Venture provided certain
17  releases were done, which never happened.
18    Q    So, you had offered to pay a portion
19  of the DOL issue?
20    A    For purposes of settlement, yes, I
21  did.  That's a matter of record.
22    Q    When was that offer made?

Page 54

1    MR. GAVETT: I will note a continuing
2    objection regarding testimony on offers of
3    settlement. Rule 408 is very clear, offers of
4    compromise or settlement are inadmissible in
5    evidence. You can ask him all you want about it.
6    I would just, rather than object to ever question
7    --
8    MR. WHITTAKER: Objection noted.
9    BY MR. WHITTAKER:
10   Q    When did that conversation take
11   place?
12   A    It was fall of '05. I am guessing,
13   fall or winter of '05.
14   Q    Was it while D.L.I. was still on the
15   project?
16   A    No. It was after the Miller Act had
17   been placed on the project by a different
18   attorney and after payments had been held and
19   after the Department of Labor investigation had
20   started, after quite a bit of dust had been
21   kicked up.
22   Q    So, you are referring to the Miller

Page 55

1    Act notice that was provided to D.L.I., to the
2    bonding company?
3    A    To Centex's, I guess.
4    Q    So, not until that time did you have
5    conversations with D.L.I. or Dale regarding the
6    contributions to the DOL issue until D.L.I. had
7    left the project, is that your testimony? Let me
8    rephrase that.
9    At any point during the project, did
10   you offer on behalf of Allegheny or Jefferson to
11   contribute to the DOL portion if D.L.I. indeed
12   did owe an amount to employees or contractors?
13   A    I am certain that during the
14   discussions on a day-to-day basis with D.L.I.,
15   that the notion, the idea that the Joint Venture
16   would support him in both presenting his case to
17   the Department of Labor and also support him
18   financially, I'm sure those were views that were
19   on the table. It was never disregarded as out of
20   the question.
21   Q    So, your answer is yes?
22   A    My answer is yes, the notion of

Page 56

1    financial assistance as well as assistance with
2    my time to provide a solution that didn't go the
3    distance.
4    Q    And you took the position on behalf
5    of Allegheny and/or Jefferson that D.L.I. and its
6    subcontractors were indeed paying the correct
7    wages, is that correct?
8    A    I advocated on behalf of D.L.I. in
9    front of Centex, in front of GSA, in front of the
10   Department of Labor that the best understanding
11   of the law provided by the Department of Labor
12   was adhered to by not only D.L.I. but by us
13   except for the overtime differential.
14   Q    You did more than advocate. You went
15   and obtained a legal opinion, is that correct?
16   A    Oh, yes.
17   Q    Was that legal opinion from Thelen
18   Reid?
19   A    Yes, it was.
20   Q    And did D.L.I. ask you to obtain that
21   legal opinion?
22   A    No. D.L.I. was not responsive during

Page 57

1    this time when it was very critical that there
2    was a plan put into effect. I took charge of the
3    matter. I noted to D.L.I. that the reason this
4    plan is required is their sub subcontractor,
5    Shalom Carpentry, had exacerbated the matter and
6    Shalom Carpentry would be required to pay for the
7    cost of legal fees. I did not receive agreement
8    on that but I did say that.
9    Q    And D.L.I. had no agreement with you
10   to pay Thelen Reid's fees, did they?
11   A    There was no written agreement to
12   that effect.
13   Q    Any agreement whatsoever?
14   A    They never agreed to pay.
15   Q    And in fact, the representations --
16   the position that you took with regards to the
17   wage payments was incorrect, is that correct?
18   A    It is incorrect as far as the
19   Department of Labor investigates or has so far --
20   so far announced, but you just told me at the
21   beginning that he has since recanted on part of
22   what he was saying before. So, at this point, I

**Capital Reporting Company**

Page 58

1 don't know.
2    Q    He has assessed D.L.I. or DOL has
3 assessed D.L.I. originally $196,000 in back
4 wages, is that correct?
5    A    That's correct. They did put that in
6 writing.
7    Q    I will state that I did represent
8 that it has been reduced to approximately
9 $160,000 as of yesterday.
10    A    Which I don't know about that.
11    Q    That is correct. You do not have
12 anything in writing yet. We are hoping to have
13 it today.
14    A    Your question was, was I wrong. It
15 sounds like there is no definitive answer yet.
16    Q    Well, at the very least, it is
17 $160,000 in back wages. So, the position you
18 took was at least somewhat inaccurate, is that
19 correct?
20    A    No. I won't agree with that. I
21 advocated as best I understood the law at the
22 time.

Page 59

1    Q    Well, at the very least, it was
2 $160,000 inaccuracy?
3    A    As it turns out, perhaps.
4    Q    Are you going to appeal that? Is
5 Allegheny or Jefferson?
6    A    The case is against D.L.I., Shalom
7 and Craftsmanship Unlimited and not against the
8 Joint Venture. The Department of Labor's case is
9 directly against those employers.
10    Q    Why did you make any representations
11 to D.L.I. regarding the back wages?
12    A    To try to resolve an issue that was
13 holding payment on us for all my subs.
14    Q    And Thelen Reid's opinion that AJM
15 had obtained was inaccurate, is that correct?
16    A    No. Thelen Reid said you could see
17 it both ways. Thelen Reid came up with two
18 papers that are included in my binder; one
19 directed to the GSA expounding the case law that
20 provided support for our position; second, an
21 internal memo which said you can see this two
22 ways. Both of those were given to D.L.I.

Page 60

1        So, the product of that work effort
2 and that cost was actually used and given to
3 D.L.I. for their own benefit and is a backcharge
4 against them.
5    Q    How did it benefit D.L.I.?
6    A    It gave them legal research.
7    Q    For what?
8    A    I don't have an answer to for what.
9    Q    Well, how did that benefit D.L.I.? I
10 can give D.L.I. legal research. What does that
11 mean?
12    A    The paper that was given to them.
13    Q    Not if it is not requested. Not if
14 it doesn't benefit them. My question is how did
15 it --
16        MR. GAVETT: Objection. If we are
17 going to argue with the witness, we can do that
18 in court.
19        MR. WHITTAKER: If you need to make a
20 statement, you can do that in court as well.
21 This will be the last time I'm asking you not to
22 interrupt my deposition. This is the last time

Page 61

1 I'm asking. If not, we will stop this, I will
2 call the judge and we will talk to him.
3        MR. GAVETT: Do you want to try and
4 call the judge on the phone?
5        MR. WHITTAKER: We are calling at
6 1:00 o'clock to set the trial date. We'll talk
7 to him then.
8        MR. GAVETT: You didn't tell me that.
9        MR. WHITTAKER: I didn't think I
10 needed to.
11        MR. GAVETT: You had an ex-parte
12 communication with the Court to schedule a
13 proceeding and you didn't --
14        MR. WHITTAKER: They called me
15 yesterday and told me you would be here at
16 1:00 o'clock. We can talk then.
17        MR. GAVETT: All right.
18        MR. WHITTAKER: If you have a problem
19 with the judge, I suggest you call him. But do
20 not interrupt my deposition again. That is not
21 proper. It's not professional. It's not
22 ethical.

Page 62

```
 1        MR. GAVETT: I'm asserting an
 2   objection.
 3        MR. WHITTAKER: Your objection is
 4   noted.
 5        BY MR. WHITTAKER:
 6    Q    How did that benefit D.L.I.?
 7    A    I don't know.
 8    Q    What benefit did it give to D.L.I.?
 9    A    It gave them legal research.
10    Q    My question again, how did that legal
11   research benefit in any way D.L.I.?
12    A    I don't know.
13    Q    D.L.I. relied on your representations
14   regarding the wage scales, is that correct?
15        MR. GAVETT: Objection as to what
16   somebody else relied on.
17        THE WITNESS: I don't know if they
18   relied on it.
19        BY MR. WHITTAKER:
20    Q    Well, D.L.I. didn't change their
21   payments based on your representations to D.L.I.,
22   is that correct?
```

Page 63

```
 1        MR. GAVETT: Objection as to what
 2   D.L.I. did or did not do.
 3        BY MR. WHITTAKER:
 4    Q    You have their certified payrolls.
 5   You know what they were paying.
 6    A    Correct.
 7    Q    So, you would know what D.L.I. did.
 8    A    All right.
 9    Q    I mean, it is more than evident what
10   D.L.I. was paying throughout the course of this
11   project. That is what the whole investigation is
12   about.
13    A    Right. They certified $28 an hour.
14   They were not paying $28 an hour. So I don't
15   know where you are taking that.
16    Q    D.L.I. relied on your representations
17   that they were indeed paying the correct wages.
18        MR. GAVETT: Objection.
19        BY MR. WHITTAKER:
20    Q    Is that correct?
21    A    I don't know.
22    Q    Well they didn't change their
```

Page 64

```
 1   behavior?
 2    A    They didn't submit the change order
 3   for extra cost is what you are saying.
 4    Q    Well, they had submitted a change
 5   order, 196,000.
 6    A    Which arrived with the lawsuit.
 7    Q    But they have submitted a change
 8   order. Your testimony is not correct.
 9        MR. GAVETT: Objection.
10   Argumentative.
11        BY MR. WHITTAKER:
12    Q    Did D.L.I. submit a change order for
13   the increased amount of wages?
14    A    With the lawsuit they provided
15   invoice number -- let's see -- D.L.I.'s invoice
16   number 4592 presented with the lawsuit.
17    Q    Which is the wage issue?
18    A    Well --
19    Q    Is that accurate?
20    A    I am assuming that's accurate because
21   the description on the invoice actually says only
22   -- what does it say -- well, you have a copy of
```

Page 65

```
 1   the lawsuit.
 2    Q    Yes.
 3    A    Okay. Whatever the description of
 4   that invoice number 4592 says is what the
 5   description was, but the description does not say
 6   Davis-Bacon.
 7    Q    But we all know that is what it says.
 8    A    I don't know. Like I said, there was
 9   no request in writing for extra money prior to
10   that and it was received with the lawsuit for
11   what is assumed to be the exact same number the
12   Department of Labor had come up to to that date.
13    Q    You and Mr. Lacy had had
14   conversations about additional compensation to
15   D.L.I. regarding the back wages?
16    A    We had settlement discussions, yes.
17   We had settlement discussions.
18    Q    You had discussions. You may term
19   them at settlement but D.L.I. had asked for
20   additional money because they owed additional
21   money.
22    A    At the end of the job for settlement
```

**Capital Reporting Company**

18 (Pages 66 to 69)

Page 66

1  purposes, it was discussed, yes.
2      Q    You may claim it was settlement
3  purposes but D.L.I. had asked for additional
4  compensation, is that correct?
5      MR. GAVETT:  Objection.  Asked and
6  answered.  Now we are at the point we are
7  hammering on the witness because you are
8  dissatisfied with the answer he has given you.
9  He has given you an answer.  Let's move on.  Ask
10 your next question.  You don't need to answer
11 that question.
12     MR. WHITTAKER:  Yes, you do.
13     MR. GAVETT:  No, he does not.  I am
14 instructing the witness not to answer the --
15     MR. WHITTAKER:  You can't do that.
16     MR. GAVETT:  -- fourth iteration of
17 the same question.  Ask your next question.
18     MR. WHITTAKER:  Will you please note
19 where that happened so when the judge calls, we
20 can raise this issue with him?
21     BY MR. WHITTAKER:
22     Q    Did D.L.I. make a request for

Page 67

1  additional money with regard to the DOL wage
2  claim?
3      A    Verbally, it was discussed as part of
4  settlement, yes, they requested that.
5      Q    If you agreed to or if you on behalf
6  of Allegheny or Jefferson had agreed to
7  compensate D.L.I. during the project portions of
8  the wage issue, why do you expect D.L.I. to bear
9  the full brunt of the DOL's claim?
10     MR. GAVETT:  Objection.  Go ahead.
11     THE WITNESS:  I can't answer -- I
12 don't expect them to agree to that is my answer.
13 There is no why answer.  We simply do not expect
14 them to agree to it, which is why we are here.
15     BY MR. WHITTAKER:
16     Q    You testified earlier, correct me if
17 I am inaccurate, that you had agreed in March or
18 June or somewhat while D.L.I. was on the project
19 to assist D.L.I. financially and to advocate on
20 their behalf with regard to the DOL issue.
21     A    Correct.
22     Q    Why now is Allegheny or Jefferson

Page 68

1  expecting D.L.I. to incur the full brunt of that
2  claim?
3      MR. GAVETT:  Objection.  Go ahead.
4      THE WITNESS:  I would only postulate
5  as to why, because we had not gotten to the
6  settlement part of this dispute.  Our dispute
7  right now is in deposition.  That is all I know.
8  Mediation efforts, the first mediation --
9      BY MR. WHITTAKER:
10     Q    Not to interrupt but we don't need to
11 discuss settlement or mediation.  I'm not asking
12 you about that.  My question is solely -- let me
13 rephrase it and if you need to continue go ahead
14 but I don't want you to discuss settlement.  That
15 is not what I'm trying to inquire about.
16     D.L.I. has made a claim whether it
17 was verbally or during the litigation for
18 compensation for this back wage issue.  You
19 testified earlier that you had agreed in some
20 time, let's say, spring of '05, on behalf of
21 Allegheny Jefferson to compensate and to advocate
22 on behalf of D.L.I.  Why at this point has

Page 69

1  Allegheny denied that request for compensation in
2  full if you had previously agreed to assist
3  financially?
4      MR. GAVETT:  Objection.  Asked and
5  answered.  Go ahead.
6      THE WITNESS:  I don't expect them to
7  agree.  We have taken the position -- the
8  purposes -- the offer to settle included
9  financial assistance pending release of the
10 Miller Act, release of payment to the Department
11 of Labor on their behalf, not our behalf because
12 we actually did the payments.  D.L.I. had the
13 opportunity to make this go away on their own
14 behalf, chose to let it become our problem, the
15 Joint Venture's problem, for us to work out and
16 for us to escrow -- and for us to do the escrow
17 work on their behalf.
18     So, when they didn't take the lead,
19 we took the lead and made it their problem.
20 That's the answer.
21     Q    Do you believe D.L.I. hasn't
22 addressed the issue with the DOL?

Page 70

1    A    Correct. I know for a fact they owe
2    back wages for overtime, not withstanding the
3    issue of fringes. They simply have not paid
4    their men time and a half.
5    Q    But do you know if D.L.I. has engaged
6    counsel since the inception of this to address
7    the issue with the DOL?
8    A    I know they have but it got nowhere.
9    The Department of Labor was dissatisfied with it.
10    Q    Do you know if any formal order has
11    been issued to D.L.I. to pay its men?
12    A    Yes. There is a report from the
13    Department of Labor to D.L.I. to Shalom and to
14    Craftsmanship individually stating underpayment of
15    wages. It's a Department of Labor form they
16    created.
17    Q    Is that an informal or a formal
18    finding?
19    A    I don't know what you call it. I
20    know it was transmitted to your office, that is,
21    the backup for the escrow payment.
22    Q    I have seen backup. I have not seen

Page 71

1    any written directive or order, and I know I have
2    addressed that with counsel.
3    MR. GAVETT: There is a due process
4    letter that was sent out and I think you
5    contacted me and advised you were not familiar
6    with the fact that letter was issued even though
7    you were shown as copied on the letter. Once you
8    contacted me, I believe I had sent a scan of that
9    to you by e-mail.
10    MR. WHITTAKER: I thought that was a
11    letter from you to DOL regarding the payments.
12    Do you know if any formal directive or order has
13    ever been issued?
14    MR. GAVETT: The Department of Labor
15    issued a letter, I think they call it a due
16    process letter.
17    THE WITNESS: It is the notice to
18    respond. It says --
19    MR. WHITTAKER: Oh, you are correct.
20    THE WITNESS: -- you have 15 days to
21    make your intentions clear or they would
22    institute withholding from above, down through

Page 72

1    Centex down to us, down to D.L.I.
2    So, the process was we got ahead of
3    the game, we took the lead, which was critically
4    important from GSA's point of view, to pay the
5    workers the overtime that was owed because not
6    paying time and a half is an egregious error.
7    Forget the issue of fringes. Paying time and a
8    quarter for every overtime hour is an egregious
9    failure to obey the law, and it was very
10    stigmatizing to the courts and we took the lead.
11    D.L.I. would not take the lead on
12    making the payment. D.L.I. still as of this date
13    has not signed a consent to pay their own
14    workers, whereas Shalom has signed that consent
15    to pay their workers, and so has Craftsmanship.
16    BY MR. WHITTAKER:
17    Q    But D.L.I. has been addressing this
18    issue with the DOL.
19    A    D.L.I. has not consented to pay its
20    own workers overtime or fringes due with the
21    Department of Labor.
22    Q    Well, in fact, it got reduced by

Page 73

1    $36,000 yesterday. Wouldn't D.L.I.'s --
2    A    I don't know. It might be spread
3    around.
4    Q    -- handling of the matter have been
5    appropriate if they got it reduced? Wouldn't
6    that benefit everybody?
7    A    It certainly would. You are
8    absolutely right about that. I am glad to hear
9    it. I wish it had been reduced to zero.
10    Q    Don't we all.
11    What is your understanding of a time
12    and materials contract or time and materials
13    agreement?
14    A    Work performed by the hours verified
15    and signed off by a supervising official of sorts
16    or foreman and payment made on an hourly basis
17    for hours approved and verified they were worked.
18    Q    And how is that hourly amount paid?
19    How is it derived?
20    A    Well, it is arrived by agreement
21    either in writing or verbally or by invoice and
22    how it is actually invoiced. 55 and 65 per hour

# Capital Reporting Company

20 (Pages 74 to 77)

Page 74

1  are the two numbers used.
2      Q    So, what would be your opinion if the
3  labor costs increased on a project, the minimum
4  wage increased on a project so you are paying all
5  your employees six dollars and the U.S.
6  Government increased it to seven dollars?
7      A    If it is a change that came during
8  the course of the project that was unknown
9  before, that would cause a recalculation of the
10  cost.
11      Q    Would that be your same opinion with
12  regards to the Davis-Bacon increase on a project?
13      A    No, because the Davis-Bacon was
14  notified in advance two months before work
15  started and then again a month after work had
16  already started.
17      Q    But isn't it correct that everybody
18  thought the amount D.L.I. was paying and its
19  subcontractors were paying was the correct amount
20  and it included the fringes and per diems?
21      A    I am confusing the rate you are
22  talking about. You are talking about the T and M

Page 75

1  billed rate from D.L.I. to us or the actual rate
2  they paid the men?
3      Q    I am off the time and materials.
4      A    Okay.
5      Q    My question was, didn't you believe
6  as well as D.L.I. the amount that was being paid
7  to the workers and subcontractors was the correct
8  amount when you included the per diem and the
9  fringes? Wasn't that the position that Allegheny
10  as well as D.L.I. had taken?
11      A    Yes. D.L.I. certified they were
12  paying their men $28 per hour and the wage scale
13  was 20.72 per hour 4.48 an hour, 24.48 net per
14  hour. That was looked at by us, looked at by
15  Centex, looked at by other people. Yes. It says
16  28 on the certified payroll signed by Danny
17  Williams, D.L.I., and here is the wage scale,
18  okay, we're good. So, that is how it goes.
19      Q    So if that was inaccurate and the
20  amount that wasn't being paid was -- needed to be
21  increased, wouldn't D.L.I. be entitled to
22  additional compensation?

Page 76

1      A    What was inaccurate about that
2  payroll was that Jose Smith, let's just say, was
3  not being paid $28 an hour he was being paid 17
4  plus per diem.
5      Q    Am I incorrect that the position that
6  was taken was the per diem and the fringes should
7  be added to the hourly and that would agree with
8  the Davis-Bacon scale? Is that not the position
9  that was taken?
10      A    Can you rephrase that? I am not sure
11  I got it right.
12      Q    Wasn't the position that was taken by
13  D.L.I. and Allegheny that the per diem and the
14  fringes would be included to the hourly which
15  would make it comply with the Davis-Bacon wage?
16      A    Our position was -- I'm not going to
17  answer that question, it is not really phrased
18  properly but our position wash that the per diem
19  that was paid, free and clear of all
20  encumbrances, free and clear of any
21  reimbursements, free and clear of any receipts
22  turned in represented the actual wages or

Page 77

1  fringes, whatever you want to call it, the actual
2  compensation to the workers and, therefore,
3  needed to have been included in the application
4  that the Department of Labor was looking for.
5  That was our advocacy. It was a $350 check every
6  two weeks to Jose Smith. It is nothing attached
7  to it.
8      Q    Right.
9      A    Ironically -- yes. That was the
10  position. That is what we thought. We thought
11  that.
12      Q    But later DOL found that should not
13  have been included and that hourly rate should
14  have been increased. Under your interpretation
15  or understanding of a time and materials
16  contract, wouldn't that make the hourly rate
17  increase on a time and materials contract?
18      A    No, it would not.
19      Q    Why?
20      A    To begin with, an understanding of 55
21  dollars and 65 dollars per hour, all costs
22  included, there are historical spreadsheets that

**Capital Reporting Company**

Page 78

1 would show this, the wage rate paid plus the
2 burden, plus overhead and profit, plus field
3 costs, hotel, lodging, parking, you name it, plus
4 ordinary and reasonable overhead and profit equal
5 $55 and $65 per hour, $55 and $68 per hour, and
6 that was what was, in fact, being paid. That was
7 based upon a normal rate of 24 an hour, 22 an
8 hour for a carpenter, which is in line with the
9 wage scale.
10    So, the reality of the understanding
11 of D.L.I.'s workers is that they were being paid
12 properly anyway, an assumption, and that $55 an
13 hour T and M rate was more than sufficient to
14 cover the cost of being there as well as normal
15 overhead and profit.
16    Q    That amount was agreed to between
17 yourself and Dale Lacy of D.L.I. before this
18 Davis-Bacon issue had come about, is that
19 accurate?
20    A    It had been used in previous projects
21 and was used again on the Prettyman Courthouse
22 and agreed to the Prettyman Courthouse with the

Page 79

1 inclusion of the Davis-Bacon.
2    Q    You had done other Davis-Bacon
3 projects with D.L.I.?
4    A    No. The Davis-Bacon facts of October
5 of '04 clearly show $20 dollars an hour for wages
6 and 3.72 for fringes, 24 bucks an hour. That is
7 not in the marketplace a high rate. It is an
8 average rate.
9    Q    That was the amount you had paid --
10 Allegheny or Jefferson had paid D.L.I. on another
11 nonDavis-Bacon jobs, is that accurate? Is that
12 what you're saying?
13    A    55 and 65 were the rates that were
14 being paid to D.L.I. on other nonDavis-Bacon jobs
15 out of town, correct.
16    Q    And you don't believe that if it was
17 a Davis-Bacon job, that amount should have been
18 increased?
19    A    No, I don't.
20    Q    Is that what you're saying?
21    A    Because the Davis-Bacon wage and
22 fringes together equal an average market rate for

Page 80

1 a carpenter.
2    MR. WHITTAKER:  Let me grab another
3 binder.  Excuse me.
4    (Recess taken.)
5    MR. WHITTAKER:  Mark this as 3,
6 please.
7         (Allegheny Jefferson
8         Deposition Exhibit No. 3,
9         Allegheny Jefferson
10        interrogatory responses,
11        was marked for
12        identification.)
13 BY MR. WHITTAKER:
14    Q    I have marked as Exhibit 3 your
15 interrogatory, Allegheny Jefferson interrogatory
16 responses.
17    MR. GAVETT:  Supplemental or the
18 original?
19    MR. WHITTAKER:  This is the
20 supplemental --
21    MR. GAVETT:  Okay.
22    MR. WHITTAKER:  -- dated May 24th,

Page 81

1 signed May 23rd.
2 BY MR. WHITTAKER:
3    Q    In your interrogatory response, sir,
4 this was answered by you, you're indicating there
5 was a backcharge issued to D.L.I. for punch list
6 work that was not completed.
7    A    Correct.
8    Q    When was that punch list presented to
9 D.L.I.?
10    A    They were working on a punch list
11 when they left the job. The punch list was an
12 ongoing creation. It was a large building that,
13 as they were being issued, being given to
14 D.L.I.'s men who were doing the work on, let's
15 say, floors one, two, three, four, five and six
16 were punch listed, for example. The list had
17 been created, had not been distributed, D.L.I.
18 left the job. Then they were distributed. We
19 had an obligation to finish the punch list work.
20    Q    Did you ever provide any notice of
21 default to D.L.I.?
22    A    I don't recall.

Page 82

1    Q    Do you know if the contract requires
2 Allegheny to provide a notice of default to
3 D.L.I.?
4    A    I don't know.
5         MR. GAVETT: Objection. Go ahead.
6         THE WITNESS: I don't know.
7         BY MR. WHITTAKER:
8    Q    Allegheny backcharged D.L.I.
9 $13,416 for not completing the punch list?
10   A    Correct.
11   Q    Do you have that document?
12   A    Yes. Let's see. Tab 20 of our
13 binder.
14        MR. GAVETT: Exhibit 2.
15        THE WITNESS: Exhibit 2, tab 20.
16        BY MR. WHITTAKER:
17   Q    Are any of those back charges related
18 to the time and materials scope of the project?
19   A    Five and six, no. These are calking
20 issues relating to wood base. Wood base is part
21 of the -- nail holes, calking and casings on
22 doors and wood base going to the doors. So, the

Page 83

1 answer is no. It is part of the lump sum
2 contract.
3    Q    But on floors two three, and four,
4 that was time and materials?
5    A    No. For a lump sum contract with
6 D.L.I., the door frames throughout floors one
7 through six were part of the lump sum contract.
8 So, a door frame on floor two that needed calking
9 or nail holes touched up would need to be done.
10   Q    So it is your testimony that the
11 $13,000 backcharge for noncompletion of the punch
12 list is all -- none of it is time and
13 materials --
14   A    Correct. That is my testimony.
15   Q    -- portion of the project?
16   A    That's correct. Those charges were
17 done at the cost rate too, not 55 and not 65 an
18 hour, just for the record. They were done at 35
19 and 42 an hour, which included Davis-Bacon by
20 other forces who complied with Davis-Bacon and
21 paid -- and charged 42 an hour, evidence that 55
22 an hour is certainly a reasonable market rate.

Page 84

1    Q    So, it is your testimony that D.L.I.
2 was provided the final punch list but didn't
3 complete it?
4    A    No. They were working on punch lists
5 that they thought they had finished enough of.
6 The remaining punch list had not been issued when
7 they left the job, and that was that.
8    Q    And to the best of your recollection,
9 no notice was provided to D.L.I.?
10   A    I don't recall. I do recall an
11 e-mail being sent to D.L.I.'s office saying we
12 are proceeding a punch list for five and six. I
13 would have to pull my records for e-mails.
14   Q    If you could produce that as
15 requested?
16   A    Okay.
17   Q    Thank you.
18        I am not sure which tab it is but it
19 is rejected work tickets. They are marked in my
20 Exhibit 1 number one as tab 2.
21   A    In our binder, it is -- the Exhibit 2
22 binder is tab eight for us, the spreadsheet.

Page 85

1    Q    You refer to work order 17787. Is
2 that correct?
3    A    Correct.
4    Q    Why was that rejected?
5    A    We did not direct them to take the
6 fireproofing off the steel columns.
7    Q    Who is John Ross?
8    A    John Ross is the superintendent for
9 Jefferson -- for Jefferson Millwork,
10 subcontractor under LLC.
11   Q    And a member of Allegheny Jefferson?
12   A    Yes.
13   Q    Did John Ross sign work order 17787?
14   A    John Ross and any foreman's duty is
15 to sign to verify hours worked and they were
16 doing so on T and M work throughout the other
17 floors. So, the preponderance of work at that
18 time frame on January 7 of '05 was T and M. John
19 Ross was signing work tickets on a daily basis to
20 verify hours. That is what the signature there
21 represents.
22   Q    This is time that D.L.I. put into the

Page 86

1    project as signed off on by John Ross?
2        A    That is what he says. John Ross says
3    they worked four hours cleaning fire retardant
4    off. That's what John Ross signature says.
5        Q    If we turn, I think the next one is
6    17701, why was that rejected?
7        A    The actual work here claimed appears
8    to be prescribing shelves to fit inside radius
9    walls which are shown on the plans as radius and
10   received closet shelves. Cutting the fit
11   woodwork into a wall system is part of the
12   installation required by AWI's guidelines and it
13   is part of the contract and should be part of the
14   contract.
15       Q    So, your representation was this was
16   rejected because this was part of the contract,
17   not time and materials. Is that accurate?
18       A    Yes.
19       Q    17705 is the next one. Why was this
20   rejected?
21       A    Same issue, part of the contract.
22       Q    Whose signature is at the bottom?

Page 87

1        A    That is Lars Larson. He was a
2    superintendent working under Allegheny Millwork
3    and he verified time for hours presented to him.
4        Q    And he had authority to do so?
5        A    To count hours, yes. He doesn't have
6    authority to make decisions about contract
7    issues.
8        Q    And that is his signature also on
9    17705, correct?
10       A    Yes.
11       Q    And why was 18449 rejected?
12       A    449? Plexiglass on long and short
13   side, became too large, verified hours only. Do
14   you have a copy of my spreadsheet? The reasons
15   there are given, again, field scribing required
16   created dry cleaning installation, shop fit is
17   not possible. I gave reasons why on each one of
18   these tickets.
19       Q    I'm asking you to testify now.
20       A    Okay.
21       Q    It says they came too large. Do you
22   know what that means on that ticket?

Page 88

1        A    Meaning that we cut down the fit,
2    which is what you would want. You would want an
3    exact fit created by the installer rather than
4    providing something --
5        Q    It is your testimony that this was
6    under the contract scope?
7        A    Correct.
8        Q    18315.
9        A    18315, add locking behind gallet
10   cabinet, standard cabin installation per contract
11   is our position on that.
12       Q    Part of the contract?
13       A    Yes.
14       Q    17736, why was this rejected?
15       A    D.L.I. was making shims for its
16   installation. Shim material was provided to
17   D.L.I. to shim out walls rather than provide them
18   with strips that were predetermined by the shop.
19   He gave them sheets of plywood that they could
20   make whatever size they needed at the time they
21   needed it. So it would be an as-you-go decision
22   on their part, not our part, what was best for

Page 89

1    them.
2        Q    Why was it rejected?
3        A    Because the work involved was to
4    their benefit and would be something that would
5    cause them less work than if we were to decide
6    for them what was best for them.
7        Q    But it was still hours provided to
8    the project, right?
9        A    Just like all the other hours were.
10       Q    But this was to be paid time and
11   materials?
12       A    No, this is lump sum contract. This
13   is the work on the staircase.
14       Q    The next one, 1553, why was this
15   reject?
16       A    Cut window sills to fit the window
17   angles and columns in room 1517, which is a
18   servery. It is a field scribing. It is part of
19   AWI's requirement. AWI is the Architectural
20   Woodwork Institute. They are mentioned in these
21   specifications. Specifications are part of the
22   contract. All installations must follow AWI

# Capital Reporting Company

Page 90

1    premium grade guidelines.
2        Q    So this is part of the contract?
3        A    Correct.
4        Q    15558.
5        A    Install base in the floors; base in
6    lobby area not on scope, describe the floor. It
7    was shown on the plans as a room number. The
8    architectural plans show it if you look at the
9    plans one way. If you look at the plans another
10   way like the foreman did, it didn't show it. It
11   is six hours worth of work.
12       Q    Why was it rejected?
13       A    It was considered part of the
14   contract.
15       Q    You are saying the two documents
16   conflicted to each other?
17       A    No. It is just the way you look at a
18   drawing showing a finished schedule for wood base
19   where the pillister -- the pillister or column
20   interrupt the finishes from one room to the next.
21   It is really an arcane kind of discussion point.
22       Q    You are saying this is per the

Page 91

1    contract?
2        A    It is part of the contract. That is
3    hour position, so is Centex's, by the way.
4        Q    The next one, I can't read that
5    number. 13439?
6        A    19435.
7        Q    Okay.
8        A    Redo base in the back of courtrooms.
9    There is an area in the back of the courtrooms
10   that calls for wood base and it is required to go
11   take the base down the steps or take it through
12   all areas of the room. They claim that there
13   wasn't -- that they asked the question and that
14   they were told to stop at a point but then they
15   were told later to go and finish the rest of the
16   room. They claimed that there was an extra
17   related to the fact that they were told one thing
18   and they had to do the full amount shown by the
19   contract. They ended up doing the full amount
20   shown by the contract. But it is not an extra
21   room.
22       Q    The next one, 15566.

Page 92

1        A    Field scribing, same issue as above,
2    AWI requirements, 1.2 hours.
3        Q    Part of the contract?
4        A    Correct.
5        Q    You can say per the contract. 18972?
6        A    Per the contract.
7        Q    18937?
8        A    Per the contract.
9        Q    18992?
10       A    Per the contract.
11       Q    18996?
12       A    Per the contract.
13       Q    19451?
14       A    Per the contract.
15       Q    Do you know why these Sunbelt
16   invoices are included?
17       A    Just as backup. We provided mobile
18   lifts after the structural scaffolding was taken
19   down so the men could access their work. Lifts
20   were given to D.L.I.'s men free of charge.
21       Q    18997 says part of contract.
22       A    Correct.

Page 93

1        Q    19000?
2        A    Part of contract.
3        Q    19452 says part of contract. 19007?
4        A    I have to look at that again.
5    Revisit area, complete elevation, 2.5 hours. I
6    don't recall. Go back in the areas already
7    installed, they were completed, may have galley
8    leads. Lars denied it, Lars Larson who was the
9    foreman for that area denied D.L.I. installed
10   half depth legs by cutting down full leg intended
11   for another location. Half depth leg became
12   useless. D.L.I. lost two legs. Two were
13   provided as replacements.
14           So, it sounds like Allegheny Millwork
15   of Pennsylvania provided extra legs to correct
16   the mistake that D.L.I. made in cutting down
17   legs. That extra cost of those legs has not been
18   backcharged to date.
19       Q    19030?
20       A    Part of contract.
21       Q    And 19031?
22       A    Part of contract.

Page 94

1    Q    I'd ask you to turn to tab number
2  four.
3    A    Your binder?
4    Q    Yes. Can you indicate what this
5  document is?
6    A    This is a backcharge invoice, one of
7  the backcharge invoices from Centex -- there are
8  several -- about cleaning. I --
9    Q    Go ahead.
10    A    I was going to say I have already
11  disputed this with Centex, for the record, have
12  not settled it. D.L.I. not on site is my
13  writing. I circled the month October. I said
14  cleaning the basement is not our issue. So, I
15  told Centex in October.
16    Q    When did D.L.I. leave the project?
17    A    The end of September, I think, of
18  '05.
19    Q    How much did you backcharge D.L.I.
20  for this invoice? How much did you apportion to
21  D.L.I.?
22    A    Well, this is in tab -- in my binder,

Page 95

1  Exhibit 2, it is under tab 21 and the amount of
2  that K number 0175, D.L.I. received 20 percent of
3  that for $835.60.
4    Q    How did you come to that number?
5    A    By presence on the job site,
6  essentially. There were other workers there
7  besides D.L.I. There was Mahogany, there was
8  Jefferson, there was Allegheny's folks. And
9  there was certainly a component where I don't
10  agree with Centex, and I disputed it.
11    Q    That backcharge is for September and
12  October and D.L.I. wasn't there in October?
13    A    Right.
14    Q    And all floors of Annex, Penthouse,
15  parking areas and prison tunnel?
16    A    Annex is basically the Courthouse.
17  When they say Annex, that's everything.
18    Q    Where is the penthouse?
19    A    I never went there. The parking
20  areas, prison tunnel, we didn't go there either.
21    Q    Did D.L.I. work -- we know they
22  worked in the Annex. Did they work in the

Page 96

1  penthouse, parking area or prison tunnel?
2    A    No.
3    Q    Did Allegheny?
4    A    No. That is why I disputed it. But
5  the portion that is going to -- 20 percent is a
6  reasonable number of $836. A notice was given on
7  those matters on March 11 of '05.
8    Q    To D.L.I.?
9    A    Yes. They were put on notice in
10  March of '05 by Centex. I turned this notice
11  over to D.L.I. with photographs, as to safety and
12  housekeeping issues, housekeeping meaning
13  cleaning issues.
14    Q    Would you look at tabs 14, 15 and 16
15  in my binder, Exhibit No. 1?
16    A    14? Yes.
17    Q    I think 15 and 16 all relate to the
18  same issue. And 17. Number 14, is an e-mail
19  from you to Danny at D.L.I. "Danny, can you fax
20  me something per below? I think that this will
21  be the last of this." And below is an e-mail.
22  That is signed by Mike Corrigan on behalf of

Page 97

1  Jefferson Millwork.
2    MR. GAVETT:  I just want to make sure
3  we are not getting off track on the tab
4  identification. The binder Mr. Corrigan and I
5  have for Exhibit 1, the e-mail you just recited,
6  Mr. Whittaker, is tab 15.
7    MR. WHITTAKER:  Okay.
8    BY MR. WHITTAKER:
9    Q    And then below is a letter or an
10  e-mail to you -- I'm sorry -- from Centex
11  regarding GSA, stating they have made restitution
12  to their employees for Davis-Bacon violations.
13  They are requesting D.L.I. to produce a letter.
14  And then I guess it's your tabs 16, 17, and 18,
15  basically involve further requests regarding that
16  letter. Is that correct? Is that accurate?
17    A    Yes, June 1 of '05, June 1 of '05,
18  May 26 of 05, May 23, yes, it was sent in twice.
19  I think it was a wording issue.
20    Q    What were the reasons for those
21  e-mails?
22    A    Centex requested it, as GSA requested

Page 98

1    it from them as a way to make the thing go away.
2       Q    And by the thing, you mean the
3    Davis-Bacon claims?
4       A    Correct, the gathering storm.
5       Q    And you believed at this point by
6    writing this letter that the issue would be
7    resolved, the Davis-Bacon issue would be
8    resolved, is that correct?
9       A    No. I hoped. I don't know what I
10   believed. I hoped it would.
11      Q    You say here on -- I'm sorry. I
12   didn't mean to interrupt you. You say here on, I
13   guess it's tab 16, "this should be the end of the
14   matter."
15      A    This should be the last of it.
16      Q    This is another one. Yes. This
17   should be the last of this, and then this should
18   be the end of the matter is on the next e-mail.
19      A    Right.
20           MR. GAVETT: I'm sorry. Which tab
21   are we looking at? Tab 15?
22           THE WITNESS: Yes.

Page 99

1           BY MR. WHITTAKER:
2       Q    What did you mean by that?
3       A    That it was my hope that we calmed
4    the storm and that the gathering questions about
5    compliance issues were laid to rest based upon
6    certifications from D.L.I., that the word of the
7    office of D.L.I. was sufficient to make them stop
8    investigating. That did not turn out to be the
9    case.
10      Q    I'd ask you to turn to my tab 24. It
11   is an e-mail from you to Dale Lacy on January 28,
12   '06.
13      A    Yes.
14      Q    I'm sorry. The top is from Dale to
15   you on January 28, '06 and below that is an
16   e-mail from you.
17           MR. GAVETT: Again, for the purpose
18   of our record, the exhibit marked Exhibit 1 in
19   Mr. Corrigan's binder is tab 25 for that
20   particular document.
21           MR. WHITTAKER: All right.
22           BY MR. WHITTAKER:

Page 100

1       Q    With your e-mail which is dated
2    Friday, January 27, 2006, what is the purpose of
3    that e-mail?
4       A    For purposes of settlement.
5       Q    Does it say anywhere on here this is
6    the purpose of settlement?
7       A    The word "settlement" is not there.
8    The word "conditional concept" is there.
9       Q    What did you mean by conditional
10   concept?
11      A    It is approvable by -- it should be
12   approvable by my joint venture partner, Allegheny
13   Millwork.
14      Q    Is it fair to say this is a payment
15   plan?
16      A    It is steps to unwind the Department
17   of Labor matter first and foremost and retracting
18   the Miller Act notice secondly.
19      Q    And here, under conditional concept,
20   you agree to contribute a portion of the DOL
21   claim.
22      A    Correct.

Page 101

1       Q    How much did you agree to -- again
2    conditionally, how much did you agree to
3    contribute to the DOL portion?
4           MR. GAVETT: Objection.
5           THE WITNESS: I don't recall anyway.
6           BY MR. WHITTAKER:
7       Q    If you look at number nine, does that
8    refresh your recollection?
9       A    D.L.I. has funded half of the AJM
10   contributions to DOL. Whatever dollar amount
11   that was, I don't know.
12      Q    Does that mean that AJM had agreed
13   conditionally to pay one half?
14      A    No. There is X amount of dollars,
15   let's say 20 grand to be simple. $10,000 would
16   go out in that period number nine and another
17   10,000 -- I don't know -- it is part of the
18   unrolling -- so, this e-mail was to show
19   liquidity, to show movement of payments and to
20   make agreements to have the workers paid.
21      Q    And did D.L.I. accept this proposal?
22      A    No. My understanding is they did

# Capital Reporting Company

Page 102

1  not.

2  Q   Did that e-mail from above on
3  January 28, 2006, that doesn't accept it, in your
4  opinion?

5  A   Well, no, the lawsuit made that
6  clear.

7  Q   Well --

8  A   As a side note, the negotiations on
9  the IMF headquarters were spinning downward too.
10  That has been settled since then. But both
11  lawsuits ended up ed at the same time.

12  Q   That's because -- strike that.

13  The amounts contained or the items
14  contained in your January 27, 2006 e-mail were
15  never paid, is that correct?

16  A   This is a conditional concept for
17  approval.

18  Q   Right.

19  A   It was not agreed. The retracting of
20  the Miller Act notice, in the order of events,
21  none of these things happened, starting with
22  number one. We never agreed on a final contract.

Page 103

1  The Miller Act was never retracted. So three
2  through nine don't exist. It's an order of
3  events.

4  Q   Why would the Miller Act notice be
5  retracted if the amounts weren't paid?

6  A   No. Actually, item one would happen.
7  We agreed on a final contract amount, which did
8  not occur, and retract the Miller Act notice and
9  then start the funding, the issue being Centex
10  holding funding because of the Miller Act and the
11  Department of Labor matter and the lawsuit.

12  Q   I'd ask you to turn to the next page,
13  two pages, I'm sorry. Do you know what that
14  document is?

15  A   It looks like D.L.I. invoice register
16  and Dale's drawings, which he does, and paid
17  versus bills.

18  Q   And what is this handwriting -- not
19  the Dale doodle --

20  A   $75,000 must be the amount that is in
21  contention for the American Indian Museum.
22  $300,000, no DOL and one-forty. So, I guess that

Page 104

1  would be one-sixty.

2  Q   Whose handwriting is that?

3  A   That is mine.

4  Q   That's what I was asking.

5  Now, continue. I'm sorry.

6  A   If you take the Department of Labor
7  matter out of it and deduct it from it, it goes
8  down to one-forty is my guess and then there is a
9  117K below that, and then I think we went out and
10  had drinks. That is where it ended.

11  Q   What does no DOL mean?

12  A   Meaning we take care of the
13  Department of Labor. He's out of the loop and we
14  pay the money out of his account.

15  Q   When was this document done or your
16  handwriting?

17  A   I am guessing it was after the --
18  well, it was early '06, I'm guessing. I don't
19  know. It was at a meeting -- we could find out.
20  It was a trip that Dale Lacy made to my offices
21  in Virginia and at my desk it was discussed and
22  scribbled on, I believe.

Page 105

1  Q   And at that point, you had offered on
2  behalf of Allegheny to be responsible for the DOL
3  back wage claim?

4  A   No, deducted from him and make those
5  payments on his behalf to -- ultimately he would
6  be paying it. It's one way of looking at the
7  amount that is out there. If you have 373, take
8  75,000 off and it is off the table for another
9  entity, you have 300,000 left. If D.L.I. makes
10  that payment to the Department of Labor direct,
11  it is still money out of his department. It is
12  trying to get to a net number of what he comes
13  out with. But it was for purposes of settlement,
14  these discussions.

15  Q   What is the 300K or 23K?

16  A   23,000 profit. Dale had mentioned in
17  his e-mail that if he made everything he wanted,
18  he would make $23,000, $32,000 margin. He shows
19  his costs there of 1.993 million, 190, $218,000
20  being profit on the job. If you take 218 minus
21  what I don't intend to pay him, then his profit
22  would have been 23,000 in that situation, given

# Capital Reporting Company

Page 106

1  that settlement. It would have shown a positive
2  cash flow but not very good.
3      Q     What happened as a result of this
4  doodling?
5      A     It was not agreed to, he left the
6  table and we went to a bar and that was it.
7      Q     So, you guys didn't reach any
8  agreement but yet you went out to drink?
9      A     Correct. The same would be true on
10  IMF.
11      Q     The attorney's fees that you are
12  seeking from Thelen Reid, that AJM is seeking,
13  what does AJM base its claim on to recover those
14  fees?
15      A     We provided work effort on behalf of
16  D.L.I. and D.L.I.'s sub subcontractor, Shalom
17  Carpentry, who --
18      Q     You already answered that portion of
19  it. I wasn't trying to reinquire. Is there any
20  contractual language that requires D.L.I. to pay
21  that amount?
22      A     I'm not aware. I have not read the

Page 107

1  contract to look for that yet.
2      Q     Is it your opinion that those
3  attorney's fees arose from a breach of the
4  contract, your contract with D.L.I.?
5      A     Nonpayment of wage scale would be a
6  breach of contract. So, yes, it would be a
7  requirement hoisted upon us by the general
8  contractor.
9      Q     Those attorney's fees didn't arise --
10  they arose prior to any -- those attorney's fees
11  were accrued by Allegheny to support its
12  position, is that accurate, not as a result of
13  any breach?
14      A     The work product that came out of
15  those attorney fees was work product that was to
16  the benefit of the Joint Venture, the LLC and
17  D.L.I. and Centex, for that matter, and GSA for
18  that matter. GSA is a separate entity of the
19  Department of Labor.
20          Each one of that party wanted this
21  issue to be settled in a manner that made sense
22  and that everyone could get their hands around.

Page 108

1  GSA's attorneys read that report too. GSA's
2  attorneys were interested in knowing that we had
3  our ducks in a row.
4      Q     I'm not sure if you answered my
5  question. Those attorney's fees were incurred to
6  support the parties' position, not as a result of
7  any breach, is that accurate?
8      A     They were incurred to support all of
9  the parties' position due to the -- yes. You
10  would have to say the perception of a breach.
11  No. Let me rephrase that. Because at that time
12  it was known there was an overtime differential
13  that had not been paid. So, the end of July of
14  '05, it was clear that time and a half was not
15  being paid to all the men. That is when all hell
16  broke loose and that is when it was almost an
17  immediate demand for the Joint Venture or
18  somebody at D.L.I. to provide concrete evidence
19  rather than a web site.
20          We provided the web site page that
21  was presented to us by D.L.I. saying this is what
22  the web site component says about fringes and per

Page 109

1  diem payments.
2          GSA said, that is nice but that is
3  not good enough. We need more backing. Ask
4  Centex for their opinion. They said, talk with
5  Thelen Reid. They have a good strong labor
6  department and we are working with them on a
7  project for other reasons, but work within the
8  department and get an opinion that will make this
9  go away.
10          D.L.I. did not get an opinion about
11  the case until after the fact or did not obtain
12  counsel until well after that report was written.
13  And it was caused by the breach of contract due
14  to the overtime which restitution was given for
15  in part, not in full.
16      Q     Restitution was given for?
17      A     Yes. Partial overtime restitution
18  was paid per Exhibit 2 binder and it was $47,000
19  that Shalom Carpentry paid those workers, because
20  they were nod paying time and a half. They were
21  paying time and a quarter.
22      Q     When that amount was increased, did

Page 110

1  D.L.I. eventually put it back to the way it was?
2  Did they increase the wages and then lower them
3  again?
4      A    There are rumors to the effect, and
5  this is a Greg King affidavit to the GSA, Greg
6  King being one of the employees of Craftsmanship,
7  wrote an e-mail to GSA saying this is what's
8  happening to us on this job site. I wasn't privy
9  to that until well after a year later.
10     Q    Let me ask you another question. Did
11 you tell Dale to lower his wages again because
12 your opinion or Thelen Reid's or the position you
13 were taking was accurate?
14     A    No, I did not.
15         THE REPORTER: Counsel, can we take
16 about a ten-minute recess?
17         MR. WHITTAKER: I'm actually done if
18 I can just speak to my client for a moment.
19         (Recess taken.)
20         MR. GAVETT: I have no questions.
21 The witness will read and sign. So, if you can
22 send me the transcript and your bill, I will see

Page 111

1  to it that he reviews this transcript.
2         I should also indicate for the record
3  that counsel are retaining Exhibits 1 and 2.
4  Exhibit 1 is being retained by Mr. Whittaker and
5  Exhibit 2 is going to be retained by the
6  defendant, Allegheny Jefferson.
7         (Deposition concluded at 12:02 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 112

1         A C K N O W L E D G E M E N T   O F
2                  D E P O N E N T
3
4
5  I, MICHAEL CORRIGAN, do hereby acknowledge I have
6  read and examined the foregoing pages of
7  testimony, and the same is a true, correct and
8  complete transcription of the testimony given by
9  me, and any changes or corrections, if any,
10 appear in the attached errata sheet signed by me.
11
12
13
14
15
16
17
18
19
20
21 _____      _____
22 MICHAEL CORRIGAN           DATE

Page 113

1  State of Maryland
2  County of Howard, to wit:
3         I, CAROL J. ROBINSON, a Notary Public
4  of the State of Maryland, Howard County, do
5  hereby certify that the within-named witness
6  personally appeared before me at the time and
7  place herein set out, and after having been duly
8  sworn by me, according to law, was examined by
9  counsel.
10        I further certify that the examination
11 was recorded stenographically by me and this
12 transcript is a true record of the proceedings.
13        I further certify that I am not of
14 counsel to any of the parties, nor in any way
15 interested in the outcome of this action.
16        As witness my hand and notarial seal
17 this 23rd day of July 2007.
18
19            CAROL J. ROBINSON, RPR
20            Notary Public
21 My commission expires:
22 April 1, 2011

**Capital Reporting Company**

Page 113

1    State of Maryland

2    County of Howard, to wit:

3         I, CAROL J. ROBINSON, a Notary Public

4    of the State of Maryland, Howard County, do

5    hereby certify that the within-named witness

6    personally appeared before me at the time and

7    place herein set out, and after having been duly

8    sworn by me, according to law, was examined by

9    counsel.

10        I further certify that the examination

11   was recorded stenographically by me and this

12   transcript is a true record of the proceedings.

13        I further certify that I am not of

14   counsel to any of the parties, nor in any way

15   interested in the outcome of this action.

16        As witness my hand and notarial seal

17   this 23rd day of July 2007.

18

19        CAROL J. ROBINSON, RPR

20        Notary Public

21   My commission expires:

22   April 1, 2011