Page 1

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLUMBIA

3    UNITED STATES OF AMERICA        *

4    for the use and benefit of      *

5    D.L.I. INCORPORATED,            *   Case No.: 1:06CV00875

6       Plaintiff                    *   Judge:  Royce C. Lamberth

7    v.                              *

8    ALLEGHENY JEFFERSON             *

9    MILLWORK, LLC., et al.,         *

10      Defendants                   *

11                    *    *    *    *    *

12                  DEPOSITION OF DALE LACY

13       The deposition of Dale Lacy, taken in the

14   above-captioned case on Wednesday, July 11th, 2007,

15   commencing at 10:00 a.m. at the Law Offices of Shawn

16   Whittaker, 1010 Rockville Pike, Rockville, Maryland and

17   was reported by Dawn M. Hyde, notary public.

18                  EVANS REPORTING SERVICE

19              7 North Calvert Street, Suite 705

20                 Baltimore, Maryland 21202

21                    (410) 727 7100

**EXHIBIT 2**

Page 2

1  APPEARANCES:
2  SHAWN C. WHITTAKER, ESQ.
   The Law Office of Shawn C. Whittaker, P.C.
3    1010 Rockville Pike, Suite 607
   Rockville, MD  20852
4    (301) 838 4502
   shawn@whittaker.law.com
5    On behalf of Plaintiff
6  GEOFFREY GAVETT, ESQ.
   Gavett & Datt
7    15850 Crabbs Branch Way, Suite 180
   Rockville, MD  20855-2622
8    (301) 948 1177
   ggavett@gavettdatt.com
9    On behalf of Defendants
10  ALSO PRESENT:
11  Mr. Mike Corrigan
12
13
14
15
16
17
18
19
20
21

Page 3

1        P R O C E E D I N G S
2            *  *  *  *  *
3        (D.L.I. Deposition Exhibit No. 1 was
4          marked for identification.)
5  Whereupon,
6            DALE LACY
7  a witness herein, called for oral examination in the
8  matter pending, being first duly sworn to tell the
9  truth, the whole truth, and nothing but the truth,
10  testified as follows on
11            EXAMINATION
12    BY MR. GAVETT:
13    Q    Mr. Lacy, for the record, could you state
14  your name, business and residential address, please.
15    A    Dale Lacy.  Business address is 1823 Second
16  Avenue North, Lake Worth, Florida 33461.  Residential
17  address is 352 South Country Club Drive, Atlantis,
18  Florida 33462.
19    Q    Mr. Lacy, have you ever given a deposition
20  before?
21    A    No.

Page 4

1    Q    Let me go over some ground rules for
2  depositions that will help us kind of get through the
3  process as quickly and efficiently as possible.
4        First ground rule is that if I ask you a
5  question that you don't understand because I have
6  garbled it or that I use terminology incorrectly
7  because you operate in an area of specialty, please
8  feel free to ask me to either repeat the question or to
9  rephrase the question so that you understand it.  I
10  don't want you answering any questions that are unclear
11  to you.
12        Second kind of rule of the road is that if
13  you answer a question yes or no, please actually
14  verbalize yes or no as opposed to uh-huhs and uh-uhs
15  and nods of the head and shakes of the head because our
16  court reporter needs to actually have a clean
17  transcript that records specifically what you're
18  saying.  In other words, you're relying on her to
19  interpret your nods and gestures and such.
20        Thirdly, in social conversation it's often
21  common for us to talk over top of one another to

Page 5

1  anticipate the end of my question and start answering.
2  Or, conversely, if you are in the middle of an answer
3  for me to try and clarify, et cetera.  Please try and
4  let me get my complete question out before you start
5  answering it because I may go in a direction you're not
6  anticipating.
7        Likewise, I will try not to question over top
8  of your answer, although if I think you're going in a
9  direction where you're spending a lot of time and it
10  wasn't what I was looking for, I may try and stop you
11  and give you a time-out.
12        Lastly, nothing about this is an endurance
13  exercise, so if you need any time to take a break, use
14  the facilities, let me know and we'll accommodate you.
15  Okay?
16    A    Okay.
17    Q    Mr. Lacy, are you here as the corporate
18  representative of D.L.I. Incorporated in response to a
19  notice of deposition which has been marked as Exhibit
20  No. 1 to your deposition?
21    A    Yes.

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 6

1    Q    And have you reviewed the notice of
2    deposition with your counsel?
3    A    Yes.
4    Q    Can you tell me, first of all, what is your
5    employment capacity with D.L.I.?
6    A    President.
7    Q    And can you tell me who are the shareholders
8    or owners of D.L.I.?
9    A    Janice S. Lacy and myself.
10   Q    Is Janice your wife?
11   A    Yes.
12   Q    When was D.L.I. formed?
13   A    1994.
14   Q    And where was it incorporated?
15   A    Florida.  Palm Beach County.
16   Q    Is D.L.I. authorized to do business in the
17   District of Columbia?
18   A    Yes.
19   Q    Has it filed papers to be -- with the
20   District of Columbia government to be accepted as a
21   formed corporation in the District?

Page 7

1    A    I don't know.
2    Q    Is D.L.I. a subchapter S corporation or a
3    C corp?
4    A    S.
5    Q    It's an S corporation.  And what is the
6    business of D.L.I.?
7    A    Millwork installation.
8    Q    D.L.I., you told us earlier, was formed in
9    Florida.  Has that been the principal geographic
10   location for most of D.L.I.'s work in its corporate
11   history?
12   A    It's 50/50.
13   Q    So 50 percent in the state of Florida and 50
14   percent in other jurisdictions?
15   A    Yes.
16   Q    Prior to the Prettyman Courthouse, what
17   projects, if any, had D.L.I. performed in the District
18   of Columbia?
19   A    International Monetary Fund, the Museum for
20   the American Indian.  I'm sure there are others; I just
21   can't think of them now.

Page 8

1    Q    Prior to the Prettyman Courthouse, had D.L.I.
2    ever worked on any projects in which the so-called
3    Davis-Bacon scale was in effect?
4    A    No.
5    Q    So the Prettyman Courthouse was your first
6    Davis-Bacon job?
7    A    Yes.
8    Q    Is D.L.I. a union or nonunion contractor?
9    A    Nonunion.
10   Q    Have any unions ever attempted to organize
11   the laborers at D.L.I.?
12   A    No.
13   Q    Within D.L.I., are there different
14   classifications of employees in terms of field labor?
15   In other words, are there carpenters and then just
16   simple laborers or how do you that have organized?
17   A    The answer is yes.  I mean, we have foremen,
18   journeymen, carpenter's helpers, laborers.  That's all.
19   Q    I take it the laborers basically provide the
20   most basic stocking of materials, cleaning of areas,
21   that sort of thing?

Page 9

1    A    Right, yes.
2    Q    And then the carpenters' helpers provide
3    assistance to the journeymen as they're actually
4    installing?
5    A    Yes.
6    Q    How many people do you employ in the home
7    office operations?
8    A    Thirty.
9    Q    And this is primarily clerical and
10   administrative staff?
11   A    No, I'm sorry.  I misunderstood your
12   question.  In the office?
13   Q    Yes.
14   A    Three.
15   Q    Three employees in the office?
16   A    Correct.
17   Q    Can you tell me who those are?
18   A    Myself, my wife, Janice, and Danny Williams.
19   Q    And that's it?
20   A    I guess there is four, I'm sorry.  A guy
21   named Mark Langhann.  He's mostly out in the field but

3 (Pages 6 to 9)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 10

1  he does work at the office.
2  Q  Langhann?
3  A  L-A-N-G-H-A-N-N.
4  Q  What other functions does your wife perform?
5  A  She does just basic bookkeeping/secretarial
6  work.
7  Q  And what does Danny Williams do?
8  A  He's the office manager.
9  Q  And what about Mark Langhann?
10  A  Field operations manager.
11  Q  Who handles payroll within the organization?
12  A  Danny Williams.
13  Q  Is payroll generated entirely in-house or do
14  you use a payroll service?
15  A  In-house.
16  Q  How long has Danny Williams been with D.L.I.?
17  A  Thirteen years.
18  Q  So pretty close to the founding of the
19  company?
20  A  Yes.
21  Q  Mark Langhann, how long has he been with

Page 11

1  you-all?
2  A  Fourteen years.
3  Q  And then you and your wife since the
4  beginning?
5  A  Yes.
6  Q  Do you know if Mr. Williams had any prior
7  experience with Davis-Bacon payroll on any projects?
8  A  I'm not aware of any.
9  Q  I would like to have you take a look at what
10  was marked yesterday as Allegheny Jefferson Millwork
11  Exhibit No. 2, which is the binder that is in front of
12  you here, AJM No. 2 for short.
13  A  Which tab?
14  Q  We are going to look first at tab number 1,
15  which is a spreadsheet. And before I ask you about the
16  spreadsheet, let me ask you generally about the binder.
17  Have you reviewed this binder previously?
18  A  Not all of it.
19  Q  Just any selected pieces that you can recall
20  or --
21  A  If you ask me a certain tab, I can tell you

Page 12

1  whether I have reviewed it or not.
2  Q  Did you understand that this binder was
3  presented by Allegheny Jefferson to its bonding company
4  in response to the Miller bond claim that you-all filed
5  on behalf of D.L.I.?
6  A  Yes. I am aware.
7  Q  Has anyone evaluated this binder on your
8  behalf aside from counsel?
9  A  The entire binder?
10  Q  Yes, sir.
11  A  I don't believe so.
12  Q  Looking at the spreadsheet which is under
13  tab 1 of AJM Exhibit No. 2, you have seen this
14  particular spreadsheet before; is that correct?
15  A  That is correct.
16  Q  And I would like to go through this with you
17  to see what you agree or disagree with in terms of the
18  presentation of information on this particular
19  spreadsheet.
20  First of all, the spreadsheet breaks down in
21  the first two pods between lump-sum contract and

Page 13

1  time-and-materials contract. Do we agree that there
2  was an initial lump-sum contract -- I'm sorry,
3  time-and-materials contract followed by a lump-sum
4  contract for this project?
5  A  The original lump-sum contract came before
6  the time-and-materials contract.
7  Q  What was the scope of the lump-sum contract
8  versus the scope of the time-and-materials contract?
9  A  The scope of the original contract consisted
10  of running and standing trim, case work, paneling.
11  Q  Any particular segments of the project?
12  A  First floor, fifth floor, sixth floor was the
13  majority.
14  Q  Lump-sum contract was -- did you say the
15  first floor --
16  A  Yes.
17  Q  -- fifth floor and sixth floor?
18  A  Correct.
19  Q  What was the scope of the time-and-materials
20  contract?
21  A  It was an hourly rate to install another

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 14

1  company's case work that was terminated from the
2  project.
3     Q   Was there any particular area of the project
4  that that tended to focus on?
5     A   I'm sorry?
6     Q   Any area within the project where that was
7  focused on?  In other words, you mentioned the fifth
8  and sixth with the lump sum.
9     A   Second, third and fourth floor.
10     Q   Now, with respect to the lump-sum contract,
11  can we agree that the contract balance was 1,175,000 or
12  the principal contract amount was 1,175,000 before any
13  change orders?
14     A   Yes.
15     Q   This particular spreadsheet shows payments to
16  D.L.I. on the lump-sum contract amount of 1,163,249.30,
17  leaving a balance due of 11,750.70.  And just on the
18  lump sum without change orders or work orders, is that
19  your understanding of the status of payment on the lump
20  sum?
21     A   I don't know.  I don't have my accounting

Page 15

1  sheet here so I can't compare.
2     Q   Have you ever given your accounting sheet to
3  your counsel?
4     A   Yes.
5     MR. GAVETT:  Is that something that would be
6  available for Mr. Lacy to look at so he could
7  cross-reference?
8     MR. WHITTAKER:  It could be, yes.  I mean, I
9  think that should have been requested up-front.
10     MR. GAVETT:  I think it's -- if you look at
11  Exhibit No. 1, which is the notice of deposition, it
12  asks for the number 6, "All knowledge of the deponent
13  with respect to work tickets, requisitions for payment,
14  account reconciliations and other documents relating to
15  D.L.I.'s work on the project."
16     Five asks for, "All knowledge of the deponent
17  with respect to D.L.I.'s claim for unpaid balances."
18     MR. WHITTAKER:  He can testify as to his
19  knowledge.  No documents were requested.  In fact, no
20  documents have ever been requested in this case.
21     MR. GAVETT:  Well --

Page 16

1     MR. WHITTAKER:  I'm not going to go dig
2  through my files to find a document that you didn't ask
3  for in advance.
4     MR. GAVETT:  The corporate designation
5  includes a duces tecum advising that. "Pursuant to the
6  Federal Rules of Civil Procedure, you must designate
7  one or more officers, directors, managing agents or
8  other persons who will testify and produce documents on
9  your behalf regarding the following matters."
10     MR. WHITTAKER:  No documents were requested
11  to be produced.  Not one of those classifications asks
12  for a document.  I read it before.
13     MR. GAVETT:  All right.
14     MR. WHITTAKER:  We can try to find it and he
15  can have time to review it.
16     THE WITNESS:  It might be in here.
17     MR. WHITTAKER:  I don't think so.
18     Off the record.
19     (Recess taken from 10:26 a.m. until
20     10:32 a.m.)
21

Page 17

1  BY MR. GAVETT:
2     Q   Going back on the record.  I'm going to,
3  Mr. Lacy, ask you -- let's compare what is Exhibit
4  No. 25 in yesterday's Exhibit AJM No. 1, tab 25 there
5  with this, and specifically it's the contract
6  reconciliation.  I believe tab 25 in AJM No. 1 is your
7  breakdown of billed and paid, is that right, for the
8  Prettyman Courthouse?
9     A   Yes, correct.
10     Q   And you have got three separate segments on
11  tab 25 of Exhibit No. 1.  One is called Prettyman
12  bookcases and you characterize that -- is that the
13  time-and-material work as you understood it?
14     A   Yes.
15     Q   And then the next pod or next grouping is
16  what appears to be extra-work orders; is that right?
17     A   Yes.
18     Q   And then lastly, the next one is the contract
19  which is the lump-sum contract amount?
20     A   Yes.  And that -- the original figure that I
21  gave you earlier was not the original contract amount.

5 (Pages 14 to 17)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 18

1  We had stated it was 1.175 million.
2     Q   Right.
3     A   It was 1.25.  1,250,000.
4     Q   Is that -- the $75,000 difference, the
5  $75,000 related to the American Indian Museum?
6     A   Yes.
7     Q   In terms of tracking payments here on the
8  time-and-materials contract, I am just going down, and
9  there appears to be agreement that between these two
10  documents, the spreadsheet which is in tab 1 of Exhibit
11  No. 2 and the breakdown included in tab 25 of Exhibit
12  No. 1, that, for example, 4069 was paid in full at
13  23,485; is that right?
14     A   The accounting on the time and materials is
15  incorrect.
16     Q   Well, my question was limited just to --
17     A   To that first invoice?
18     Q   To that first invoice, 4069, was billed
19  23,485 and paid 23,485.
20     A   Yes.
21     Q   4125.  Invoice 4125 was billed at 18,480 and

Page 19

1  paid at 18,480.
2     A   Yes.
3     Q   Invoice 4189 billed at 47,245, paid at that
4  amount?
5     A   Correct.
6     O   4219 billed at 71,292.50.  You show only
7  66,852.50 paid and the Allegheny Jefferson
8  reconciliation showed 68,552.50.  Is that -- do we
9  agree that that's a discrepancy between paid on your
10  reconciliations?
11     A   It could be.  I don't know that to be a fact.
12  It's a discrepancy between the two sheets, yes.
13     Q   It's off by $2,000.  I'm sorry, $2,300
14  between the two.
15     A   I'm sorry, but our accounting is correct on
16  that invoice.
17     Q   Referring to tab 25 of Exhibit No. 1, your
18  sheet with your doodle.
19     A   Yes.
20     Q   Invoice 4272 you show as billed 228,775 and
21  paid 226,172.50, correct?

Page 20

1     A   Yes.
2     Q   And that is also what is shown on the
3  Allegheny Jefferson breakdown as what was paid on that
4  invoice?
5     A   Yes.
6     Q   Invoice 4298 you show as billed $207,400,
7  paid $207,385.58.
8     A   Yes.
9        (Mr. Corrigan joined the deposition.)
10        MR. GAVETT:  Michael Corrigan of Allegheny
11  Jefferson has just joined us.
12     BY MR. GAVETT:
13     Q   I think we were last looking at invoice 4298.
14  You show as on your reconciliation a billing of
15  207,400, paid 207,385.58, correct?
16     A   Correct.
17     Q   And that lines up with what is shown on the
18  Allegheny Jefferson reconciliation in terms of billed
19  and paid?
20     A   For what portion?
21     Q   For invoice number 4298 billed 207,400, paid

Page 21

1  207,385.58.
2     A   Yes.
3     Q   Invoice 4353 you show as billed 50,280, paid
4  49,597.50; is that right?
5     A   Correct.
6     Q   And that lines up with the Allegheny
7  Jefferson breakdown in terms of what was billed and
8  paid; is that correct for invoice 4353?
9     A   For invoice 4353, yes.
10     Q   Invoice 4542 you show billed 3,965 and
11  nothing paid on that amount; is that right?
12     A   Yes.
13     Q   And looking at the Allegheny Jefferson, that
14  likewise shows an invoice of 4542 of $3,965 and nothing
15  being paid so far on that amount.
16     A   Correct.
17     Q   Now, on the Allegheny breakdown of the
18  time-and-materials contract, there is a -- he includes
19  that as invoice 4354 in the amount of 36,450 as billed
20  and paid 35,546.  Do you agree that what is labeled as
21  Prettyman grommets on tab 25, Exhibit No. 1, is part of

6 (Pages 18 to 21)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 22

1  the time-and-materials contract?
2      A   I do not agree.
3      Q   What was that for?
4      A   Extra work.
5      Q   Well, since it was included under Allegheny
6  Jefferson's time-and-materials contract billed and paid
7  with the exception -- and there's a discrepancy of less
8  than $1,000 particulars between what was billed and
9  what was paid, it works out the same, doesn't it,
10  whether it's billed as time and material or billed as
11  extra work?
12      A   Well, no, because the time-and-material
13  portion of the job dealt with another company's case
14  work.  We also had extra-work orders on the project
15  that dealt with extra work above and beyond the
16  contract but it was not part of that company's work.
17      Q   Well, the 36,450, at least with the exception
18  of the less than $1,000 that was not paid, it appears
19  that it was billed and paid --
20      A   I agree that it was -- yes, there was a
21  portion paid towards that invoice.

Page 23

1      Q   And that was billed on a time-and-materials
2  basis?
3      A   Yes, an hourly rate.
4      Q   There is -- as far as the billing on the
5  contract, where on this listing did -- on tab 25,
6  Exhibit No. 1 -- did D.L.I. bill the $75,000?
7      A   I am not sure which invoice it was under.  I
8  would have to see copies of the invoices.
9      Q   Oh, I see.  Okay.  I am looking at tab -- I
10  am looking on your reconciliation invoice 4356.  You
11  have it as 85,763.99.  And on the reconciliation by
12  Allegheny Jefferson it's listed as -- 4356 is listed as
13  10,763.99.
14      A   I think for condensing purposes that is
15  incorrect.  The $75,000 was billed on invoice number
16  4606.
17      Q   So at least on tab 25, Exhibit No. 1, you
18  consolidated 4606 and 4356?
19      A   Yes.
20      Q   All right.  And then finally, looking at the
21  extra work, extra-claim invoices, there is -- it's

Page 24

1  invoice number 4358 of 166,493.75 on which nothing has
2  been paid, correct?
3      A   Correct.
4      Q   Then there's invoice 4387, 43,095, nothing
5  has been paid?
6      A   Correct.
7      O   And invoice 4397 billed 64,285 and again
8  nothing paid?
9      A   Correct.
10      Q   So having gone through this exercise just to
11  see where the discrepancies between the two
12  reconciliations lie, let me try and recapture it and
13  you tell me if I've got it right or wrong.
14          But so far as I can tell, in terms of what's
15  been paid, there's a discrepancy on invoice 4219 in
16  that Allegheny Jefferson showed 68,552.50 having been
17  paid, you show 66,852.50 having been paid; is that
18  right?
19      A   Correct.
20      Q   And then you have the Prettyman grommets
21  invoice 4354 as an extra-work claim that's been

Page 25

1  characterized as time and materials by Allegheny
2  Jefferson but it worked out, in terms of billing, the
3  same way; is that right?
4      A   I don't know.  I guess.  I mean, I assume.
5  It was extra work.
6      Q   And then finally on invoice 4310 -- I'm
7  sorry, 4357 for the 85,763.99, that's really a
8  consolidation of 4356 and 4606?
9      A   Correct.
10      Q   Can you tell me when the Prettyman Courthouse
11  project was first brought to your attention?
12      A   Sometime in the fall of '04.
13      Q   And who was the first person to discuss the
14  project with you?
15      A   Mike Corrigan.
16      Q   And what if anything do you recall Mike
17  Corrigan telling you about the Prettyman Courthouse
18  project?
19      A   Told me that we had an opportunity to make a
20  lot of money because somebody else had fallen down on
21  the project and we were going to take it over.

7 (Pages 22 to 25)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 26

1    Q    And did he ask you to provide him a quote
2  with regard to time-and-materials component of the
3  contract?
4    A    I don't recall.
5    Q    Did he ask you to bid a lump-sum component?
6    A    Yes, he did.
7    Q    And in terms of the scope of works that you
8  knew what to bid against, were you provided a document
9  with that scope of work?
10    A    Yes.
11    Q    I'm going to show you what has been marked in
12  the binder as -- this is AJM Exhibit No. 2, tab 15,
13  which is in the larger binder.
14        This particular document is a standard form
15  of subcontract agreement, tab 15, Exhibit No. 2,
16  Jefferson Millwork and Design, Allegheny Millwork on
17  the top of the document, dated February 12th, 2005.
18  And it has been marked and initialed at various points
19  throughout the document.
20        Are those your cross-outs and initials?
21    A    Yes.

Page 27

1    Q    And in terms of the scope of work, referring
2  you to the page appearing immediately following the
3  signature page on the document, there's a document
4  called Dale Lacy Installation Inc., E. Barrett
5  Prettyman Scope of Work.
6        Do you recognize that?
7    A    Yes.
8    Q    And is that -- are those your initials and
9  changes?
10    A    Yes.
11    Q    Now, at the bottom of that scope of work you
12  have written in, "Floors two, three and four bookcases,
13  wainscot and related trim, et cetera."
14        And is that referring to the
15  time-and-materials work?
16    A    Yes.  It was excluded from the base bid
17  contract.
18    Q    And so you're trying to get the exclusion --
19  to include under the list of exclusions anything having
20  to do with that particular scope of work?
21    A    From the base contract.

Page 28

1    Q    From the base contract.
2    A    That was my intent, yes.  Because we knew
3  that that was going to be extra work.
4    Q    But in terms of the scope of what you would
5  be billing for the lump-sum amounts, the first -- you
6  initialed next to the scope of work items one through
7  eight, that particular scope of work; is that right?
8    A    With the exceptions of the railing grille.
9    Q    Oh, okay.  The railing grille's been crossed
10  out by you?
11    A    Correct.
12    Q    You also, under inclusions, crossed out the
13  overtime and evening work as required list of
14  inclusions; is that right?
15    A    That is correct.
16    Q    And basically what you're saying is if I have
17  to work overtime, I will be paid for the overtime.
18    A    Correct.
19    Q    And evening work would also likewise reflect
20  that?
21    A    Yes.

Page 29

1    Q    Do you recall whether Mike Corrigan ever
2  discussed with you that the Prettyman Courthouse
3  project would be a Davis-Bacon job?
4    A    Not until the two laborers from Labor Ready
5  in February raised an issue over it.
6    Q    I am going to refer you to a document that
7  appears in tab 13 of Exhibit No. 2.  It's a fax
8  transmittal cover page to Dale Lacy from Mike Corrigan.
9        First of all, is -- there's a fax number
10  listed, 561-586-1120; is that the fax number for
11  D.L.I.?
12    A    No, it is not.
13    Q    It is not the fax number for D.L.I.?
14    A    No, it is not.
15    Q    What is the fax number for D.L.I.?
16    A    561-586-1140.
17    Q    What about 1120?
18    A    It's not the fax number.
19    Q    Do you recall seeing this document before?
20    A    I do not.
21    Q    Did you ever see the labor rates?

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Dale Lacy 7/11/07

Page 30

1  A  Not until after February of '05.

2  Q  Referring to tab 14, there is a fax

3  transmittal to Danny from Mike Corrigan.  Is the fax

4  number correct on that page?

5  A  It is, yes.

6  Q  And attaching various information pertaining

7  to the Davis-Bacon wage determinations?

8  A  I see them in the binder.

9  Q  And referring to the last page of the

10  document in tab 14, a fax transmittal report indicating

11  that the fax transmitted on January 5th of 2005.

12  Do you know whether Danny received

13  information about Davis-Bacon previous to you receiving

14  the information?

15  A  I am not aware of him receiving the

16  information.  I'm not sure of the time frame when the

17  gentlemen from Labor Ready approached the contractor.

18  Q  Referring you to Exhibit No. 1 from Allegheny

19  Jefferson's deposition, tab 10, this is an e-mail from

20  Mike Corrigan to Danny Williams, Monday, March 7th,

21  2005.

Page 31

1  A  Yes.

2  Q  And then basically, "Danny, per below,

3  Tracie, the woman who we want to keep happy, has

4  released a payment hold today.  Thank you for your help

5  on this.  Apparently, and I didn't know this until

6  Tracie told me today, two guys from Labor Ready

7  actually went in to her office and complained about the

8  wage scale thing.  I hope those two guys aren't on site

9  anymore.  Thanks.  Mike Corrigan."

10  First of all, you were copied on this e-mail;

11  is that right?

12  A  Yes.

13  Q  And do you remember receiving it?

14  A  Yes.

15  Q  And does that e-mail sort of give you a point

16  in time where you can sort of be fixed to and say you

17  started to become aware that there was a Davis-Bacon

18  issue on this job?

19  A  Yes, but I am not sure because it doesn't

20  reference a date on when those guys went into her

21  office.  It may have been a week before, it may have

Page 32

1  been a month before, it may have been the day before.

2  I don't know.

3  Oh, if you look at the bottom of that page,

4  it says that the workers complained about the work --

5  the underpaid wages during the period of time of

6  February 12th and February 25th.  So --

7  Q  Somewhere between February 25th and March 7th

8  somebody complained?

9  A  Yes.  It appears that way.

10  Q  Labor Ready was a sub-subcontractor to

11  D.L.I.?

12  A  Correct.

13  Q  And they were providing laborers for the job?

14  A  Yes.

15  Q  Who do you recall first brought to your

16  attention the fact that Davis-Bacon was an issue for

17  this project?

18  A  When you say "issue," define "issue."

19  Q  Well, when did the -- who was the first

20  person to say anything to you about Davis-Bacon?

21  A  First person, I don't recall.

Page 33

1  Q  I want to show you what is in Exhibit No. 1,

2  smaller binder, tab 11.  There is an e-mail from you to

3  Mike Corrigan, March 15th.

4  A  Yes.

5  Q  "Fringe breakdown 2005 installer XLS

6  spreadsheet attached"; is that right?

7  A  Yes.

8  Q  And you're basically showing how you are

9  accounting for the payment of wages and fringes to your

10  finish carpenters for the Prettyman Courthouse project;

11  is that right?

12  A  Based on Mike Corrigan's input as to how we

13  were instructed to do this sheet so we could show that

14  we were trying to meet the Davis-Bacon requirement, but

15  everything was at his direction.

16  Q  So looking at the spreadsheet -- well, the

17  wage -- Mike didn't give you the wage.  20.73 is what

18  you were paying.

19  A  No.  That's the wage that exceeded the

20  Davis-Bacon wage calculations that he wanted us to be

21  above it.  So he said produce a document that reflects

9 (Pages 30 to 33)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Dale Lacy 7/11/07

1  the Davis-Bacon.

2      Q   What were you actually paying your carpenters

3  at Prettyman Courthouse per hour?

4      A   An average or do you want to know figures for

5  every man?

6      Q   Let's take an average first.

7      A   Direct D.L.I. employees or subcontractors?

8      Q   Direct D.L.I. employees.

9      A   Direct D.L.I. employees were being paid --

10  they were -- most were above the Davis-Bacon.  There

11  were a couple, you know, a little short.

12      Q   Give me the high and the low of the scale.

13      A   I don't recall.  If I had my accounting in

14  front of me, I could probably give it to you.

15      Q   Is it your understanding that the principal

16  controversy in involving the Davis-Bacon charges

17  brought by the United States Department of Labor has to

18  do with the per diem and travel expense component?

19      A   Yes.

20      Q   Whether it should or should not be included

21  within the fringe package?

1      A   We were told by Mike Corrigan, and he was

2  informed by Tracie Forest from Centex or the GSA that

3  we were to include $175 per diem, the travel expenses

4  and the housing as a fringe benefit.  He did the

5  research.

6      Q   And ultimately that was not acceptable by the

7  Department of Labor?

8      A   Correct.

9      Q   At any time around the presentation of this

10  information, did you make any -- give any notice to

11  Allegheny that the Davis-Bacon rate was such that you

12  could not perform the work?

13      A   Yes.  I mean, we needed to raise our rates.

14      Q   At the point that this came across the radar

15  for you the first time, is it fair to say that the

16  time-and-materials work was pretty far along to

17  completion?

18      A   The time-and-material portion I don't recall.

19      Q   Looking at your billing I assume lagged your

20  payroll.  In other words, you didn't bill until you

21  paid your payroll on the project?

1      A   Correct, yes.

2      Q   So by April 14th of 2005 you had billed a

3  substantial amount of time and material already on the

4  project; is that right?

5      A   Maybe half.  The time-and-material work was

6  ongoing all the way to the end of the project.

7      Q   Did you ever send Mike Corrigan any kind of

8  written notice that the previously negotiated rates for

9  time-and-material work were no longer acceptable based

10  upon the Davis-Bacon scale?

11      A   I don't recall anything in writing.

12  Verbally.

13      Q   You said so verbally?

14      A   Yes.  We had numerous conversations about the

15  Davis-Bacon Act.  Numerous.

16      Q   And at any time did you say -- well, let me

17  get this -- I don't think we got this on the record,

18  from you, at least.  What was the hourly rate for

19  regular time and overtime on the time-and-materials

20  project?

21      A   I believe it was 55 per hour regular hour and

1  65 for overtime hour.

2      Q   And at any point in time did you say on

3  time-and-materials contract, "Mike, we're going to stop

4  work.  We're not going to do any more work until we

5  agree on an increase in hourly rate"?

6      A   I said that we would stop -- we would have to

7  renegotiate the entire project.  I encompassed the

8  time-and-material work.

9      Q   Did you ever send written notice to Allegheny

10  Jefferson of the need to renegotiate the contract while

11  the work was under way?

12          MR. WHITTAKER:  Objection; asked and

13  answered.

14          Go ahead, answer.

15      A   There were several things that happened

16  during that period of time.  We discussed raising the

17  rates of the employees to meet the Davis-Bacon

18  requirement until such time as he could provide us with

19  information whether or not the per diem would work as a

20  fringe, whether the travel allowance would work as a

21  fringe, whether the housing allowance would work as a

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 38

1 fringe.

2      So we raised the rates, Craftsmanship

3 Unlimited raised their rate to meet the Davis-Bacon

4 requirement for one week as well as us. Shalom

5 Carpentry I'm not aware of whether they did or not.

6      At the end of that week, that was sufficient

7 and time enough for him to provide me with the

8 information from the DOL Web site and we have evidence

9 of his handwriting encompassing a paragraph on a sheet

10 saying that the per diem counted as a fringe and to go

11 back the way we were doing it because we were well

12 within the Davis-Bacon requirement. We far exceeded

13 it, in other words. So we went back.

14      BY MR. GAVETT:

15      Q    So there was a document that Mr. Corrigan

16 prepared that said that --

17      A    Yes.

18      Q    -- D.L.I. was complying with --

19      A    Well, not D.L.I., but it was a Department of

20 Labor printout that was faxed or it was faxed to us

21 with his -- the parenthesis that the per diem counted.

Page 39

1 There you go.

2      Q    Looking -- you're referring specifically to

3 tab 18?

4      A    I have to review it.

5      Q    In Exhibit No. 1.

6      A    Yes. It's page 1 of 2, I guess. Yes.

7      Q    Just for the record, we're looking at tab 18,

8 AJM Exhibit No. 1. There is a cover letter or memo to

9 you at D.L.I. dated August 5th, 2005. And then there

10 is attached to that some printouts from the Department

11 of Labor Web site attached to that.

12      A    There is one -- I'm pretty sure there's one

13 that's previous to this as well.

14      Q    Incidentally, looking on the fax number for

15 D.L.I., just looking at tab 2, I am looking at some

16 work orders from D.L.I., and at the top the fax number

17 is indicated as being 561-586-1120.

18      A    That was previous, yes. But at the time in

19 '04 we just hadn't changed our headings on those work

20 orders, but in the fall of '04 it was 1140.

21      Q    Do you know when in '04 it was switched over

Page 40

1 to 1140?

2      A    It was after we moved into our new office.

3 That was sometime in September after the hurricane.

4      Q    Whatever happened to the 1120 number? Was it

5 abandoned?

6      A    Yes.

7      Q    All right. So you -- just to kind of go back

8 to the communications regarding the Davis-Bacon issue,

9 you think that in addition to the August 5th, 2005 fax

10 with attachments there was some other documents?

11      A    Yes.

12      Q    Or information provided by Mr. Corrigan.

13      A    Yes. One in March.

14      Q    In March?

15      A    Yes. I guess it's tab 12 of -- "When Tracie

16 from Centex gave me the packet that I have just faxed

17 over, please review the fax" -- [inaudible].

18      MR. WHITTAKER: She needs to type this as

19 you're reading it.

20      THE WITNESS: Oh, she does.

21

Page 41

1      BY MR. GAVETT:

2      Q    Well, actually, if you want to save yourself,

3 the document speaks for itself but you're identifying

4 this document as additional information provided by

5 Mike Corrigan?

6      A    Correct.

7      Q    The fax -- I am reading this e-mail, "Please

8 review that fax February certified payroll, the circled

9 items are the ones that need correction if the fax is

10 not legible for any wages that are below the wage rate

11 and do a restitution for same."

12      A    Yes.

13      Q    "Or reclassification to laborer or helper if

14 that is the case."

15      Is it your recollection that there was

16 information beyond the February certified payroll in

17 that faxed packet?

18      A    Well, this is just evidence that we were

19 trying to comply and everything went through Mike

20 Corrigan. We did everything at his direction. So he

21 was aware -- totally aware of our subcontractors and

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Dale Lacy 7/11/07

Page 42

1  what we were told to put down as certified payroll.
2      Q   So Mike Corrigan was trying to get the GSA to
3  accept that you were complying with Davis-Bacon by
4  including the travel and lodging allowances in the
5  fringe benefit package?
6      A   That is correct.
7      Q   At any time -- did Mike Corrigan at any time
8  say to you, "If this does not work, we are going to
9  renegotiate the contract"?
10     A   I don't recall that, no.
11     Q   Did Mike Corrigan at any time ever say,
12  "Dale, if there are charges from the Department of
13  Labor or these workers for Davis-Bacon, we on behalf of
14  Allegheny Jefferson agree to pay those charges"?
15     A   Absolutely.
16     Q   When did he say that?
17     A   I don't recall specific dates but it was --
18  we were just misled.  Mike Corrigan wanted to keep us
19  on the project.  Sometime in probably March was the
20  first conversation we had about stepping up to the
21  plate.  I mean, we didn't know that the Department of

Page 43

1  Labor would not accept per diem.  They had not gotten
2  involved yet.  Only the GSA.
3      Q   What to your recollection did Mike Corrigan
4  actually say regarding an agreement by Allegheny
5  Jefferson to assume liability for the Davis-Bacon
6  charges?
7      A   He told me that he would pay for it, that
8  Allegheny Jefferson would pay for it.
9      Q   And did he ever say that to you in writing?
10     A   Yes.
11     Q   When?
12     A   The first time in writing probably in '06,
13  January of '06.
14     Q   And are you referring specifically to the
15  e-mail that's marked as tab 25 in Exhibit No. 1?
16     A   Yes.
17     Q   And essentially this is the Friday,
18  January 27th, 2006, Mike Corrigan writes to you, "Okay,
19  Big Guy, here is my conditional concept that should be
20  approvable by my joint venture partner."
21         And then he sets forth order of events and

Page 44

1  basically sets forth nine specific things that need to
2  occur.
3      A   State your question again.  I know the nine
4  specific things but what is your question?
5      Q   My question is, is it correct that he's
6  saying these are the conditional concepts "that should
7  be approvable by my joint venture partner," order of
8  events and then he sets forth nine separate things that
9  need to occur?
10     A   Correct.
11     Q   Your response to him is Saturday,
12  January 28th.  And basically is it fair to say that
13  what you did is reject his nine steps?
14     A   Yes.
15     Q   So in terms of a written agreement to pay,
16  Mr. Corrigan's agreement was contingent upon the nine
17  things having occurred; is that right?
18         MR. WHITTAKER:  Objection.
19         You can answer.
20     A   Our conversations were ongoing.  We had
21  another meeting after this e-mail and an evening in his

Page 45

1  office.  That's what the doodle is all about.
2      BY MR. GAVETT:
3      Q   But at least in terms of an agreement to
4  assume liability, isn't it fair to say that
5  Mr. Corrigan's agreement to assume that liability was
6  conditioned upon all nine of these items having been
7  agreed to by everyone?
8         MR. WHITTAKER:  Objection.
9      A   No.
10     BY MR. GAVETT:
11     Q   So was some statement -- was there any
12  additional written document aside from tab 25, Exhibit
13  No. 1 from Mr. Corrigan to you in which Allegheny
14  Jefferson agrees to assume liability?
15     A   I don't recall.
16     Q   You have been through Exhibit No. 1, which is
17  25 tabs, with your counsel; is that right?
18     A   I think we reviewed most of them, yes.
19     Q   And many of these documents, for example,
20  contain your notes to counsel about what you understood
21  the e-mail to mean or what it had to do with the

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 46

1  projects, correct?
2      A   Correct.
3      Q   Are there any other documents, either e-mails
4  from you to Mr. Corrigan, e-mails from Mr. Corrigan to
5  you, fax transmissions, anything that you can recall
6  that make reference to the Davis-Bacon issue other than
7  what is in this binder of 25 tabs, Exhibit No. 1?
8      A   There may very well be.
9      Q   But you don't know right now?
10     A   No.
11         MR. WHITTAKER:  For the record, that was a
12  document created by counsel for the purposes of
13  deposition.  That is, by all means, not a totally
14  inclusive document.  I have a lot more documents that
15  were produced to me by my client that I did not choose
16  to include in my deposition exhibit.  Mr. Lacy has
17  never reviewed that binder.
18         MR. GAVETT:  Okay.
19         BY MR. GAVETT:
20     Q   Sitting here today, are you able to
21  independently recall any written document in which

Page 47

1  Allegheny Jefferson agreed to assume liability for the
2  DOL Davis-Bacon charges aside from the one that we
3  looked at at tab 25 in Exhibit No. 1?
4      A   I can't recall.
5      Q   Referring to that, as you call it, the doodle
6  page that has the account reconciliation that we've
7  looked at before and the handwritten notations, was
8  there a -- whose handwriting is on this document, first
9  of all?
10     A   Mike Corrigan.
11     Q   And what if anything do you understand to be
12  what Mr. Corrigan is saying with all these numbers in
13  terms of any kind of deal that he was proposing?
14     A   The deal that was proposed and that was
15  pretty much agreed to, I believe, was that of the
16  $373,000.  Mike Corrigan -- when it says "No deal on
17  140k," that means the per diem.  We spent $138,000,
18  $139,000 in per diem which he was under the assumption
19  that we were going to be able to receive credit towards
20  the Davis-Bacon Act.
21         That was him saying that he was going to pay

Page 48

1  the DOL:  "No DOL for D.L.I."  The $300,000 is the
2  settlement number.  The $75,000 was going to go away.
3  So we would receive $300,000 and not be responsible for
4  any DOL.
5      Q   And did Mr. Corrigan, other than these notes,
6  ever put anything in writing to you saying, "We're
7  offering you $300,000 to settle out and we will pay
8  DOL"?
9      A   Other than this document, no.
10     Q   And did Mr. Corrigan say that was a done deal
11  or did he say he had to talk to his joint venture
12  partners or what?
13     A   At this time the DOL was still reviewing the
14  case.  So I told him if the increase in DOL amount, he
15  agreed to take care of it.  He said he would have to go
16  back to his joint venture partner for the additional
17  DOL money, if there were any.
18     Q   What was your understanding of the DOL number
19  at that time?
20     A   At that time it was somewhere around -- I
21  don't really recall what the number was at that time.

Page 49

1  But we knew it was an ongoing investigation at that
2  point.
3      Q   I believe sometime shortly after this you
4  filed your complaint in federal court; is that right?
5      A   Yes.
6      Q   And at this time I think in your papers you
7  indicated $191,000.
8      A   That was a figure that was actually arrived
9  by my office manager and presented based on the
10  shortages.  I mean, we didn't know if that was a good
11  number.
12     Q   Is there a -- I just want to be clear.  Your
13  understanding of the 300k was you get paid 300k,
14  Allegheny Jefferson pays the 191 separate from that?
15     A   Correct.
16     Q   But the DOL number was still out there
17  floating around so there was no conclusion at that
18  time?
19     A   Correct.
20     Q   What is your understanding as to what the
21  Davis-Bacon Act required, now having been through all

13 (Pages 46 to 49)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Dale Lacy 7/11/07

Page 50

1   this process, what Davis-Bacon required you to pay the
2   carpenters leaving aside the per diem?
3       A   I don't understand your question.
4       Q   Well, I will do it this way. Referring you
5   to tab 13 there is a Davis-Bacon scale -- tab 13 of
6   Exhibit No. 2. There's a document which sets forth
7   Davis-Bacon scale and includes a reference to rates and
8   fringes for carpenters, a base rate of $20.72 plus
9   $3.76 in fringes, which by my humble math comes out to
10  $24.48 an hour. Can we agree on that?
11      A   Yes.
12      Q   And basically what the Department of Labor
13  says is when you look at that $3.76, you cannot include
14  your per diem.
15      A   That is my understanding after their
16  investigation.
17      Q   What were you paying on a per-diem basis to
18  the carpenters that were working at the Prettyman
19  Courthouse?
20      A   In per diem alone?
21      Q   Yes.

Page 51

1       A   $175 a week.
2       Q   And that's based on a 40-hour work week?
3       A   Yes.
4       MR. WHITTAKER: Are you close to concluding
5   or should we take a break now?
6       MR. GAVETT: If you want to take a break, we
7   can.
8       (Recess taken from 11:27 a.m. until
9       11:33 a.m.)
10      BY MR. GAVETT:
11      Q   I was just doing some rough math on the per
12  diem at $175 per week for a 40-hour work week, I came
13  out with $4.38 an hour to cover the cost of the per
14  diem; is that right?
15      A   I guess, yes.
16      Q   Here's -- let me --
17      A   I don't know where you're leading so...
18      Q   Let me be more specific. Your agreement on
19  an hourly basis for time and materials with
20  Mr. Corrigan is $55 an hour for standard time and then
21  $65 an hour for any overtime; is that right?

Page 52

1       A   Which was our customary hourly rate for all
2   projects. I mean, that would have not been the rate
3   for a DOL project had I been aware, no.
4       Q   So the margin is you got $55 an hour and
5   you're paying somebody straight time. I believe you
6   testified earlier that your range of hourly per-hour
7   rate for your carpenters was what?
8       A   I would have to go back to that time period
9   and look at my actual hourly rates to give you even an
10  average to be factual. I mean, we can be, you know.
11      No, I would have to have my facts.
12      Q   If the Davis-Bacon rate is applied, which is
13  the $20.72 per hour plus $3.76 per-hour fringes, and
14  throwing on top of that the $4.38 an hour to cover the
15  $1.75 a week per diem, I come out with $28.86 to stay
16  in compliance with Davis-Bacon.
17      A   Well, no, compliance with Davis-Bacon is
18  $24.48 regardless. I mean, the per diem which we were
19  told would be inclusive. I mean, would count towards
20  Davis-Bacon would have put us in excess.
21      Q   You provided per diem to your workers in

Page 53

1   order to get them to the job; is that right?
2       A   Yes.
3       Q   These fellas didn't live in the Washington,
4   D.C., metro area?
5       A   Correct.
6       Q   So the $175 was something that you needed to
7   pay your workers to get them to agree to come to
8   Washington, D.C., and perform this work?
9       A   Well, not only that. We had to house them
10  and we had to pay their travel expenses and I was told
11  by Mr. Corrigan that his research found that all three
12  of those items counted which would have put us way over
13  the Davis-Bacon requirement.
14      Q   You previously provided the Davis -- I'm
15  sorry, you previously provided carpenters for the
16  American Indian Museum and the International Monetary
17  Fund projects for $55 an hour straight time and $65 an
18  hour for overtime; is that right?
19      A   I'm not sure about the overtime rate. It
20  probably was more. Yes, I provided -- but those were
21  bid jobs. They weren't, you know, when we had

14 (Pages 50 to 53)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Dale Lacy 7/11/07

Page 54

1  additional work on those two projects, yes, it was
2  billed at 55 and whatever the overtime rate was that we
3  agreed to.
4      Q    And basically the only difference between
5  those jobs and the Prettyman Courthouse is the fact
6  that fringes were required to be paid on top of the
7  hourly rate; is that right?
8      A    Under the Davis-Bacon Act.
9      Q    Right.  I am just trying to get an
10 apples-to-apples comparison here for your work at
11 American Indian and at International Monetary Fund
12 where your rate for your time-and-material work is $55
13 an hour.  In the same community, same labor force,
14 correct?
15     A    Without the Davis-Bacon Act?
16     Q    Without the Davis-Bacon.
17     A    Correct.
18     Q    And so for you the impact is, at least
19 looking again at Exhibit No. 2, tab 13, it's that $3.76
20 per hour of fringe that you're required to be paid.
21     A    We were not required to pay that fringe or

Page 55

1  the $20.72 for the IMF or the Indian Museum.
2      Q    Were you paying any of your carpenters less
3  than the $20.72?
4      A    On those projects?
5      Q    Yes, sir.
6      A    Yes.
7      Q    How much less?
8      A    Without my records I can't be specific.
9      Q    What is your standard labor burden for your
10 hourly rate?
11     A    Local or out of town?
12     Q    In Washington, D.C.
13     A    It's 52 percent on the base rate, plus
14 travel, plus housing, plus per diem.
15     Q    So base rate, if we just say we take a
16 carpenter, $20 an hour, we add 52 percent to that $20
17 and that will cover your payroll tax obligations,
18 workers' comp insurance, that sort of thing; is that
19 right?
20         MR. WHITTAKER:  Objection.  I'm just
21 objecting to the line of questioning.  You can continue

Page 56

1  but it's irrelevant how much it costs him to have his
2  workers here.  It's not part of this case.  Nor is the
3  North American Indian Museum or the other things.  It's
4  beyond the scope of the deposition.
5      BY MR. GAVETT:
6      Q    Is that correct for the 52 percent on top of
7  the -- using a $20 an hour rate just for the sake of
8  simplicity, $10.04; is that right?
9      A    That's 40 cents.
10     Q    $10.40, I'm sorry.  So did you have any
11 carpenters you were paying $20 an hour?
12     A    On the Prettyman job?
13     Q    Not on the Prettyman job.  Just for
14 out-of-town carpenters.
15     A    Some less, some more.
16     Q    I'm just trying to use your example of the
17 way you calculated.  $20 an hour plus $10.40 for the 52
18 percent, plus the housing.  Now, what was the housing
19 cost?
20     A    It varies.  Depends on where you can get, you
21 know, rooms.

Page 57

1      Q    Do you have a recollection as to what you
2  were able to get in the Washington, D.C., metro area
3  for your guys?
4      A    No, I don't recall.
5      Q    Where were your men staying in the
6  Washington, D.C., area while they were performing the
7  Prettyman job?
8      A    Various places.  I mean, apartments.  I had
9  rented apartments for them.  I don't recall the name of
10 the apartment complex.
11     Q    And then the per diem is what we talked about
12 before, $175 a week?
13     A    Yes.
14     Q    And so just so we're on the same page, $175
15 divided by 40 hours per week, 437.5 cents.
16     A    Okay.  Yes.
17     Q    Round it up to $4.38.
18     A    Fine.
19     Q    And you just don't recall the housing.  Can
20 you give me any kind of ballpark at all as to what
21 housing was costing you?

15 (Pages 54 to 57)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Dale Lacy 7/11/07

Page 58

1    A    It was like $2,000 a week for an apartment.
2    I mean a month for an apartment.
3    Q    Was that shared?
4    A    Yes.
5    Q    By how many men?
6    A    Three.
7    Q    So the three men into $2,000 a month?
8    A    Yes.
9    Q    So assuming 22 workdays a month, $2,000
10   divided by three, $666 per month.
11   A    Okay.
12   Q    Divided by 22 working days divided by eight
13   hours a day: $2.78 per hour.
14   A    That's fair.
15   Q    $2.79.  So the base rate plus the 52 percent,
16   plus the housing cost, plus the per-diem cost, correct?
17   A    Yes.
18       MR. WHITTAKER:  What was your question?
19       MR. GAVETT:  I'm just trying to figure out
20   how he's calculating his labor burden.
21       MR. WHITTAKER:  Don't you need to include

Page 59

1    taxes?
2        MR. GAVETT:  I thought that the --
3        THE WITNESS:  He's forgetting travel, he's
4    forgetting material: nails, glues, screws.
5        MR. WHITTAKER:  Well, overhead's already in
6    the 52 percent.
7        BY MR. GAVETT:
8    Q    That's what I'm trying to find out.  The 52
9    percent labor burden includes your payroll taxes, your
10   workers' comp costs, all that sort of thing, right?
11   A    True.
12   Q    Travel, are you reimbursing your men on an
13   as-billed basis?
14   A    No.  It depends on how many -- I bring them
15   home every -- well, some four weeks, some six weeks.
16   So travel expenses is a major cost.
17   Q    On an in-state job what is your hourly rate?
18   A    In Florida?
19   Q    Yes.
20   A    Back then?
21   Q    Yes.

Page 60

1    A    That was two and a half years ago.  Like $45
2    an hour.
3    Q    So basically an extra $10 an hour for
4    out-of-state work?
5    A    Well, it's more than that.
6    Q    What do you mean?  Why is it more than that?
7    A    Well, you've got the housing.  It depends on
8    where you are.  I mean, your housing costs.
9    Q    What you're billing your client is what I'm
10   talking about.  If you bill Mr. Corrigan $55 an hour
11   for time and materials, for the time -- for the labor
12   component, not the materials.  We all agree the
13   materials should be billed out-of-pocket cost, right?
14   A    Right.
15   Q    So your $45 an hour in Florida is what you're
16   billing your customer in Florida for standard rate?
17   A    Yes.
18   Q    And you're billing $55 an hour at least back
19   in Washington, D.C., metro area?
20   A    Correct.
21   Q    And the -- I mean, just doing a -- and then

Page 61

1    travel expense, you're paying for your guys to come
2    back home?
3    A    Yes.
4    Q    Flying home?
5    A    Both ways.  I mean, drive or fly.
6    Q    I guess what I am trying to figure out here
7    and why I'm leaning on all this is there's a delta
8    between $55 an hour and your out-of-pocket costs for
9    this labor and I am trying to figure out have you done
10   any kind of calculations as to what that delta is
11   supposed to be?
12   A    As far as a profit margin?
13   Q    Yes, sir.
14   A    You know, it normally runs about 12 percent.
15   Q    $6.60 per hour?
16   A    Yes.
17   Q    On a $55 --
18   A    That's what our goals are, yes.
19   Q    Have you done any calculations as to what
20   your profit margins were on the time-and-materials
21   work?

16 (Pages 58 to 61)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Dale Lacy 7/11/07

Page 62

1    A    It was irrelevant. You've got a hard-bid
2    portion of the job and you've got a time-and-material
3    portion of the job. You lose money on the hard-bid
4    part, then you make up for some of it on the time and
5    materials. I mean, you know, it's all in the job.
6    Q    Have you done a calculation as to your actual
7    profit on the time-and-materials component of the
8    project for the Prettyman Courthouse based upon --
9    including the DOL charges?
10    A    You mean with that component in there?
11    Q    Yes.
12    A    It would have been a loser.
13    Q    Have you done any kind of math on that in
14    terms of what that cost is?
15    A    I don't see how that is even relevant. I
16    mean because you have to look at the whole project.
17    You can't take one element of the project and find out
18    whether you made money on it or not.
19    Q    Have you done a profitability analysis on the
20    entire project?
21    A    No. Still ongoing. I am still spending

Page 63

1    attorney's fees.
2    Q    Excluding attorney's fees, have you done a
3    profitability analysis?
4    A    I have expert witnesses, I have, you know, I
5    have a DOL attorney, I still have costs incurred that
6    haven't been paid. So no, I mean, I can't put a dollar
7    figure to this job I haven't been paid. We had an
8    agreement. We had an agreement on the dollar figure
9    that I was going to receive. It was a done deal.
10    Q    But a negotiated settlement?
11    A    It was a settlement. We had a deal. Just
12    like all the other ones.
13    Q    But not a documented deal?
14    A    As far as I was concerned, it's a documented
15    deal.
16    Q    That's basically the doodle page on tab 25?
17    A    That's right. We had many agreements over
18    the last seven years in that form or fashion and he --
19    whether it took him a year to pay me or not, we got
20    paid. We reached the agreement and it was over.
21    Q    Has D.L.I. ever submitted certified payroll

Page 64

1    on any project prior to the Prettyman Courthouse?
2    A    Yes.
3    Q    What kind of projects?
4    A    Well, other projects. I can't be specific.
5    I don't remember.
6    Q    D.L.I. ever had any projects for federally
7    owned facilities before Prettyman Courthouse?
8    A    Smithsonian. The National Museum for the
9    Indian -- I guess that's federal.
10    MR. WHITTAKER: It's actually owned by the
11    Smithsonian Institution which is a private institute
12    but...
13    THE WITNESS: Okay. What about the
14    International Monetary Fund?
15    MR. WHITTAKER: No.
16    A    Then no other federal projects, I guess.
17    BY MR. GAVETT:
18    Q    Has D.L.I. ever done any state projects
19    either in Florida or any other jurisdiction?
20    A    No state.
21    Q    On the certified payrolls that you had to

Page 65

1    submit in the past, does D.L.I. break out fringes in
2    addition to the base rate?
3    A    I am not aware if it's required or not.
4    Personally I have never looked at a certified payroll.
5    Q    Did you have -- were you ever made aware of
6    what Shalom Carpentry was paying its workers for
7    overtime?
8    A    Not until there was a complaint.
9    Q    And what did you hear about what Shalom
10    Carpentry was paying its workers for overtime?
11    A    When we found out that they were paying time
12    and a quarter, we rectified it. May have taken a week
13    or two but it got rectified and he paid up and along we
14    went with the project.
15    Q    Who told you that Shalom was paying time and
16    a quarter?
17    A    I don't recall. I think it was one of his
18    workers. Actually, my office manager told me but I
19    didn't have any direct conversations with any of his
20    employees.
21    Q    I would like to have you take a look at tab

17 (Pages 62 to 65)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 66

1    16 in AJM Exhibit No. 2. There is a first page is a
2    letter to Bryan Frady, F-R-A-D-Y, at Centex
3    Construction from Mike Corrigan attaching log of
4    overtime differential due to Shalom workers and then
5    copies of checks to individual entities for overtime
6    due.
7        A    Okay.
8        Q    Individuals and entities. There is a set of
9    spreadsheets followed by a fax which appears to be from
10   Danny of your office dated August 10th of '05.
11       A    Yes.
12       Q    And this indicates that restitution checks
13   for the overtime issues with Shalom are to be provided
14   August 11th, the next day; is that right?
15       A    It appears that way, yes. These are Shalom
16   checks. Copies of Shalom checks.
17       Q    Reflecting the overtime differential to be
18   paid.
19       A    Correct. It is in here twice.
20       Q    Did you ever indicate to Mike Corrigan that
21   in order to do the work on Prettyman Courthouse that

Page 67

1    you would need to have a guaranteed profit margin?
2        A    No.
3        Q    I would like to ask you about some of the
4    disputed extra-work tickets. If you go to tab 8,
5    exhibits -- AJM Exhibit No. 2. You were present
6    yesterday when Mr. Corrigan was asked about this
7    spreadsheet and the backup documentation as to your
8    work orders, were you not?
9        A    Yes.
10       Q    Can we agree that -- first of all are you
11   familiar with the Architectural Woodwork Institute?
12       A    Yes.
13       Q    And are you also familiar with that
14   organization's premium grade installation
15   specifications?
16       A    Yes.
17       Q    And are you familiar with -- would you agree
18   that those were the specifications or the standards
19   that were in effect for the Prettyman Courthouse job?
20       A    Yes.
21       Q    Having heard Mr. Corrigan's testimony as to

Page 68

1    why these particular change orders were -- extra-work
2    tickets were rejected, can you tell me whether you
3    disagree with his position stated on behalf of
4    Allegheny Jefferson on those tickets?
5        A    Yes, I disagree.
6        Q    And tell me why.
7        A    Well, this was above and beyond the call of
8    duty. It was above and beyond the work required by the
9    premium grade installation. It's evident by the
10   signatures of his field superintendent. They wouldn't
11   have signed them if it wasn't justified.
12       Q    Would you take a look at the second work
13   ticket, which is 17701.
14       A    Right.
15       Q    You say, "Authorized for payment signature."
16   Is that what you're referring to them being signed off
17   by Allegheny Jefferson's representatives?
18       A    Yes. And if I'm not correct, that "verified
19   time only" statement was written in after these tickets
20   were turned in.
21       Q    On what basis do you say that?

Page 69

1        A    The original work orders -- I'd have to get
2    them from my office.
3        Q    I am looking at a version of the same tickets
4    that appear in the binder marked Exhibit No. 1, tab 2,
5    which appear starting again on 17701, "verified time
6    only" is written on many of these tickets.
7        A    There's been many copies of these things
8    passed around.
9            MR. WHITTAKER:  Again, as previously stated,
10   I did that work as counsel and those tickets were
11   copied from the binder by my secretary.
12       A    I have a document here provided by Jefferson
13   that says their recount -- Allegheny Jefferson
14   Millwork, it's a recap of all of our hourly tickets.
15   We submitted tickets for 4,085 and three quarter hours.
16   I have approved by Jefferson -- Allegheny Jefferson
17   3,712 hours and a quarter. So we had originally billed
18   265,574 and approved by Jefferson 241,295. And that's
19   every single work order on the project. So you can't
20   go back after the fact and deny stuff that you already
21   approved.

Page 70

1    Q   Let me see that document.

2    A   Plus I was given verbal direction to also

3  provide an invoice for 200 hours at $55 an hour for

4  terrazzo delays which never -- we never provided that.

5  I mean, we probably should have because that was

6  another $11,000 that we could have gone for.  And I

7  have that in writing as well.

8        MR. GAVETT:  Can we mark this as Exhibit

9  No. 2.

10       (D.L.I. Deposition Exhibit No. 2 was

11       marked for identification.)

12  BY MR. GAVETT:

13    Q   Referring you to the document that we have

14  marked as D.L.I. Exhibit No. 2, you're talking about

15  the -- when you talk about the D.L.I. hours, there are

16  actually three columns, are there not?  There's D.L.I.

17  hours submitted?

18    A   Right.

19    Q   Hours verified?

20    A   Right.

21    Q   And then hours submitted for payment to GSA.

Page 71

1    A   Well, those are extra -- yes, but these are

2  what the Allegheny Jefferson approved to pay us.  These

3  were extras to the owner.  These were AJM-caused change

4  orders that -- when we repaired their work.

5    Q   The hours verified --

6    A   There are none by these tickets right here.

7  No hours on there.  They didn't verify these hours.

8  They rejected them.

9    Q   So are you saying that the ones that are in

10  tab 8 of Exhibit No. 2 or tab 2 of Exhibit No. 1 do not

11  appear on here?

12    A   Correct.

13    Q   They're nowhere reflected at all?

14    A   Well, the work order tickets are there but

15  they did not approve any of the hours.

16    Q   So that would be consistent with their --

17    A   I still have an argument with them.

18    Q   When they say the hours are verified, doesn't

19  necessarily mean they're accepting that they're outside

20  the contract; isn't that right?

21    A   In our conversations those were approved for

Page 72

1  payment.

2    Q   You are interpreting "hours verified" as

3  approved for payment?

4    A   Yes.

5    Q   Not the hours submitted?

6    A   Hours submitted were to the owner for extra

7  work which they were delayed.  I mean, when we

8  submitted our invoices, they were done in a timely

9  manner.  Allegheny Jefferson sat on them and didn't

10  submit them to the owner until very, very late in the

11  project, which is no concern of mine.  You sign it; you

12  bought it.

13    Q   Well, I guess what I am asking is are there

14  any hours on Exhibit No. 2 that were shown accepting

15  these work tickets that were otherwise rejected in

16  tab 8, AJM Exhibit No. 2?

17    A   I have not reviewed that sheet compared to

18  these numbers, no, I have not.  But, you know, for

19  these work order numbers.  Not all of them.  I just did

20  a couple of them.

21    Q   When you say that the work was above and

Page 73

1  beyond the call of duty, first of all, were you there

2  actually filling out the tickets?

3    A   No.

4    Q   You were relying on your men to fill out the

5  tickets?

6    A   My foremen.

7    Q   And have you reviewed each of these disputed

8  tickets with them as to whether or not it fell within

9  or inside or outside the lump-sum contract?

10    A   I have not but my office manager has.  And we

11  have -- there is a document that Danny sent and I don't

12  know where it is -- but it's a rebuttal to all of the

13  excuses why they didn't pay us on each ticket.

14    Q   On the work tickets that are disputed in

15  tab 8, AJM Exhibit No. 2, do you -- does D.L.I. retain

16  the originals of these tickets?

17    A   Yes.

18    Q   And this is a carbonized form, is it not?

19    A   Yes.

20    Q   And how many versions are on there?

21    A   I believe there's three.

19 (Pages 70 to 73)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 74

1    Q   So white original, yellow copy and a pink
2  copy?
3    A   Yes.
4    Q   Who gets the yellow copy?
5    A   Typically, the customer gets one.  What they
6  do with them -- sometimes they throw them away;
7  sometimes we just include a copy with an invoice, you
8  know.
9    Q   Have you examined the originals of the
10  disputed work tickets to see whether or not "verified
11  time only" does not appear?
12    A   I have not.
13    Q   Did D.L.I. walk off this job?
14    A   Absolutely not.
15    Q   Never failed to staff the job to completion?
16    A   Absolutely not.  We were told by Mike
17  Corrigan that we had done all we can do.  Go ahead and
18  leave.  We completed four punch lists.  Never walked
19  away from a project in my entire existence.
20    Q   Was your last day of work on the project
21  September 22nd, 2005?

Page 75

1    A   No, it was not.
2    Q   What was your last day?
3    A   It was in November.  Two days in November.
4    Q   Is it your position that D.L.I. also was not
5  notified of remaining punch-list work to be performed?
6    A   That is correct.  He knows it too,
7  Mr. Corrigan.
8        MR. GAVETT:  What I'd like to do is I'd like
9  to take a break, talk to Mr. Corrigan to see if we can
10  come to a conclusion.
11        MR. WHITTAKER:  Sure.
12        (Recess taken from 12:11 p.m. until
13    12:41 p.m.)
14    BY MR. GAVETT:
15    Q   Mr. Lacy, I wanted to show you the contract
16  document that we have been looking at before at tab 15
17  of AJM Exhibit No. 2.  We have looked at various
18  versions of the contract.  But take your time, take a
19  look at it if you need to.
20        But is it fair to say that tab 15 of AJM
21  No. 2 is the full subcontract agreement for the

Page 76

1  lump-sum portion of the Prettyman Courthouse project
2  between D.L.I. and Allegheny Jefferson?
3    A   It's really not valid.
4    Q   Why is that?
5    A   Because I never received a signed copy.  I
6  didn't get a signed copy until after I filed a lawsuit.
7    Q   Do you agree that you had an agreement for a
8  lump-sum price to do that work?
9    A   Of 1,250,000.
10    Q   The contract document on its face that --
11  well, you reviewed tab 15; is that right?
12    A   Yes.
13    Q   And you made extensive annotations and
14  changes and initialed those annotations and changes?
15    A   Correct.
16    Q   And these -- you understood that these were
17  the terms and circumstances under which you were
18  prepared to do the work as annotated?
19    A   The only part of the contract that I got was
20  the first -- this was what I received.
21    Q   There is an e-mail immediately following that

Page 77

1  from Mike Corrigan to you dated December 9th, 2004 is
2  the scope of work submitted and the strike-out items
3  are things like Corian and items Centex removed.  Did
4  you get that --
5    A   That was via e-mail.
6    Q   Via e-mail.
7    A   Yes.
8    Q   But you understood this was the scope of
9  work, the detailed scope of work?
10    A   Yes.
11    Q   So suffice to say whether you had a signed
12  contract or not, at least the portion of the work
13  described in the document entitled "Dale Lacy
14  Installation Inc., E. Barrett Prettyman Scope of Work"
15  is the scope of work you had for the lump sum, correct?
16    A   No.  The scope of work that I priced was sent
17  to me via e-mail.
18    Q   I'm sorry?
19    A   It was sent to me via e-mail.  It's not
20  attached to that contract.
21    Q   Right.  This scope of work here that is

20 (Pages 74 to 77)

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 78

1  initialed by you and changed by you is not the scope of
2  work for the lump-sum project?
3     A   It may very well be but that's invalid
4  because I never received a signed contract.
5     Q   Can we agree that you did some portion of
6  this work for a lump-sum price?
7     A   Yes.  The scope of work that was sent to me
8  via e-mail.
9     Q   And that would be the e-mail dated
10  December 9th, 2004?
11    A   Yes.
12    Q   So anything that was in the e-mail and scope
13  of work falls under that price of the 1,250 million?
14    A   To the best of my recollection, yes.
15    Q   And of that 1.25 million, you're including
16  the $75,000 in relation to the payment on the American
17  Indian Museum project?
18    A   Yes.  Which he yesterday admitted that he
19  owes me.
20        MR. WHITTAKER:  Try not to use pronouns.  The
21  court doesn't know who "he" or "she" is.

Page 79

1     A   Mr. Corrigan admitted yesterday in his
2  testimony that he owes me the $75,000 as well as the
3  back wages.  We would be compensated for it.
4  BY MR. GAVETT:
5     Q   Your office -- I understood your early
6  testimony to say that your office was damaged in a
7  hurricane in the fall of 2004?
8     A   Yes.
9     Q   Which hurricane was that?
10    A   Jean or Frances.  I don't know.  We had four
11  or five of them in five weeks.  We had four of them in
12  five weeks and our roof was ripped off.  Everything was
13  destroyed in our office.
14    Q   Was that about September of 2004?
15    A   Yes, early September.
16    Q   And then you relocated your office as a
17  result of that?
18    A   Correct.
19    Q   Do you know when you moved into your new
20  offices?
21    A   Sometime late September.  I mean, it was a

Page 80

1  couple of weeks after we were torn up.
2     Q   Was there any point in time where you were
3  operating out of two offices at the same time, old and
4  new?
5     A   No.
6     Q   Do you know when the fax number for your
7  company was switched from 1120 to 1140?
8     A   It was sometime in that time frame.
9     Q   Who is the telephone service provider for
10  your company?
11    A   AT&T.
12    Q   Is that for cell phone or for landlines?
13    A   Landlines and DSL, you know.
14    Q   That used to be the BellSouth and then they
15  merged?
16    A   No, it is BellSouth.  I apologize.  I don't
17  see the bills so...
18    Q   How many square feet are in your office?  Do
19  you have an office space?
20    A   I don't see where that is relevant.
21        MR. WHITTAKER:  Answer the question if you

Page 81

1  can.
2     A   I have no idea.  1800, 2000.  I have no idea.
3  I never measured it.
4  BY MR. GAVETT:
5     Q   Do you and Mr. Williams have separate offices
6  or do you all work in a common --
7     A   Separate.
8     Q   How often do you confer with Mr. Williams on
9  a weekly basis?
10    A   Daily.
11    Q   Did you ever do any of your own research on
12  Davis-Bacon -- interpretation of the Davis-Bacon Act?
13    A   Did I?
14    Q   Yes.
15    A   After the two guys -- well, when it became an
16  issue in March, yes.
17    Q   In March of 2005?
18    A   Yes.
19    Q   Did a little Internet research?
20    A   Yes.
21    Q   Did you ever provide that to Mr. Corrigan?

Court Reporting in
Baltimore/Washington

Evans Reporting Service
800-256-8410

Over 20 years of
award-winning service

Page 82

1    A    We both provided information, yes, to one
2  another.
3    Q    What did your research show as to whether or
4  not you were entitled to count the per diem against
5  your fringes?
6    A    I don't recall.  I mean, it was -- we did so
7  much trying to figure it out, you know, both of us, and
8  he worked with Tracie Forest and they were the ones
9  that came up with the opinion.  And then further
10  research was done through -- he hired the attorneys to
11  provide their opinion.  I think that was in August.
12    MR. GAVETT:  I have no further questions.
13  The court reporter's going to prepare a transcript of
14  your testimony --
15    MR. WHITTAKER:  I have a couple of questions
16  for you.
17    MR. GAVETT:  I will reserve the right to
18  close the deposition until after I've heard your
19  questions.
20    MR. WHITTAKER:  Of course.
21

Page 83

1            EXAMINATION
2    BY MR. WHITTAKER:
3    Q    Mr. Lacy, you were asked some questions about
4  this document and you stated that there was an
5  agreement; is that accurate?
6    MR. GAVETT:  "This document" being the last
7  page --
8    MR. WHITTAKER:  I'm sorry, the last page
9  of --
10    MR. GAVETT:  The last page of tab 25.
11    BY MR. WHITTAKER:
12    Q    AJM Exhibit No. 1, tab 25, which you refer to
13  as the doodle.
14      What was your understanding as to these
15  notations?
16    A    My understanding is that that was the deal.
17  That was the done deal.  We were going to get 300,000,
18  they were going to pay the DOL.
19    Q    Were you under the impression there were any
20  other conditions to that?
21    A    No.  That was for early payment.

Page 84

1    Q    And you were also asked about filing the
2  lawsuit with relation to this document or soon
3  thereafter.  Why was the lawsuit filed?
4    A    Because we received no more compensation when
5  we were told we were going to receive it.
6    Q    And that -- your impression from that
7  document was that you were to receive $300,000?
8    A    Yes.
9    Q    And Allegheny Jefferson would assume the
10  liability for the DOL?
11    A    Absolutely.  Our time frame was running out.
12  You have a certain amount of days to file a lawsuit or
13  file against the bonds, and I informed Mr. Corrigan
14  that we were getting close to that and that I would not
15  let that time frame pass.  I filed the lawsuit within a
16  timely manner.
17    MR. WHITTAKER:  Nothing further.
18    MR. GAVETT:  No further questions.
19    MR. WHITTAKER:  We'll read and sign.
20    (Deposition concluded at 12:51 p.m.)
21

Page 85

1
2  STATE OF MARYLAND
3  HOWARD COUNTY
4
5      I, Dawn Michele Hyde, a Notary Public of
6  the State of Maryland, Howard County, do hereby certify
7  that the above-captioned proceeding took place before me
8  at the time and place herein set out.
9      I further certify that the proceeding was
10  recorded stenographically by me and this transcript is a
11  true record of the proceedings.
12      I further certify that I am not of counsel
13  to any of the parties, nor an employee of counsel, nor
14  related to any of the parties, nor in any way interested
15  in the outcome of the action.
16      As witness my hand and seal this 11th day of
17  July, 2007.
18
19            Dawn M. Hyde
20            My Commission Expires 10/1/07
21

Court Reporting in                    Evans Reporting Service                    Over 20 years of
Baltimore/Washington                      800-256-8410                       award-winning service

Dale Lacy 7/11/07

Page 86

1                    INDEX
2          DEPOSITION OF DALE LACY
3           Wednesday, July 11th, 2007
4    EXAMINATION                     PAGE
5    Mr. Gavett                        3
6    Mr. Whittaker                     83
7
8    EXHIBIT    DESCRIPTION                PAGE
9    1         Deposition Notice          3
10   2         Extra-Work Tickets         70
11
12
13
14
15
16
17
18
19
20
21

Page 87

1
2          ERRATA AND SIGNATURE SHEET
3
4      I, DALE LACY, have read the aforegoing and
5    verify the same to be stenographically accurate with the
6    exception of the following changes (if any):
7    Page   Line   Reads          Should Read
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   ( ) I have no changes.
18
19          _____
20              Signature of Deponent
21

23 (Pages 86 to 87)

Court Reporting in                Evans Reporting Service              Over 20 years of
Baltimore/Washington                  800-256-8410                   award-winning service