## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| **for the use and benefit of D.L.I. Inc.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-875 (RCL)** |
| ) | |
| **ALLEGHENY JEFFERSON** ) | |
| **MILLWORK, LLC,** *et al.,* ) | |
| ) | |
| **Defendants.** ) | |

---

### MEMORANDUM OPINION

This matter comes before the Court on the parties' cross-motions for partial summary

judgment.  The Court has considered defendants' motion [25], plaintiff's consolidated opposition

and motion [28, 29], defendants' consolidated reply and opposition [30, 31, 33], plaintiff's

consolidated surreply and reply [32, 34], the entire record herein, and the applicable law.  For the

reasons set forth below, defendants' motion [25] will be GRANTED in part and DENIED in part;

plaintiff's motion [28] will be DENIED.

### BACKGROUND

This contract dispute arises from the recently-completed construction of an annex to the

E. Barrett Prettyman Courthouse on Constitution Avenue in Washington, D.C. – in which,

incidentally, this Court now sits.  After securing the principal contract from the General Services

Administration ("GSA"), Centex Construction Company ("Centex") engaged subcontractors to

1

complete the project's various elements.[1]  (Compl. ¶¶ 8, 10.)  On October 17, 2004, Centex

selected Allegheny Jefferson Millwork, LLC ("Allegheny"), a joint venture formed by two

Pennsylvania corporations, to fabricate and install architectural millwork and casework.[2]  (Def.

Statement of Undisputed Mat. Facts ¶¶ 1, 2.)  Allegheny turned to plaintiff D.L.I. Incorporated

("DLI") to supply labor for its portion of the project, and DLI then contracted (sub-sub-

subcontracted) with Craftsmanship Unlimited ("Craftsmanship") and Shalom Carpentry

("Shalom").  (*Id.* ¶¶ 4, 5.)

Except where expressly indicated, the following facts are not in dispute.

**1.      Lump-Sum & Time and Materials Contracts**

Allegheny subcontracted two groups of tasks to DLI: installation of materials fabricated

by Allegheny on the first, fifth, and sixth floors, under a lump-sum contract, and installation of

materials fabricated by another company on the second, third, and fourth floors, on a time and

materials ("T & M") basis.  (Corrigan Dep. 8-9; Lacy Dep. 13-14.)  Initially, the parties verbally

agreed to a price of $1,175,000 for the lump-sum contract work and to specific per hour rates for

the T & M portion.  (Compl. ¶ 12; Corrigan Dep. 24; Def. Statement of Undisputed Mat. Facts ¶

8; Pl. Second Consol. Mem. 4.)  DLI commenced performance on approximately December 5,

2004.  (*Id.* at 20.)  Allegheny emailed DLI a "scope of work" document four days later (Lacy

Dep. 77-78.)

---

[1] Defendant Travelers Casualty & Surety Company ("Travelers") served as a surety on
Centex's payment bond for the project.  (Def. Statement of Undisputed Mat. Facts ¶ 3.)

[2] Defendants Fidelity and Deposit Company of Maryland ("Fidelity") and Great American
Insurance Company ("Great American") served as sureties on Allegheny's payment bond for the
project.  (Def. Statement of Undisputed Mat. Facts ¶ 3.)

One of the joint venturers, Jefferson Millwork & Design, Inc. ("Jefferson"), had previously collaborated with DLI on construction of the Smithsonian's National Museum of the American Indian, and as of early 2005, Jefferson still owed DLI some amount of money for its services on that project. (*See* Corrigan Dep. 24, 27; Pl. Ex. 1.) In an email on December 22, 2004, Michael Corrigan – Jefferson's general manager and a manager of Allegheny – proposed that if Jefferson failed to remit the balance to DLI by January 9, 2005 (which it did not do), the Allegheny-DLI lump-sum contract price would rise to $1,250,000. (Corrigan Dep. 5, 6, 27, 29; Def. Ex. 11; Pl. Ex. 1.)

On February 12, 2005, Allegheny sent DLI a nine-page, unsigned, standard form subcontract. (Compl. ¶ 14; Def. Ex. 5.) DLI's president, Dale Lacy, signed and returned the contract, with extensive mark-ups and revisions, on April 5, 2005. (*See* Def. Ex. 5 at 1; Def. Ex. 6; Compl. ¶ 14.) Corrigan testified he signed the altered version on Allegheny's behalf "when we received it or thereafter" and filed it for accounting purposes. (Corrigan Dep. 37.) Allegheny did not return a signed copy to DLI until after DLI filed its complaint in this case, but Lacy apparently assumed his changes had been accepted in April. (Lacy Dep. 76; Def. Ex. 6.) DLI nonetheless asserts the parties have no valid written contract because it never received a signed copy back from Allegheny. (Lacy Dep. 76; Pl. First Consol. Mem. 13.)

To date, Allegheny has paid DLI $1,163,250 on the lump-sum contract. (*See* Def. Statement of Undisputed Facts ¶ 2; Pl. First Consol. Mem. 3.) Allegheny contends only $11,750 remains due. (Def. Statement of Undisputed Mat. Facts ¶ 11.) DLI, however, insists the true contract price is $1,250,000, and thus Allegheny still owes it $86,750. (Pl. Second Consol. Mem. 5.) DLI now seeks summary judgment on this issue. (Pl. First Consol. Mem. 2.)

2.     **Davis-Bacon Issues**

The Davis-Bacon Act ("Davis-Bacon"), 40 U.S.C. section 3141 *et seq.*, requires that

workers on most District of Columbia or federally-assisted construction contracts be paid no less

than the prevailing wage and fringe benefit rates in their project's geographic area.  40 U.S.C. §

3142 (2008).  *See also* 29 C.F.R. § 5.5 (2008) (implementing regulations).

At their first meeting on October 5, 2004, Centex informed Allegheny that Davis-Bacon

rates would apply to the courthouse project.  (Corrigan Dep. 39-40.)  Allegheny, in turn, notified

DLI, faxing the appropriate wage tables on October 5, 2004 and again on January 5, 2005.  (Def.

Statement of Undisputed Mat. Facts ¶¶ 15, 16; Pl. First Consol. Mem. 2.)   Lacy, however,

claims he first learned Davis-Bacon applied to the courthouse project in February 2005.  (Lacy

Dep. 29-30, 39-40.)  Around that time, two laborers employed by one of DLI's subcontractors

complained of underpayment to a GSA representative.  (Lacy Dep. 30-32; Corrigan Dep. 48.)

Many of DLI's own laborers and its subcontractors' laborers had traveled from outside

the Washington, D.C. area to work on the courthouse project.  (Lacy Dep. 52-53.)  Thus, they

received *per diem* in addition to their wages and other fringe benefits.  (*See id.*)  Allegheny and

DLI initially assumed that this *per diem* could count toward the Davis-Bacon minimum fringe

benefit figure, but first GSA, and later the Department of Labor ("DOL"), disagreed.  (Pl. First

Consol. Mem. 4; Def. Resp. to Pl.'s Statement of Undisputed Mat. Facts 6.)  Over the next few

months, the parties discussed the Davis-Bacon issue repeatedly, (Lacy Dep. 35-37; Corrigan Dep.

50-52), and Lacy claims he informed Corrigan verbally, though never in writing, that if DOL's

position was correct, DLI would need to stop work and renegotiate the entire project, (Lacy Dep.

35-37).  Throughout this period, Corrigan represented to Lacy that Allegheny would continue to

advocate the parties' joint position to DOL and suggested that it might shoulder some portion of any ultimate liability.[3]  (Corrigan Dep. 55-56.)  To assist with its advocacy efforts, Allegheny retained counsel who produced two documents – an "advocacy letter" marshaling legal authority for the parties' position and a client opinion letter acknowledging the issue was, legally, an open one – both of which Allegheny provided to DLI.  (Corrigan Dep. 59-60.)

On September 2, 2005, Centex notified Allegheny that due to its potential Davis-Bacon claim liability, it would withhold further payments to Allegheny pending resolution of DOL's investigation.  (Def. Ex. 11.)  Thereafter, Corrigan offered to contribute to any finalized DOL claim against DLI, provided the parties signed mutual releases.  (Corrigan Dep. 54-55.)  No such releases were signed.  (*Id.* at 55.)  In January 2006, Corrigan emailed Lacy a settlement proposal. (Pl. Ex. 4.)  Indicating this was a "conditional concept," he sketched out a sequence of events that would include Allegheny's indemnifying DLI against the Davis-Bacon claims.  (*Id.*)  The following day, Lacy firmly rejected this proposal by email.[4]  (Def. Ex. 20.)  At some point afterward, the two men met in person and resumed negotiations.  (Lacy Dep. 44.)  Although he made notes of their discussion, Corrigan maintains they did not reach an agreement, (Corrigan Dep. 106), and the deal Lacy describes was expressly conditioned on Corrigan's obtaining

---

[3] DLI contends that it briefly raised its workers' pay rates in March but lowered them again at Allegheny's direction.  (Lacy Dep. 37-38.)  Allegheny, naturally, denies giving any such instruction.  (Def. Ex. 19.)

[4] Lacy's somewhat colorful language clearly indicates he found Corrigan's offer unsatisfactory – e.g., "you think I just 'fell off the Turnip Truck'" – and he demanded a "bottom line . . . number."  (Def. Ex. 20.)

approval from Jefferson's joint venture partner.  (Lacy Dep. 48).[5]  DLI now insists the parties

formed a "contract" under which Allegheny would pay DLI $300,000 and assume all liability to

DOL on the Davis-Bacon claim.  (Pl. First Consol. Mem. 5, 9.)

On March 29, 2006, DOL investigator Bruce Dory emailed Allegheny a preliminary total

of $191,727.46 for the Davis-Bacon claims against DLI and its subcontractors.  (Def. Ex. 12.)

Coincidentally, on February 9, 2006, DLI submitted an invoice to Allegheny for $191,909.41.

(Def. Ex. 7 at 14.)  The "job name" on that invoice is "Prettyman Restitution," and the

description references only "millwork installation."  (*Id.*)  Allegheny contends – and DLI

evidently concedes – that DLI issued this invoice based on its prospective Davis-Bacon liability.

(*See* Def. Statement of Undisputed Mat. Facts ¶ 12 (describing basis of invoice number 4592 as

"Davis Bacon charges by DOL – Listed as 'Millwork Installation in invoice'"); Pl. Second

Consol. Mem. 7 (responding that "DLI [] disputes the amount of the DOL claim").)

Soon afterward, on May 9, 2006, DLI sued Allegheny and various sureties[6] in this Court.

Its complaint alleged breach of contract and quantum meruit, and it also sought to collect against

Centex and Allegheny's surety bonds.  All defendants answered on June 1.

As the case proceeded through discovery, the underlying factual scenario continued to

develop.  On March 20, 2007, DOL served a due process letter on Centex stating that its

---

[5] Although Corrigan was a manager of Allegheny, the joint venture, he principally served as general manager and vice president of Jefferson Millwork & Design, Inc., one of the joint venture partners.  (Corrigan Dep. 5, 6; Def. Ex. 11.)  Lacy testified Corrigan told him that "he would have to go back to his joint venture partner [Allegheny Millwork, Inc.] for the additional DOL money, if there were any."  (Lacy Dep. 48.)

[6] While the Court refers only to Allegheny throughout the text of this opinion, defendants Travelers, Fidelity, and Great American have joined each of Allegheny's submissions.

investigation had identified $196,509.99 in unpaid Davis-Bacon fringe benefits. (Def. Ex. 14.)  In

April, to prevent the government's continued withholding of payments on the courthouse project,

Allegheny and Centex notified DOL that they intended to pay the $196,509.99 into an escrow

account pending final resolution.  (*See* Def. Ex. 15.)  On May 29, 2007, Allegheny remitted

payment to DOL in the form of three certified checks.  (S*ee* Def. Ex. 16.)

Contemporaneously, Allegheny moved for partial summary judgment, and DLI filed a

cross-motion with its opposition.  DLI claims it is entitled to recover the Davis-Bacon claim

amount, $164,834.83,[7] from Allegheny, and it seeks summary judgment in its favor on this point.

(Pl. First Consol. Mem. 14.)  Allegheny, on the other hand, contends it is entitled to summary

judgment: 1) that it need not pay DLI's February 9, 2006 invoice; and 2) that it may "back

charge" (withhold final payment from) DLI in the amount it has escrowed with DOL,

$196,509.99.  (Def. Mem. Supp. Mot. 6.)

## DISCUSSION

**I.     Legal Standard for Summary Judgment**

A court should grant summary judgment when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact" suitable for trial.  Fed. R. Civ. Pro. 56(c).  To ascertain

---

[7] DLI now claims that in July 2007, DOL's final determination reduced the Davis-Bacon claim's total value to $164,834.83.  (Pl. Ex. 2 at 1; Pl. Ex. 3 at 1, 4; Pl. Second Consol. Mem. Ex. 1 at 3.)  In its response to DLI's statement of undisputed facts, filed September 4, 2007, Allegheny declares it "has never received any communication from the Department of Labor verifying this fact and there is nothing in the documentation submitted as DLI Ex. 3 which explicitly states that the aggregate claims have been reduced to the aggregate figure of $164,834.83." (Def. Resp. to Pl. Statement of Undisputed Mat. Facts 4.)  Hence, the parties continue to dispute the Davis-Bacon claim's aggregate value.

whether an issue involves "material" facts, a court must look to the substantive law on which the claim or defense rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if its resolution could establish an essential element of the nonmoving party's challenged claim or defense. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). Where "the nonmoving party [] fails[] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. Further, the court must accept the nonmoving party's evidence as true and must draw "all justifiable inferences" in his favor. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge . . . ." *Id.* at 255. Yet "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* at 252. This standard is "'very close' to the 'reasonable jury' directed verdict standard," and despite their distinct procedural postures, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or . . . is [instead] so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 250-51.

## II.     Analysis

### 1.     Validity of Written Subcontract

As a threshold matter, the parties dispute the written subcontract's validity. Because this agreement involves construction services, familiar, common law contracts principles apply.

It is axiomatic that "formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange" – offer and acceptance – and consideration.

Restatement (Second) of Contracts §§ 17, 22 (1981).  "[A]n acceptance[] upon terms varying from those offered[] is a rejection of the offer[] and puts an end to the negotiation, unless the party who made the original offer . . . assents to the modification suggested." *Iselin v. United States*, 271 U.S. 136, 139 (1926).

Once a valid contract is formed, if it is unambiguous, it "speaks for itself and binds the parties without the necessity of extrinsic evidence." *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983).  "Whether a contract is ambiguous is a question of law." *Washington Properties, Inc. v. Chin*, 760 A.2d 546, 548 (D.C. 2000).  Ambiguity exists where a provision is reasonably susceptible of more than one construction or interpretation, but it does not arise merely because the parties disagree as to the provision's meaning. *Id.*  Although courts must construe contract language so as to effectuate the parties' intent, when that language is unambiguous, intent should be assessed objectively. *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1093 (D.C. 1988).  Hence, "the first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant." *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982).

In February 2005, Allegheny sent DLI a nine-page, unsigned, standard form subcontract. (Compl. ¶ 14; Def. Ex. 5.)  The document identified the price ($1,175,000) Allegheny would pay for a specific performance by DLI (the attached scope of work) and contained numerous other particulars.  (*See* Def. Ex. 5.)  Whatever the parties' then-existing legal relationship may have been, this constituted an offer.  *See* Restatement (Second) of Contracts § 24 (1981) ("[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it").

9

In April 2005, Lacy signed and returned the contract.  (*See* Def. Ex. 5 at 1; Def. Ex. 6;

Compl. ¶ 14.)  Because he had extensively revised the document, however, this was a counter-

offer rather than an acceptance.  *See* Restatement (Second) of Contracts § 39 (1981) ("[a]

counter-offer is an offer made by an offeree to his offeror relating to the same matter as the

original offer and proposing a substituted bargain differing from that proposed by the original

offer").  As such, it terminated DLI's power to accept the original subcontract and invited assent

by Allegheny to the altered version.  *Iselin*, 271 U.S. at 139.

Lacy made dozens of changes to the subcontract, including to paragraph 28.  (*See* Def.

Ex. 5.)  But he left one phrase in that paragraph unchanged:  "[t]he Subcontract [would] be of no

force or effect unless and until accepted in writing by [Allegheny] at its office."  (*Id.* at 8.)  DLI

insists that this provision required Allegheny to sign the contract *and return a copy to DLI*, and

that because Allegheny failed to do so (until after DLI filed suit), no valid contract was formed.

(Lacy Dep. 76; Pl. First Consol. Mem. 13.)  In response, Allegheny points to general propositions

of contract law – that a contract need only be signed by the party to be bound, and that conduct

may demonstrate mutual assent as well as a signature.  (Def. Consol. Mem. 18 (citing *Davis v.

Winfield*, 664 A.2d 836, 838 (D.C. 1995).)

While the parties evidently disagree as to this provision's implications, their

disagreement, alone, does not render it ambiguous.  *Washington Properties, Inc.*, 760 A.2d at

548.  Indeed, "accepted in writing . . . at its office" bears but one reasonable interpretation.

Although DLI suggests this provision required Allegheny to notify DLI of its acceptance, the

contract's plain language does not so indicate.  Moreover, nothing in the phrase "accepted in

writing . . . at its office" implies that anything need occur anywhere *other* than at Allegheny's

office for its acceptance to be effective.  Rather, a reasonable person in the parties' position would construe this language to mean that Allegheny could effectively accept DLI's counter-offer by simply memorializing its acceptance in some form of writing, at its office.  *See Intercounty Constr. Corp.*, 443 A.2d at 32.

In his deposition, Corrigan testified he signed the altered version on Allegheny's behalf "when we received it or thereafter."  (Corrigan Dep. 37.)  In its briefing papers, DLI asserts that Allegheny never executed the Subcontract.  (Pl. First Consol. Mem. 12; Pl. Second Consol. Mem. 28.)  On summary judgment, the non-moving party must put forth *some* evidence – even if scarcely more than a "scintilla" – to support its position.[8]  But DLI points to no evidence that contradicts or casts doubt on Corrigan's testimony – it simply cites to the deposition transcript's next page, where Corrigan admitted he had not returned the signed document to DLI.  (*See* Pl. First Consol. Mem. 12 (citing Corrigan Dep. 38).)  As such, the undisputed facts in evidence establish Allegheny complied with the express terms of DLI's counteroffer in accepting it, thus forming a valid and enforceable contract.[9]

---

[8] DLI has, of course, also moved for summary judgment, but it nonetheless bears this burden in responding to Allegheny's motion, which relies heavily on the written subcontract.

[9] In arguing that any purported acceptance by Allegheny was ineffective without prompt and proper notice,  DLI cites this contractual provision but does not contend notification was otherwise necessary.  As a general rule, acceptance of an executory bilateral contract is effective only if the offeree exercises reasonable diligence to notify the offeror, or if the offeror receives such notification seasonably.  Restatement (Second) of Contracts § 56 (1981).  Notification is not essential, however, where the offeree has performed in whole or in part, or where the offeror has rendered a performance, the benefit of which the offeree has accepted.  *Id.* cmt. a.  Here, both parties had commenced performance before Allegheny accepted.  Moreover, Lacy apparently assumed his changes had been accepted in April.  (Def. Ex. 6 ("I figured he accepted the deletions I made to the agreement").)  DLI does not claim it was unaware Allegheny had accepted its counter-offer, nor that it was prejudiced by Allegheny's failure to provide notice.  Under the circumstances, the Court concludes notification was unnecessary to render

2.       **Value of Lump-Sum Contract**

Because the parties executed a valid written agreement, the Court must invoke the

venerable parol evidence rule.  "[W]hen the parties to a contract have reduced their entire

agreement to writing, the court will disregard and treat as legally inoperative parol evidence of []

prior negotiations and oral agreements."  *Giotis v. Lampkin*, 145 A.2d 779, 781 (D.C. 1958).  To

determine whether a writing in fact embodies the parties' entire agreement, the Court must

examine their intent by looking to "the written contract, the conduct and language of the parties

and the surrounding circumstances."  *Standley v. Egbert*, 267 A.2d 365, 367 (D.C. 1970).

> The precise criteria bearing on this question are as numerous and as varied as the cases
> themselves . . . [but] certain standards usually recur: (1) the appearance and nature of the
> writing itself, i.e., whether it is comprehensive or merely devoted to a few of the possible
> subjects of negotiation; (2) the relative positions and experience of the parties themselves;
> (3) assistance of counsel in the preparation of the document; [and] (4) whether the
> contract contains any expression at all on the subject involved.

*Giotis*, 145 A.2d at 782.  In particular, the presence of an integration clause weighs heavily in

favor of a complete integration.  *United States v. Sears, Roebuck and Co.*, 623 F. Supp. 7, 8

(D.D.C. 1984) (Hogan, J.) (citing *Luther Williams, Jr., Inc. v. Johnson*, 229 A.2d 163, 165 (D.C.

1967)).

---

Allegheny's acceptance effective.
       Additionally, DLI insists the written subcontract is invalid because it received the
document "months after [it] started the project" and never received certain requested information.
(Pl.'s First Consol. Mem. 13.)  Neither fact is material to the contract's validity.  First, parties to
an existing oral agreement may freely modify its terms at any time so long as the modification
possesses all elements of a valid contract.  *See Hershon v. Hellman Co.*, 565 A.2d 282, 283-84
(D.C. 1989).  Second, DLI did not condition its counteroffer on Allegheny's provision of the
referenced information – it simply requested it.  (*See* Def. Ex. 6 ("I would like to request a copy
of the partnership agreement between the two companies within the next ten days.").)  Hence,
DLI's objections do not undermine the contract's validity.

The written subcontract between Allegheny and DLI consists of nine pages of single-spaced type and addresses, *inter alia*, price, costs, timing and terms of payment, assignments, insurance, and bonding.  (*See* Def. Ex. 5.)  It includes elaborate provisions defining what constitutes breach and default and outlines the consequences thereof.  (*See id.*)  It incorporates various warranties by DLI as to the quality of its workmanship as well as attachments defining the scope of work.  (*See id.*)  The Court could easily characterize the subcontract as comprehensive based on its exhaustive coverage of these various topics, and its integration clause reaffirms this assessment: "As regards the subject matter hereof, this writing constitutes the entire agreement between the parties."  (*Id.* at 7.)

Though no evidence indicates either sought assistance of counsel, both Allegheny and DLI were apparently experienced in forming construction contracts.  (*See, e.g.*, Corrigan Dep. 13-18, 42; Lacy Dep. 6-8.)  DLI, the party presently seeking to avoid the contract's application, had been in the construction business for ten years and had worked extensively outside its home state of Florida, including on at least two other major projects in the District of Columbia.  (Lacy Dep. 6-7.)

 These facts establish the subcontract was a fully integrated agreement, and as such, the court will admit no evidence of prior or contemporaneous oral, or prior written, agreements to vary its terms.  *Giotis*, 145 A.2d at 781.  On its first page, the agreement conspicuously lists the lump-sum contract price as $1,175,000.  (Def. Ex. 5 at 1.)  Though he made three other modifications to that page, Lacy, DLI's president, left this provision unchanged.  (*See id.*)  Yet DLI now asks the Court to honor the $1,250,000 price proposed in Corrigan's December 22, 2004 email.  Whatever that email's legal effect may have been at the time, the parties'

subsequent execution of a fully integrated written agreement effectively subsumed any prior

negotiations or oral agreements.

That valid and enforceable contract set the lump-sum price at $1,175,000.  It is

undisputed that Allegheny has thus far paid DLI $1,163,250 of this amount.  (*See* Def. Statement

of Undisputed Facts ¶ 2; Pl. First Consol. Mem. 3.)  Hence, only $11,750 remains due, and DLI's

motion for summary judgment in the amount of $86,750 must be denied.[10]

### 3.        Responsibility for Davis-Bacon Claim

The parties do not dispute that Davis-Bacon applied to the courthouse project and to all

related contracts and subcontracts.  Nor do they dispute DOL's decision that *per diem* payments

may not count toward the Davis-Bacon minimum for fringe benefits.  Instead, their disagreement

centers on which party should bear the cost of this adverse determination.[11]

Federal regulations charge the prime contractor with responsibility for ensuring its

subcontractors' compliance with Davis-Bacon.  29 C.F.R. § 5.5(a)(6) (2008).  Thus, "[t]he prime

contractor is liable for wage underpayment made by its subcontractor whether the prime

contractor had knowledge of the violations and despite good faith on the part of the prime

contractor."  *In the Matter of Northern Colorado Constructors, Ltd.*, WAB Case No. 86-31, 1986

---

[10] Allegheny has not sought summary judgment on this issue.

[11] The Court may easily dispose of one aspect of Allegheny's motion.  DOL has accepted payment on the Davis-Bacon claim from Allegheny and has not pursued DLI directly.  Moreover, DLI has authorized Allegheny to pay back wages to its employees on its behalf.  (Pl. Second Consol. Mem. Ex. 1 at 2.)  Thus, DLI has no basis whatever on which to seek reimbursement from Allegheny under invoice 4592 for the back wages owed its and its subcontractors' workers.  Hence, Allegheny is entitled to summary judgment in its favor as to this work ticket.

14

WL 193131, at *2 (Oct. 3, 1986).  *Accord Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1337,

1449 n.1 (D.C. Cir. 1994) (prime contractor was equally responsible for repayment of unpaid

wages to subcontractor's workers); *Mohr v. J. Pease Constr. Co.*, No. 92C8342, 1994 U.S. Dist.

LEXIS 5693, at *4 (N.D. Ill. May 2, 1994) (compliance with Davis-Bacon "is as much the prime

contractor's responsibility as the subcontractor's").

 After DOL ascertains the final amount by which workers have been shortchanged, the

prime contractor may forward cashier's or certified checks for this sum directly to the

Comptroller General.  *See* 1986 WL 193131, at *6.  Here, Allegheny, a first-tier subcontractor,

preemptively paid $196,509.99 into an escrow with DOL pending its final resolution of the

Davis-Bacon claim against its (second-tier) subcontractors.  (S*ee* Def. Ex. 16.)

 In its motion for summary judgment, Allegheny offers no authority for the proposition

that in such a case, the subcontractor (or as here, the sub-subcontractor) must indemnify the

prime contractor (or as here, the subcontractor) in full or in part.[12]  Instead, it argues that several

terms in the written subcontract place responsibility for the Davis-Bacon claim on DLI.  (Def.

Mem. Supp. Mot. 21.)  For instance, the contract provides that DLI must "comply with all wage

---

[12] Rather, it directs the Court to two Wage Appeals Board matters – *In the Matter of Cherry Hill Construction, Inc.*, WAB No. 85-7 (Oct. 2, 1987), and *In the Matter of All Phase Elec. Co.*, WAB 85-18 (June 18, 1986) – in which the Board expressly declined to consider whether a subcontractor must indemnify the prime contractor.  But at least one other federal court has done so.  Observing that Davis-Bacon does not address liability as between a contractor and its subcontractor, that court reasoned: "[b]y declining to provide a federal remedy to prime contractors against subcontractors in violation or their sureties, Congress appears to have intended to relegate those prime contractors to their state law remedies for breach of contract." *Dorey Elec. Co. v. Pittman Mech. Contractors, Inc.*, 789 F. Supp. 734, 739 (E.D. Va. 1992) (declaratory judgment claim premised on Miller Act did not confer federal subject matter jurisdiction).  Notably, here, Allegheny presented no counterclaims, state law or otherwise, in its answer.

scales . . . established . . . by any governmental authority having jurisdiction," (Def. Ex. 5 at 4);

declares that DLI will "be responsible for compliance therewith and [will] correct any violations

thereof," (*id.* at 5); and states that Allegheny "shall not be responsible for any direct or

consequential expenses or damages incurred by [DLI] resulting from any labor disputes," (*id.* at

8).  Further, it conditions Allegheny's final payment to DLI on DLI's furnishing satisfactory

evidence that it "has paid in full all persons furnishing labor . . . in connection with the Work

including any . . . governmental charges with respect thereto."  (*Id.* at 2.)  The subcontract also

explicitly permits Allegheny to pay any of DLI's unpaid liabilities on the project, including labor

costs, and to withhold the amount advanced from DLI.  (*Id.* at 6.)

These provisions make clear that DLI owed a contractual duty to comply with Davis-

Bacon, and that when DLI breached this duty, Allegheny acted within its contractual rights in

remitting payment to DOL for the Davis-Bacon claim and withholding that amount from DLI.

Yet the written subcontract expressly governs only DLI's installation of millwork and

casework on the fifth and sixth floors.  (*See* Def. Ex. 5 at 10.)  Although the document does

provide that its terms will govern "any and all future work assignments" agreed by the parties,

(*id.* at 8), the version proposed by DLI and accepted by Allegheny explicitly excludes "floors 2,

3, + 4 Bookcases, Wainscot, and Related Trim, etc," (*id.* at 10).  Hence, by its terms, the contract

does not apply to the T & M portion of the job.  The written contract thus permits Allegheny to

"back charge" to DLI *only* that portion of the Davis-Bacon claim arising from work performed

pursuant to the lump-sum contract.[13]

---

[13] DLI presents three arguments to support its cross-motion for summary judgment, but as
to the lump-sum contract, each one fails.  First, DLI contends Corrigan orally represented to Lacy

As to the portion of the Davis-Bacon claim attributable to DLI's T & M work, Allegheny has offered no adequate legal basis to support its asserted right to "back charge" DLI. Its motion for summary judgment lays out four arguments.

---

that Allegheny would shoulder some portion of any ultimate Davis-Bacon liability, and that these statements created a contract under which Allegheny is solely responsible for the Davis-Bacon claim. (Pl. First Consol. Mem. 7-9.) If the parties formed an oral agreement to this effect, it would modify the terms of the written subcontract, which as discussed above, allocated responsibility for the Davis-Bacon entirely to DLI. Yet according to that subcontract's terms, it may "not be modified or amended in any way except [] by a writing executed by both parties," save in emergency situations not present here. (Def. Ex. 5 at 7.) Hence, if actually attempted, the supposed oral modification had no effect on the written subcontract.

Second, DLI asserts the parties were mutually mistaken concerning the correct labor rate and asks the Court to reform the contract. (Pl. First Consol. Mem. 9-10.) The mutual mistake doctrine takes two forms. A mutual mistake by the parties concerning an extrinsic fact material to the bargain renders a contract voidable by the adversely affected party, unless he has assumed the risk. *Isaac v. First Nat'l Bank*, 647 A.2d 1159, 1163 n.8 (D.C. 1994); Restatement (Second) of Contracts § 152 (1981). Alternatively, "reformation is available when there is an error in reducing the agreement of the parties to a writing." *Isaac*, 647 A.2d at 1163 n.10. DLI seeks the latter remedy, but its arguments implicate the former theory of mutual mistake. (*E.g.*, Pl. Second Consol. Mem. 23 (repeatedly referring to a "mutual mistake of fact" rather than a mistake in transcription).) A party can assume the risk of a mutual mistake of material fact by agreement, or if "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." *Id.* § 154. Here, the written subcontract obligates DLI to comply with government wage scales and other applicable statutory provisions. It thus allocates the risk of the parties' mistake concerning *per diem* to DLI. Moreover, by the time DLI sent its counteroffer to Allegheny in April 2005, DLI was aware both that Davis-Bacon applied to the courthouse project and that laborers had complained to GSA concerning DLI's compliance. (Lacy Dep. 29-32, 39-40.) Hence, when the contract was formed, DLI knew the parties' joint position on the *per diem* payments was subject to doubt. On these facts, the Court concludes DLI assumed the risk of any mistake concerning the correct labor rate and cannot void the written subcontract on this basis.

Third, DLI argues that Corrigan, on behalf of Allegheny, promised that Allegheny would pay any ultimate Davis-Bacon claim, and that DLI foreseeably and detrimentally relied on this promise. (Pl. First Consol. Mem. 10-11.) Unfortunately for DLI, "[t]he existence of an express written contract bars the plaintiff's use of the promissory estoppel doctrine." *Woodruff v. Nat'l Opinion Research Ctr.*, 505 F. Supp. 2d 138, 143 n.3 (D.D.C. 2007) (Leon, J.). *See also Bldg. Servs. Co. v. AMTRAK*, 305 F. Supp. 2d 85, 95 (D.D.C. 2004) (Walton, J.) ("District of Columbia law presupposes that an express, enforceable contract is absent when the doctrine of promissory estoppel is applied.").

First, Allegheny claims DOL's prevailing wage determinations "must be deemed to be included as terms of any contract falling within the jurisdiction of the Davis Bacon Act, even if these wages are not specifically set out in the contract." (Def. Mem. Supp. Mot. 14.)  When such provisions are omitted from a *prime* contract, they do become part of the contract by operation of law, and the prime contractor is charged with constructive knowledge of Davis-Bacon's requirements.  *In re BUI Constr. Co. & Building Supply*, 84-1 B.C.A. (CCH) P17,183, 1984 ASBCA LEXIS 659, at *5 (Feb. 15, 1984).  Yet Allegheny offers no authority suggesting this rule extends to *sub*contracts.  Indeed, the stark difference in prime and subcontractors' responsibilities under Davis-Bacon's implementing regulations supports a contrary conclusion: prime contractors – not intermediate subcontractors –  are accountable for lower tier subcontractors' compliance with the regulations.  29 C.F.R. § 5.5(a)(6) (2008).

Second, Allegheny contends the written subcontract bound DLI to comply with Davis-Bacon.  As discussed above, this argument fails as to the T & M portion of the work.

Third, Allegheny contends DLI "was placed on actual notice of the prevailing wage and certified payroll requirements of the statute." (Def. Mem. Supp. Mot. 16.)  Whether or not DLI received notice before the parties agreed to hourly rates for the T & M work, notice does not equate to liability.  Allegheny points to no statute or precedent to support its contention that actual notice would entitle Allegheny to "back charge" DLI under the circumstances present here.

Fourth and finally, Allegheny asserts that equity demands it be permitted to set off the Davis-Bacon claim amount against its contractual payments to DLI.  (Def. Mem. Supp. Mot. 21.)  "A set-off is an equitable defense which can reduce or defeat the opposing party's claim."

*Johnson v. Fairfax Village Condominium IV Unit Owners Assoc.*, 641 A.2d 495, 508 (D.C. 1994). In Allegheny's view, "there is no question that [it] has been, by virtue of the withholding scheme of the Davis Bacon Act, required to pay the debts of DLI and its sub-subcontractors for wages owed to their employees." (Def. Mem. Supp. Mot. 21.) Thus, it asserts "[e]quity requires" the Court to reduce any successful claim by DLI by this amount. (*Id.*)

Yet Allegheny offers nothing beyond this broad-brush declaration of equitable entitlement to persuade the Court that an injustice has occurred. The undisputed facts establish that for several months after questions arose concerning its validity, both Allegheny and DLI adhered to the position that *per diem* could count toward the Davis-Bacon minimum for fringe benefits. DLI is no more blameworthy in this respect than Allegheny. True, DLI could have hedged its bet by temporarily raising its workers' wages – it contends that it did, though the parties disagree on this point. But Allegheny, likewise, could have insisted DLI raise its pay rates to forestall any potential Davis-Bacon liability, or else sought guarantees of indemnity from DLI. Instead, Allegheny, as well as DLI, allowed the status quo to persist well after its attorneys advised that the *per diem* issue was, legally, an open one. "A court of equity will not intervene 'where there are equal equities or where there are no equities.'" *Heifetz Metal Crafts, Inc. v. Peter Kiewit Sons' Co.*, 264 F.2d 435, 439 (8th Cir. 1959) (quoting *Pacific Royalty Co. v. Williams*, 227 F.2d 49, 58 (10th Cir. 1955)). As Allegheny makes no argument and recites no evidence to demonstrate the equities weigh in its favor, the Court declines to credit its request.

Hence, because Allegheny has offered no supporting evidence or basis in law for its asserted right of "back charge" against DLI as to the T & M portion of the project, the Court cannot grant judgment for Allegheny on this issue.

Nor, however, may the Court grant judgment on this issue to DLI on any ground asserted in its cross-motion: facts relevant to liability for the Davis-Bacon charges arising from DLI's T & M work remain either undeveloped or in dispute.

First, DLI's T & M work was governed by an oral agreement between Lacy and Corrigan formed prior to December 2004.  (Compl. ¶ 12; Corrigan Dep. 20; Pl. Second Consol. Mem. 4.) The contours of this agreement remain almost wholly undefined, and neither party's filings address them in any detail.  Hence, though DLI contends Corrigan's subsequent discussions with Lacy created a "contract" under which Allegheny is solely responsible for the Davis-Bacon claim, (Pl. First Consol. Mem. 7-9), the Court cannot ascertain how such an agreement would impact the original, underlying oral contract absent further elucidation of the latter's terms.

Moreover, the parties continue to dispute the nature, content, and timing of Corrigan's statements.  DLI argues that Corrigan, on behalf of Allegheny, promised that Allegheny would pay any ultimate Davis-Bacon claim, and that DLI foreseeably and detrimentally relied on this promise.  (Pl. First Consol. Mem. 10-11.)  Yet in his deposition, Corrigan admitted only that "the notion of financial assistance" was "on the table," and that on Allegheny's behalf, he had offered to contribute to any finalized DOL claim against DLI, provided the parties signed mutual releases (which did not occur).  (Corrigan Dep. 54-56.)  Further, it is unclear precisely when Corrigan made these statements.[14]

---

[14] As Allegheny contends any such statements were made in connection with settlement offers and are thus barred by Federal Rule of Evidence 408, their timing is particularly relevant.

Second, though DLI asserts the parties were mutually mistaken concerning the correct labor rate,[15] Allegheny evidently knew from the outset that Davis-Bacon applied to the courthouse project, (Corrigan Dep. 39-40), and a dispute exists as to whether and when it successfully communicated this fact to DLI. (Def. Statement of Undisputed Mat. Facts ¶¶ 15, 16; Lacy Dep. 29-30, 39-40.)

Accordingly, the Court cannot grant judgment to either party at present concerning liability for the portion of the Davis-Bacon claim attributable to DLI's T & M work.  Resolution of this issue must await further proceedings.

The Court has, however, determined Allegheny may withhold contract funds from DLI as indemnification for the portion of the Davis-Bacon claim attributable to DLI's work under the written, lump-sum contract.  Allegheny's memorandum in support of its motion lists the aggregate "back charge" amount as $196,509.99, the amount it paid DOL.  (*See* Def. Mem. Supp. Mot. 6.)  DLI, however, calculates the "back charge" amount as $164,834.83.  (Pl. First Consol. Mem. 14.)  Nothing in either party's evidence permits the Court to determine what portions of these aggregate values are attributable to DLI's lump-sum contract and to its T & M work, respectively.   Moreover, the parties have not made clear to the Court whether Allegheny has actually withheld funds from DLI based on its asserted right of "back charge," and if so, in what

---

[15] Although DLI asks the Court to "reform" the contract, "reformation is available [only] when there is an error in reducing the agreement of the parties to a writing."  *Isaac*, 647 A.2d at 1163 n.10.  This doctrine is inapplicable to the oral T & M contract.

amount.  Plaintiff's complaint does not parse its damages demand.  Hence, the precise pecuniary

values associated with the Court's determination must also await further briefing.[16]

## CONCLUSION

For the forgoing reasons, the Court concludes as follows:

(1) DLI's request for summary judgment that Allegheny owes it $86,750, plus interest,

under the lump-sum contract must be denied;

(2) DLI's request for summary judgment that Allegheny is responsible for the Davis-

Bacon wage claim – and thus may not withhold funds otherwise owed DLI for its work on the

courthouse project – must be denied;

(3) Allegheny's request for summary judgment that it may properly withhold funds from

DLI based on the Davis-Bacon claim must be granted as to the amount attributable to DLI's work

under the lump-sum contract, and denied as to the amount attributable to DLI's T & M work; and

(4) Allegheny's request for summary judgment that it need not pay DLI's February 9,

2006 invoice in the amount of $191,727.46 must be granted.

---

[16] In its motion for partial summary judgment, DLI also seeks $300,000 allegedly due under a "post-project reconciliation agreement."  (Pl. First Consol. Mem. 14.)  But even construed liberally, DLI's complaint alleges neither a settlement agreement nor its breach.  DLI may not properly seek summary judgment for damages it has not pleaded.  Anticipating this result, in the last substantive sentence of its second consolidated memorandum, DLI requests leave to amend its complaint.  The proper procedural vehicle for such a request would be a motion for leave to amend, not a reply brief.  *See* Fed. R. Civ. Pro. 15(a)(2); Local Civil Rule 7(I).

In a similar vein, DLI's second consolidated memorandum adds a request for summary judgment as to the amount still owed on certain disputed T & M work tickets.  (*See* Pl. Second Consol. Mem. 30.)  This ground does not appear in DLI's motion, and the parties have not briefed the issue.  Hence, the Court declines to consider it at this time.

A separate order shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, March 31, 2008.